```
 1                      UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF OHIO
 2                           EASTERN DIVISION

 3      ------------------------------X
        UNITED STATES OF AMERICA,      :  Case No. 1:21-cr-491
 4                                      :  Cleveland, Ohio
                   Plaintiff,           :
 5                                      :
             v.                         :  Monday, July 8, 2024
 6                                      :  12:04 p.m.
        PAUL SPIVAK, et al.,            :
 7                                      :
                   Defendants.          :
 8      ------------------------------X

 9

10           TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS

11            BEFORE THE HONORABLE J. PHILIP CALABRESE

12                  UNITED STATES DISTRICT JUDGE

13

14

15      Court Reporter:          Donnalee Cotone, RMR, CRR, CRC
                                 Realtime Systems Administrator
16                               United States District Court
                                 801 West Superior Avenue
17                               Court Reporters 7-189
                                 Cleveland, Ohio 44113
18                               216-357-7078
                                 donnalee_cotone@ohnd.uscourts.gov
19

20

21

22

23

24      Proceedings recorded by mechanical stenography, transcript

25      produced by computer-aided transcription.
```

```
 1     APPEARANCES:

 2

 3     For the              ALEJANDRO A. ABREU
       Government:          Assistant United States Attorney
 4                          801 West Superior Avenue
                            Suite 400
 5                          Cleveland, Ohio 44113
                            216-622-3620
 6                          alejandro.a.abreu@usdoj.gov

 7     For Defendant        DAVID L. AXELROD, ESQ.
       Paul Spivak:         LAUREN W. ENGELMYER, ESQ.
 8                          Ballard Spahr LLP
                            1735 Market Street, 51st Floor
 9                          Philadelphia, Pennsylvania 19103
                            215-665-8500
10                          daxelrod@ballardspahr.com
                            lengelmyer@ballardspahr.com
11

12     For Defendant        JOHN F. MCCAFFREY, ESQ.
       Olga Smirnova:       IZAAK HORSTEMEIER-ZRNICH, ESQ.
13                          Tucker Ellis LLP
                            950 Main Avenue
14                          Suite 1100
                            Cleveland, Ohio 44113
15                          216-592-5000
                            jmccaffrey@tuckerellis.com
16                          izaak.horstemeier-zrnich@tuckerellis.com

17

       For Defendant        MICHAEL J. ROSEN, ESQ.
18     Christopher          Michael J. Rosen, P.A.
       Bongiorno:           100 S.E. 2nd Street, Suite 3400
19                          Miami, Florida 33131
                            305-446-6116
20                          mjr@mjrosenlaw.com

21

22

23

24

25
```

```
 1              AFTERNOON SESSION, MONDAY, JULY 8, 2024

 2                   (Proceedings commenced at 12:04 p.m.)

 3                              - - -

 4              THE COURT:  Good afternoon, everyone.

 5         We are on the record in Case Number 1:21-cr-491,

 6    United States of America v. Paul Spivak, and others.

 7         Counsel, will you please state your appearances for

 8    the record.

 9              MR. ABREU:  Good afternoon, Your Honor.

10         Assistant U.S. Attorney Alex Abreu for the

11    United States.

12              MR. AXELROD:  And good afternoon, Your Honor.

13         David Axelrod and Lauren Engelmyer on behalf of

14    Paul Spivak.

15              MR. McCAFFREY:  Your Honor, good afternoon.

16         John McCaffrey and Izaak Zrnich on behalf of

17    Olga Smirnova.

18              MR. DeVILLERS:  Good afternoon, Your Honor.

19         Dave DeVillers and Billy Martin on behalf of

20    Mr. Scott.

21              MR. ROSEN:  Good afternoon, Judge.

22         Michael Rosen on behalf of Chris Bongiorno.

23              THE COURT:  Well, good afternoon, everyone.

24         There's a number of items on my agenda.  There may be

25    a few other things you all want to raise.
```

1    So let me kind of go through what I have on my list,

2    and then we'll address anything else that we need to at this

3    point.

4    So first, at the outset, let me say, there's several

12:05:21  5    filings that various parties have made.  The one that I have

6    not read and have not prepared to deal with today as a

7    result is the motion from the United States for

8    reconsideration on the dismissal of Counts 48 and 50.  I've

9    simply not had a chance to read that at this point.  In

12:05:42  10    large part, that's because I spent the last week in

11    temporary restraining order proceedings, getting that ruling

12    out last night.  So my calendar's opened up a little bit

13    today.  So I will turn to that promptly and get to it, but I

14    just have not had the opportunity to do that yet.

12:06:06  15    There were submissions regarding *Jencks*, *Brady*, and

16    *Giglio*, which I have read.  But I'm happy to hear from each

17    of you on those issues.  And perhaps it makes sense to take

18    them one at a time.  I have them in that order, but it might

19    make sense to take them in a different order.

12:06:31  20    So, Mr. Abreu, happy to hear from you first on those

21    issues, since, you know, the order of briefing has basically

22    been United States followed by the defendants.  And I'm

23    happy to have you respond to anything that they raised, or

24    put any other issues or the like on the table from the

12:06:50  25    perspective of the Government.

1          MR. ABREU:  Thank you, Your Honor.

2          Yes, Your Honor.  In terms of our -- the second notice

3    of discovery status, which was filed to notify the Court

4    relative to some of the deadlines in that second pretrial

12:07:08  5    and trial order, that had called for certain disclosures

6    being made by the end of the month.  And I think we asked

7    for a little bit more time, and the Court graciously granted

8    that.  And so it was just to inform the Court that we, in

9    our view, had complied with what the Court had ordered, and

12:07:28  10    had provided, I think importantly, the reverse proffer to

11    the defendants in terms of a presentation of what we thought

12    was some of the most germane evidence, our theory of the

13    case, and had done that by the -- in the timeline that the

14    Court had ordered.

12:07:54  15          Of course, sort of programatically, the

16    U.S. Attorney's Office, it's, I think, careful and wanted to

17    express that, you know, we -- because in this case, we have

18    always said that we were happy to do those kinds of meetings

19    and have those kinds of meetings.  And I think even before

12:08:19  20    we did this last reverse proffer for all of the defendants,

21    we had met with several defendants and had those meetings.

22          We just wanted to make sure that there was a notice of

23    their -- for the Court's view, on what -- to specify what we

24    did and what we didn't do, and why we didn't interpret the

12:08:40  25    Court's order in a certain way for other legal reasons.

1       The -- Your Honor, the issues raised by Mr. Spivak and

2   Ms. Smirnova in their response, I'll have to say are the

3   first time that I've heard these specific requests in terms

4   of favorable letters sent by victims, notes from FBI

12:09:08  5   interviews that are favorable to the defendants from

6   employees of the company, and a request for all of the, you

7   know, plea agreements and other documents relative to

8   cooperators that may or may not testify in the case.

9       I think we're happy to work that -- those issues out

12:09:29 10   with the defense.  I don't think there is as much daylight

11   between our positions as they might -- as they might worry

12   that there are.  I think -- and I think everybody can

13   appreciate that the United States has, from our view, some

14   legal obligations, and there are sort of legal timelines in

12:09:59 15   terms of when those disclosures have to be made.

16       And so I try not to promise in excess of those

17   timelines, but with the full knowledge and -- that, you

18   know, we will make disclosures earlier than, you know, after

19   a witness testifies or the day before.  But that is the

12:10:16 20   minimum.  And the United States, in general, resists efforts

21   to have that timeline dictated by the defendants to do it.

22       And so that's the only issue I would take with the

23   defendants' response, is its request that the Court order by

24   certain dates that it turn over *Jencks*, or that it views the

12:10:49 25   materials that it calls out as *Brady* or *Giglio* -- really, as

1    *Brady* or *Giglio*.  They're *Jencks* materials.  These are -- if

2    any of these things exist, they are memorializations of

3    statements made by third parties.

4        And to the extent that they're, you know, favorable to

12:11:08  5    the defendants -- again, first time I've heard about it.

6    I'm not aware of any particular letter that, you know, I'm

7    withholding that says any particular defendant is, you know,

8    completely innocent, and they didn't do this.  But I'm happy

9    to look through that stuff.  That's not really an issue.

12:11:24  10        So I guess that's really, in terms of the discovery

11    status, where we stand.

12                    THE COURT:  All right.  Thank you.

13        Mr. Axelrod, happy to hear from you first on the

14    issues, unless you want to hand that football off to

12:11:44  15    somebody else.

16                    MR. AXELROD:  No.  I'll start.  And I'm

17    certain that Mr. McCaffrey will fill in for everything that

18    I've missed or didn't do a good enough job explaining.  But

19    with all due respect to Mr. -- Assistant United States

12:12:00  20    Attorney Abreu, I think there is some daylight here.

21        I mean, when we saw this second notice of discovery

22    where it says in no uncertain terms, the Government believes

23    any *Brady* material would have been produced by the Court's

24    deadline of June 30th, 2023, I mean, I was pretty shocked,

12:12:17  25    actually.  Because we are aware of both investor victim

1    witnesses and USLG employee witnesses who have spoken to the

2    FBI, and, you know, listen, under Mr. Abreu's

3    characterization, I'm not sure that anyone has told the FBI

4    that all of the defendants are completely innocent and this

12:12:35   5    case should go away.  But we do know that they have made

6    favorable statements about USLG, about Mr. Spivak and

7    Ms. Smirnova, and perhaps, other favorable things.

8         And so we don't take a narrow --

9              THE COURT:  I guess one of the questions --

12:12:49  10    and I apologize for interjecting on that particular example.

11    I know it's not the only one you gave.

12         But are those statements that go to trial evidence?

13         It seemed to me that they go more to mitigation at

14    sentencing, if we get to sentencing.  But, I mean, I don't

12:13:07  15    know what they might be.

16              MR. AXELROD:  Well, Your Honor, I think the,

17    you know, Government's taken a position that selling

18    securities in USLG is a fraud, right?

19         So, perhaps, a defense to that could be that selling

12:13:21  20    securities in USLG is not a fraud because people who were

21    investing got the shares that they were promised and got

22    shares in a company that is both real, significant, and a

23    real ongoing business.

24         And I think that witnesses who have knowledge -- who

12:13:38  25    would testify about that ongoing business and about the good

1    faith of both Ms. Smirnova, Mr. Spivak, and others at USLG,

2    of course, go to intent for the crimes that are charged.

3              THE COURT:  All right.  Sorry.  I interrupted

4    you.

12:13:54  5              MR. AXELROD:  No, that's okay.

6         But so that's the first thing.

7         The second thing is that evidence of bias, of a

8    witness's bias is *Brady*.  I mean, this is settled law.  And

9    here we have, I suspect, though I haven't seen the

12:14:15  10   Government's witness list, I suspect it's going to contain

11   other defendants who have been charged in this case who have

12   received promises from the Government, who may have criminal

13   records, who may have been sued by -- for other things that

14   call into question their credibility.

12:14:30  15        I think there are going to be witnesses who are not

16   sued by the Government but were given leniency or other

17   promises of nonprosecution for their testimony.  And all of

18   that goes to -- goes to *Brady*.  And we haven't seen any of

19   that.

12:14:45  20        And I don't know -- I guess I'm not sure of why we

21   would have ever had to request *Brady* and *Giglio* and

22   information about a Government witness's bias or those

23   things.  But to the extent we haven't asked for them, I'm

24   certainly making it clear, we're asking for it now.  And I'm

12:15:08  25   shocked that we haven't got it.

1       But those are quite different -- then I'll move to the

2   second part of our response -- than the *Jencks* issue.

3       Now, the Jencks Act says what Jencks Act says, and

4   we're all aware of what that is.  But Your Honor has his

12:15:26  5   rules, which suggests that the Government provide *Jencks* as

6   early as possible.  And then we have a court order from the

7   Court that says by July 22nd, the Jencks Act material should

8   be provided.

9       And, you know, I know that the Government takes a very

12:15:38 10   black and white view of what the law is, saying that the

11   Jencks Act says you can get it after the witness testifies

12   at trial, which, of course, would lead to a trial that

13   could -- I don't know how a trial like that would happen.

14   We'd have to take huge breaks, and the jury would be put

12:15:55 15   out, and it wouldn't be an efficient use of the Court's or

16   the jury's or the lawyers', or the parties' time.

17       But here we have a Court order, and there are courts

18   across this country who have said that there are other

19   constitutional issues in play besides the Jencks Act, which

12:16:09 20   is a statute put forth by Congress.  And these things all

21   work together.

22       And I don't think we're asking for something crazy

23   saying, "Can we have statements of what witnesses in a

24   sophisticated, complicated white-collar case may say three

12:16:26 25   weeks before trial so that we have the ability to

1    effectively represent our clients and can track down

2    relevant material, things that those witnesses may say,

3    things that they've said that are favorable to our clients

4    so we can prepare those?"

5    I've just -- I've never been put in a position like

6    this where I'm having to fight for *Jencks* materials in a

7    case that doesn't involve credible threats to witnesses'

8    safety.  It just -- I find it a little surprising.

9    So that kind of takes us through the discovery issues

10   that were briefed.

11   I have another -- I should say that Mr. McCaffrey and

12   I have another couple discovery issues that have not been

13   briefed.  But I didn't want to move on to those until

14   everyone has had a chance to speak to these issues.

15                  THE COURT:  All right.  Mr. McCaffrey.

16                  MR. McCAFFREY:  Just to supplement what

17   Mr. Axelrod said, about two weeks ago, Your Honor, we did

18   get about 4,000 pages of documents from the Government.  And

19   I guess we were anticipating that at least in there, there

20   would be some of the *Brady* and *Giglio* material.  But as has

21   been referenced, for example, you know, we've only been able

22   to obtain one codefendant's plea agreement.

23   As it's this Court's practice, as well as other

24   members of the Court, the plea agreements are not filed

25   until the time of sentencing.  But that certainly doesn't

1    preclude the Government from producing those.  We have a

2    protective order in this case.  We had anticipated that

3    those plea agreements would be within those 4,000 pages, and

4    some of the other material that Mr. Axelrod has addressed,

12:18:04  5    but it was not.

6         On the -- on the issue of the *Jencks*, my concern,

7    Your Honor, is -- because I've had this happen with the

8    office before -- is that right on the eve of trial, we're

9    going to get a dump of 302s, not just for those witnesses

12:18:25  10   that are going to testify, but also for all the other

11   individuals that may have been interviewed in connection

12   with the case as somehow satisfying the *Brady/Giglio*

13   obligation on the eve of a trial.

14        And just to echo what Mr. Axelrod said, you know, some

12:18:46  15   of these -- some of these witness 302s, because it may have

16   involved several different interviews over the long time

17   span of this case, could be, you know, 30, 50, 70 pages

18   long.  And because they're just a continuous chronological

19   summary of the different interviews, and we may -- we may

12:19:14  20   well be coming to the Court and asking for time to be able

21   to go through that material, especially if we're getting it,

22   you know, into the wee hours of the night before.

23        I do -- and as Mr. Axelrod said, there are some other

24   issues in the second notice of discovery status if you want

12:19:36  25   to address those.

1          THE COURT:  All right.  Thank you.

2          Mr. DeVillers, is there anything to add?

3          MR. DeVILLERS:  Yes, Your Honor.

4          Mine is probably more fact-specific.  But in the -- my

12:19:49  5  fear is that some of the 16(a)(1)(B), that is, my client's

6  statements, are somehow being considered *Jencks.*  And I say

7  that because of the last tranche of discovery we provided.

8          In that discovery was an email chain with Mr. Church,

9  who is, I'm assuming, a cooperating codefendant.  He was

12:20:11  10  originally indicted with Mr. Scott.  Where there are

11  statements from my client that we just got, we've never had

12  that before, and in that particular tranche, within the

13  inventory of discovery, it says there's other emails from

14  Mr. Church, which aren't in discovery.  Mr. Abreu is working

12:20:30  15  with us on those getting us those.

16          But my fear is that we're going to get -- I'm going to

17  get my own client's statements through emails of either

18  Mr. Church or Mr. Mallion, or any other codefendant, or

19  anybody, that we haven't been provided yet.  And this is

12:20:47  20  discoverable information that we should have gotten a long

21  time ago.  I know Mr. Church is relatively new to the game,

22  but not that new.  And if in the next, you know, three or

23  four weeks were spent reviewing thousands of emails, that

24  concerns me.

12:20:59  25          THE COURT:  All right.  Thank you.

1          Mr. Rosen.

2               MR. ROSEN:  Judge, the only point I wanted to

3     add is that on the *Giglio* issue, rather than just simply

4     accept the information that the Government gives, certainly

12:21:12  5     on the eve of trial, we ought to have the opportunity to

6     investigate the information that's contained in the *Giglio*

7     and not just rely upon what information the Government is

8     providing.  So that the timing of providing that information

9     becomes very critical.

12:21:28 10          So I'm asking the Court to entertain an order that

11     directs the Government to forthwith provide this *Giglio*

12     information on all of its witnesses so the defense has the

13     opportunity to investigate the information, and the

14     information behind what the Government is giving us.

12:21:46 15               THE COURT:  All right.  Thank you.

16          Mr. Abreu, I'm happy to have you address any of those

17     concerns if you feel the need to do so or care to do so.

18               MR. ABREU:  Yes, Your Honor.  Thank you.

19          I guess with respect to, I think, probably the

12:22:01 20     clearest issue, which is what Mr. DeVillers has raised

21     relative to the emails with Mr. Scott, I believe we

22     disclosed four or five emails that weren't received through

23     the normal discovery process, or as part of the

24     investigation.  And admittedly, they weren't provided sort

12:22:25 25     of immediately when the Government received them.  But their

1   existence and the contents, at least generally, were

2   discussed with counsel at the time that the issue of these

3   emails, when we came into possession of those emails, the

4   concerns we had relative to the communications between

12:22:47  5   Mr. Church, Mr. Scott, and Mr. Spivak were made known to

6   Mr. DeVillers and Mr. Martin, and also to Mr. Spivak's, I

7   think, prior counsel.

8        And I think I can fairly say that I'm aware that the

9   defendants have those emails.  Despite us having those

12:23:11  10   emails and providing them, I think they have them

11   independently.  But obviously, we provided what we had

12   available to the prosecution team.  I think there are other

13   emails that may involve privilege issues, and that is not

14   available to the prosecution team, so I don't have it to

12:23:27  15   turn over.

16        I know that the -- that defense counsel, I guess,

17   should have been contacted by other folks in our office who

18   are handling those issues, and we'll work through them.

19        But I guess to Mr. DeVillers' main concern, there

12:23:45  20   isn't another tranche of -- I don't consider a defendant's

21   statements *Jencks*.  It's discoverable under Rule 16, and,

22   you know, the notes, the 302s, even though that's

23   technically a statement of the agent, we provide all of that

24   up front as part of Rule 16.  These emails are no different.

12:24:05  25   And so there isn't a surprise tranche of documents being

1    held the day before trial as part of *Jencks* or anything.

2         I guess the issues the defendants are raising relative

3    to *Jencks*, it seems a bit premature.  I think I've

4    represented to the Court what the Government's, in these

12:24:30    5    types of cases, what our typical practice is, and have tried

6    to sort of delineate that from -- you know, we've recognized

7    that us following the, you know, the taking the maximum

8    amount of time that the law permits to disclose these

9    materials would be disruptive to the trial.  And we have no

12:24:51   10    intention of doing that.  It's just a position -- you know,

11    the timing of those disclosure are essentially up to our, I

12    think, you know, thoughtful discretion.  It's not sort of a

13    random decision.

14         There have been issues relative to witness tampering,

12:25:13   15    at least, you know, the way we see it, and I know that's a

16    disputed -- that's a disputed issue, obviously.  But there

17    are concerns, and there are concerns for cooperators, should

18    they exist.  And frankly, it's also premature because we

19    haven't designated our witnesses.

12:25:38   20         Obviously, there are lots of things sort of influx

21    with the case right now.  We're asking the Court to

22    reconsider some of its rulings, and that would

23    necessarily -- could change or will change how the

24    Government presents its case and what witnesses it decides

12:25:55   25    to put on.

1          So in order that -- you know, if we were having a

2     final pretrial on the 22nd, and none of the *Jencks* had been

3     disclosed, as to the Court's suggestion, maybe that would be

4     a more appropriate time to discuss that we haven't taken the

12:26:16  5     Court up on its suggestion that we -- you know, its strong

6     suggestion that we turn over that material by that date.

7     But we're not there yet.  This is the 8th.

8          And the information and the law, the argument that's

9     made out in the Government's notice is simply it wanting to

12:26:40 10     be clear as to what it believes its legal obligations are,

11     and -- but, obviously, the realities on the ground are that,

12     you know, we don't intend to wait until a witness -- you

13     know, absent some other circumstance, we don't intend to

14     wait until a witness testifies to turn over *Jencks*

12:27:02 15     materials.  So I don't think that's necessary.

16          And I think those were mainly the two issues.

17          In terms of, you know, ordering the Government to turn

18     over *Giglio* forthwith, again, we haven't identified our

19     witnesses that would be definitely coming to any trial.  So

12:27:28 20     that's kind of impossible for us to do.

21          But we know what those materials are.  And I'm happy

22     to take a look at the materials that Mr. Spivak and

23     Ms. Smirnova, that their counsel have highlighted, the

24     letters and notes and documents for cooperators.

12:27:49 25          Obviously, you know, we want to be as cooperative

1    and -- as possible.  There's no need to hide the ball on

2    things.  And so, you know, happy to talk to them about it.

3    Obviously, we haven't had -- I didn't have a chance to look

4    into all of these things having seen it for the first time

12:28:14  5    in this response.

6              THE COURT:  Well, you raised one of the issues

7    I wanted to ask you about, and that was concerns about

8    witness tampering and so forth.

9         My view on that is to the extent you have any material

12:28:31  10    that you have concerns about ultimately disclosing in that

11    regard, I would encourage you to submit it for in-camera

12    review sooner rather than later, as soon as this week, just

13    given everything on my plate, and I can get through it and

14    make decisions about whether I think there's that concern.

12:28:47  15        I mean, obviously, you're closer to that, and I give

16    appropriate deference, notwithstanding the end of the recent

17    Supreme Court term to the executives' judgments in that

18    regard.

19        But I think to the extent those are legitimate issues

12:29:05  20    and concerns, and I agree with you that to some extent, at

21    least, they are present or potentially present in the case,

22    so I don't take that lightly here.  But given that that's an

23    issue, I think the sooner I can get some of those materials

24    and start working through them, the better I can help you,

12:29:24  25    and by extension, all of you, on that front.

1          The other thing I would say for the moment is that

2     there were some specific documents that were highlighted in

3     the briefing and that were raised again in our discussions

4     this afternoon.  What I would say there is, between now and

12:29:48  5     July 22nd, I'd ask counsel to be working together on that.

6          I think, Mr. Abreu, that's already on your to-do list

7     based on your comments.  But I will request an update on

8     where that stands at that point in time.

9          And I will just encourage all of you, I think that

12:30:10 10    it's probably -- I don't want to say -- I'm going to say

11    this, and I don't -- take me seriously and not literally on

12    this one, you can't communicate with each other too much on

13    those issues.  Now, obviously, you can at some point.  But I

14    think you need to be communicating on these issues over the

12:30:34 15    next couple of weeks to move them forward.

16          It sounds like there might be some other issues on

17    discovery.  But not sure what those might be.

18               MR. AXELROD:  Your Honor, if I could just add

19    one more thing just very quickly.

12:30:52 20          When it comes to *Jencks*, you know, I won't speak for

21    all the defendants' counsel, but we're not seeking a huge

22    amount of materials.  There are a discrete number of

23    witnesses.  I mean, we're talking theoretically on this

24    conversation, but we all know there are a discrete number of

12:31:09 25    the witnesses, largely the codefendants, who have plead

1    guilty, and it looks like they have cooperation agreements

2    with the Government in this case.

3         And really, what -- and this goes to what

4    Mr. McCaffrey said.  It is very likely that the Government

12:31:23  5    has spoken to those witnesses multiple times and that the

6    FBI 302s and other materials will be quite voluminous.

7         And I find it incredulous that the Government has not

8    identified that it intends to call those people as witnesses

9    in this case, despite giving them cooperation agreements.

12:31:44  10   And I do not think that there's any reason that the

11   Government cannot be prepared to produce those *Jencks* --

12   *those Jencks* materials for those discrete set of

13   witnesses -- we all know who they are -- very quickly.

14        And then one other thing -- and I'll take the

12:32:00  15   Government for their word and what they write.  In their

16   second discovery notice, they say that they expect to turn

17   over *Jencks* material at a minimum on or before the day

18   before each witness testifies.  That's what they wrote.

19        And if that's going to be the case, and we're going to

12:32:16  20   get a dump of *Jencks* materials, you know, before the first

21   day of trial and then going through trial, I just think it's

22   going to be -- I do believe that that is a -- that's going

23   to be a violation of our clients' constitutional rights to

24   counsel and to due process.  And we will be asking the Court

12:32:33  25   for long recesses so that we can research what's in these

1    *Jencks* materials.  And I think that's completely an

2    untenable way to run a trial, especially one where, you

3    know, I do not think that there are credible issues of

4    danger to the named cooperating defendants in this case who

12:32:51  5    everyone has known about for -- since 2021.

6        But with that said, you know, I'm quite happy to move

7    on now.

8            THE COURT:  I guess I'll only add one issue.

9    Although, somebody, I think, was about to speak.  Sorry to

12:33:06 10   interject.  I'm not sure who that was.

11           MR. ABREU:  Oh, no, Your Honor.  It was just

12   me.

13           THE COURT:  Go ahead.

14           MR. ABREU:  I'm thinking through at a minimum

12:33:14 15   and at a maximum, and I don't know if I chose the right

16   word.  But the latest we would turn it over is what the --

17   you know, at the deadline that the Court -- or that the law

18   requires.  And I think we've been clear that that's not the

19   way we expect the vast majority of this information -- the

12:33:33 20   timing of this information to go through.  But in terms of

21   what legal obligations we have, you know, that's the latest

22   we would turn this information over.

23           THE COURT:  So I'll only add a couple of other

24   things.

12:33:49 25       First, to follow up on that point, I think the

1     Government's position is clear to me.

2          Second, I'll just put on the table, I do think that

3     there are other considerations that come into play under the

4     Sixth Amendment.  For example, in the fairness of the trial,

12:34:12  5     I don't think, based on what I know right now, that as we

6     sit here disclosure of, you know, *Jencks* tomorrow, or on the

7     22nd would be a problem.

8          However, I think that there is the potential for that,

9     as we wait in a trial of this complexity and so forth.

12:34:35  10     And I will add as well that the trial's already

11     expected to take a considerable amount of time.  And my

12     objective as a judge, in addition to making sure that each

13     of you and your clients receive a fair trial, is to maximize

14     every minute of the workday possible for the jury to be in

12:35:06  15     the box.

16          In my experience, they want to be in the box more than

17     out of the box, even if that means taking very short lunch

18     breaks.  Pack accordingly.  And I think that the extent,

19     later disclosures of any materials are going to interfere

12:35:26  20     with that, we're going to run into just trial management

21     problems very quickly, and I want to do everything I can to

22     avoid that.

23          But I think we've said everything there is to be said

24     at the moment on that, and do have some immediate short term

12:35:46  25     work on a to do, and consistent with the orders that, I

1    believe it was Mr. Abreu who referenced them, we'll sure be

2    talking more about these issues in a couple of weeks.

3        But turning to other discovery issues, then, I'm not

4    sure exactly what those might be, or whether they're ripe or

12:36:05 5    so forth.  And since they weren't briefed, I'm not sure

6    Mr. Abreu even knows what they were.  But I'm happy to hear

7    what they might be.

8            MR. MCCAFFREY:  Judge, John McCaffrey on

9    behalf of Ms. Smirnova.

12:36:18 10        This next issue Mr. Abreu is aware of.  We were just

11   made aware of it in the Government's second notice of

12   discovery status report that was filed on June 20th.  And at

13   page 2 of that filing, Docket Number 334, there was

14   reference made to the production that I alluded to earlier

12:36:41 15   that the Government made on June 14th, and then it -- that

16   the filing then states "That voluntary effort is ongoing, as

17   the Government continues to identify likely exhibits in

18   advance of trial and evidence from the data extracted from

19   computers seized during the execution of a search warrant at

12:37:04 20   USLG's offices."

21        So this is the first that we've been put on notice

22   that the Government intended to go back to those devices and

23   review and use information from those devices.

24        Now, I want to remind the Court, because some of the

12:37:22 25   counsel weren't involved at that time, but we've ordered the

1    transcript from the proceeding before the Court back on

2    October 24th.  And I can take you to exactly that exchange

3    between the Court and Mr. Abreu about those materials.  And,

4    I mean, he made it very clear that, you know, if they did

12:37:47  5    intend to go back and start looking at those materials, that

6    they would -- you know, that they would make them available.

7         I can -- I'd like to take the Court -- with the

8    Court's indulgence, show on the screen exactly what the

9    statement was.

12:38:06 10                    THE COURT:  All right.

11                    MR. McCAFFREY:  Okay.

12                    THE COURT:  Or you can -- what is the ECF

13    number of the transcript while you're bringing that up?

14                    MR. McCAFFREY:  Yeah.  The -- that is number

12:38:17 15    342.

16                    THE COURT:  342.  All right.  Thank you.

17                    MR. McCAFFREY:  Yes.  And it's starts -- the

18    relevant portion starts on page 13.

19         And this is when the Court was considering, you know,

12:38:30 20    the issue of all the -- that ESI that had been seized.

21                    THE COURT:  Right.

22                    MR. McCAFFREY:  And it -- you know, the Court

23    was even throwing out the idea at the bottom of page 14 --

24    yeah, right here.  "To prepare a witness/exhibit list, but

12:38:59 25    if you give me both of those in a reasonable period of time,

1    that may facilitate some of the defendants' review."

2         And this is where Mr. Abreu then indicated that -- you

3    know, that they're in possession of 20 devices.  "If we do

4    end up pulling some of the data off the 20 devices for

12:39:22  5    trial, we would provide it to the defendants, to TopDocs,

6    and identify where they came from.  But right now, there's

7    not one piece of data, not one document that comes off those

8    20 devices that we would use at trial.  Everything else has

9    been provided."

12:39:39  10    So we are now being told on June 20th that it appears

11    that the Government's going back to one or more of the

12    devices, which, since this assurance was made back in

13    October of 2022, we have not focused on those -- on those

14    devices whatsoever.  And we don't know what's coming.

12:40:05  15            THE COURT:  All right.  Mr. Abreu, happy to

16    have you speak to those issues.

17            MR. McCAFFREY:  One point, Your Honor.

18            THE COURT:  Oh, yeah.

19            MR. McCAFFREY:  We did have -- we did make an

12:40:15  20    attempt to have an exchange with Mr. Abreu on this issue.

21    There were some email exchanges with Ms. Engelmyer on

22    July 2nd, and Mr. Abreu responded on July 3rd.

23         In his email he says, "I told the Court and the

24    defendants that if we identified materials we would be using

12:40:35  25    as part of our case-in-chief, we will voluntarily identify

1    those for the defendants in advance of trial."

2         Again, Your Honor, this is the first time now we're

3    being advised that they've even gone back to those devices

4    to look for materials, and/or that they're going to use

12:40:54  5    documents from those seized devices in this trial.

6              THE COURT:  All right.  Thank you.

7         Happy to have you respond, Mr. Abreu.

8              MR. ABREU:  I have to choose my words

9    carefully so that they don't end up on the screen next week.

12:41:15 10         Thank you, Your Honor.

11         I don't think I said anything different at that

12    hearing.  I didn't have the benefit of the transcript when I

13    responded to Ms. Engelmyer.  But my recollection of what I

14    said, I think, matches up with what Mr. McCaffrey put up on

12:41:30 15    the screen, which was that, although I can't commit to it at

16    this point -- and that was over a year ago.  That was in

17    2023 -- that we weren't going to use any of the information,

18    any of the data from those computers.

19         But right at that point, there was no intention to.

12:41:49 20    And if there was information off of those computers -- and I

21    think what I put in the notice was from the data extracted

22    from the computers seized during the execution of the search

23    warrant at USLG's offices.

24         So this is the data that was provided in discovery,

12:42:06 25    not even whatever else is on the computers that we gave

1    defendants access to, but they didn't want the images

2    themselves, the FTK images.  That if we were going to use

3    anything from that production, that we would specifically

4    call it out.

12:42:26 5        And I think that I represented that because I

6    recognized that it was a lot of loose data, so to speak,

7    from 20 different computers.  And so I don't intend on

8    surprising the defendants.  But I don't think that I said we

9    are never looking at these computers, and as soon as we look

12:42:48 10   at these computers, that we had, you know, lawful authority

11   to seize and search, that we would notify you so that you

12   could start paying attention to them.

13        They -- the defendants asked for that data, and we

14   provided it.  I -- whether they looked at it or not, I guess

12:43:05 15   it's -- you know, that's their strategy.  But I merely put

16   in our notice what I mentioned we would do.  If we did

17   identify evidence extracted from the computers, we plan to

18   specifically call them out.

19        The data has the metadata to allow us to inform the

12:43:29 20   defendants which computer item that came from.  They have

21   the map of the -- from the search of the offices, and they

22   will be able to match the computer to the specific location

23   where it was seized from, and -- but, you know, presumably,

24   they know who worked in those spaces and will know whose

12:43:52 25   computers they are.  There might be other data in the

1    computers that would identify that user as well.

2        But, again, I think what I've said is consistent with

3    what I said before, which is that we're not trying to

4    blindside them, and that we would call out that information

12:44:07 5    if we were going to use it.

6                    MR. McCAFFREY:  May I respond, Your Honor?

7                    THE COURT:  Sure.

8                    MR. McCAFFREY:  I want to go back to the

9    transcript from October of 2022.

12:44:16 10        Continuing in the same paragraph, Mr. Abreu said, "So

11    in terms of the exhibits at trial, broad brush, it doesn't

12    include any of this," referring to the 20 devices.

13        And I don't know that we have all the 20 devices,

14    Your Honor.

12:44:37 15        He goes on to state that "I think that may answer your

16    question, at least in preparing to counter the Government's

17    evidence, how useful the devices are going to be to the

18    defendants, the time and effort they might want to take to

19    review them.

12:44:54 20        "You know, I'll mention, Judge, that we've offered

21    it -- it's been a few months, I think, since we offered

22    those devices, at least two.  No one's taken us up on the

23    offer, so no one knows what's in them because they haven't

24    looked at them."

12:45:10 25        And I mean, we took the Government at its

1    representation that it was not going to use any -- use any

2    exhibits from those materials.  And certainly, that if that

3    changed, we would be provided with notice, at least as to

4    what devices then we could get copies or confirm that we had

12:45:29  5    a copy of -- I think there were 20-some devices that were

6    seized during that search.

7         So, again, Your Honor, this is the first notice that

8    we got, was back on the filing on June 20th of this year.

9              THE COURT:  On this issue, I'll just say two

12:45:56  10    things, perhaps.

11        So I do remember, for better or for worse, this issue

12    and this series of conferences pretty well.  I do recall

13    quite clearly the representation, which Mr. McCaffrey put on

14    the screen, that these were devices that were at issue that

12:46:17  15    were not likely to be the source of evidence to be

16    introduced at trial.

17        Frankly, that was a fact that entered into the way I

18    approached those issues.  Because if that fact had been

19    different, I might have made different decisions at the

12:46:38  20    time, I might not have.  I just don't know.  I can't,

21    obviously, turn back the clock and kind of work through that

22    all again.  But that did inform how I approached that issue

23    at that time.

24        The other thing I would say is that July 15th is the

12:46:55  25    current deadline for exhibits.  So I think we'll have

1      definitive clarity a week from now on what the Government

2      intends to use from that, if anything.  So that's another

3      issue we can revisit on the 22nd.

4          With some trepidation, I asked if there's other

12:47:15  5  discovery issues you need to put on the table at this point.

6              MR. AXELROD:  Your Honor, just one.  And this

7      is also an issue that --

8              THE COURT:  I thought I heard references to

9      issues, plural, and not just one other one.  But okay.

12:47:26 10              MR. AXELROD:  Just one another one, and this

11      is an issue that we have corresponded with Mr. Abreu about.

12          While preparing for trial, I found one -- at that

13      time, I found one clearly privileged communication between

14      Paul Spivak and a lawyer representing him in an SEC

12:47:46 15  investigation.

16          At that time, we sent a letter to Mr. Abreu asking the

17      following questions:  Where the privileged communication was

18      seized from, who reviewed the privileged communication,

19      whether Mr. Abreu or anyone else involved in prosecuting the

12:48:00 20  case had seen the privileged communication, whether

21      Mr. Abreu or anyone else involved in the case had talked to

22      anyone about the contents of the privileged communication,

23      whether the United States had reviewed other privileged

24      communications, and what steps the Government had taken to

12:48:16 25  ensure that privileged materials were not improperly viewed,

1    seized, or retained during the course of the investigation

2    or prosecution.

3         I sent that letter on June 18th.  Since that time,

4    Mr. Abreu responded, told me he had no answers.  And I've

12:48:32 5    gotten no information from him about any of these issues.

6         Today, I heard some reference to some type of team,

7    but Mr. Abreu never told me about that before.  I suspect

8    that that is a completely new development.

9         But I will tell you that since sending that letter, we

12:48:50 10   have now identified 200 privileged communications that the

11   Government has produced in discovery.  It looks like the

12   Government took no effort whatsoever to protect my client's

13   attorney-client privilege.  And these are germane matters to

14   this prosecution.  They involve communications with lawyers

12:49:08 15   during the conspiracy.  But they also involve communications

16   with lawyers who were representing USLG and Paul Spivak in

17   the SEC's related investigations.

18        And, you know, if I provided these to Your Honor in

19   camera, these are not the type of communication you would

12:49:26 20   say, "Well, okay this -- maybe this is privileged."  These

21   are like, you take a look at the document, this is a -- this

22   is a privileged document.

23        And at this point, I can't get any answers from the

24   Government about what it did to protect my client's

12:49:37 25   attorney-client privilege.  And so, you know, at some point

1    soon, I'll be filing a motion to compel, or some other type

2    of motion.  But since we have you on the phone today, and

3    Mr. Abreu raised this issue previously, I thought it made

4    sense just to tell you where we're at so this won't surprise

12:49:54  5    you when I file a motion to compel because I can't get

6    answers from the Government.

7              THE COURT:  All right.  Thank you.

8         Mr. Abreu, happy to have you speak or decline to do so

9    as you see fit at this point in time.

12:50:06  10              MR. ABREU:  Thank you, Your Honor.

11         Yeah.  I can speak to some of it.  I don't think -- I

12    mean, potentially, the fact that there is a filter team and

13    a filter review might be new to Mr. Axelrod, as the second

14    lawyer on the case for Mr. Spivak.  But I don't think that

12:50:29  15    that was a secret.

16         Mr. Spivak received a copy of his own phone, which

17    indicated that all of the privileged materials from that

18    phone had been removed.

19         There -- the Government has taken steps -- the delay

12:50:48  20    in getting them a response was that I was supposed to be in

21    trial on July 1st and I'm not, thankfully, or I wasn't.  And

22    there are other individuals in our office that are separated

23    from the prosecution team that need to answer some of those

24    questions relative to the one document that Mr. Axelrod

12:51:09  25    referenced.  I don't know anything about the other 199, or

1   who had them and how we got them.

2       I will note that Mr. Spivak sent a lot of

3   correspondence to the SEC, including a lot of communications

4   with his own lawyers, and -- in response to SEC's subpoenas

12:51:29 5   or as part of his correspondence with the SEC for various

6   issues.

7       So I don't know what those documents are.  I don't

8   know exactly what the document is that the defendants

9   mentioned was privileged.  I know it came from a production

12:51:51 10  that indicated it was from a thumb drive that was received

11  from Susan Tubbs, a former employee of USLG.  And that that

12  was provided to us by Ms. Tubbs, and she was represented by

13  counsel.

14      So it's not something that -- that one document, I

12:52:12 15  don't know who was on the -- I didn't even ask Mr. Axelrod

16  or Ms. Engelmyer for sort of the privilege log information

17  you would want, right, who sent it, who it was to and what

18  the subject was.  I simply sent it to our filter -- our

19  filter team, and they will be coming up with a response.

12:52:35 20      In terms of who's looked at it, no one from the

21  prosecution team has looked at it.  I haven't looked at it,

22  the agents haven't looked at it.  And so they'll get all of

23  those -- all of that information.  But, you know, that was

24  part of a production that was made by the United States on

12:52:55 25  June 30th, 2023.  And out of that entire production, there

1    was one document that the defendants have claimed privilege

2    over.

3        And I will say based on just what was included with

4    the discovery letter on the subject of the -- of that email,

12:53:19 5    or at least the document title, there are other

6    communications with that purported attorney that the

7    defendants haven't claimed privilege over.

8        So, again, I don't know what's in there.  I don't know

9    what significance it has.  But to the extent that there's

12:53:38 10   any concern that the Government has not taken steps to

11   protect Mr. Spivak's privilege, I think that's false.  I

12   think the Government has.  And especially in a case where

13   Mr. Spivak is charged with his wife, the Government has been

14   mindful, even of the spousal privilege.  And so we have

12:53:57 15   taken those steps.  I think we'll be able to work that out

16   with the defendants and at least sort of, you know, go

17   through what we've gone through.

18       If there are other documents that they believe are

19   privileged, I would encourage them to let us know in the

12:54:13 20   form of a, you know, log.  Obviously, I don't want the

21   communications.  But if they want to tell us the Bates label

22   and, you know, who it was from, who it was to, and the

23   subject, I'm happy to put them in touch with our filter

24   attorney, and they can -- we can work through those issues.

12:54:31 25   And if there's a problem, then, obviously, they can raise it

1    with the Court.

2         But I'm just not prepared to speak to those issues

3    because this is the first time I'm hearing about them today.

4              MR. AXELROD:  You know, Your Honor, I wrote a

12:54:45  5    letter three weeks ago, and this is the first time I've

6    heard any of this information.  And frankly, none of it

7    makes sense.  The documents that -- we found, you know, over

8    200 privileged documents that are clearly privileged on

9    their face.  So I don't know how those were removed from the

12:55:02  10   production before when we have them.

11        And I guess I'm just at a complete loss because I

12   don't see any protection that was provided to Mr. Spivak's

13   privileged communications.  I'm aware of none.  I received

14   none after receiving a -- writing a letter to Mr. Abreu.

12:55:17  15   And I'm happy to review what those protections are, but I

16   can't seem to get an answer from the Government.

17             THE COURT:  So to me, this is another issue

18   that I think you, obviously, have a lot to talk about and

19   should be communicating pretty constantly in the next few

12:55:38  20   days about to try to run this to ground.

21        Subject to my earlier admonition saying you can't

22   communicate enough about this coming up, but I'll add it to

23   my agenda to ask for an update to July 22nd.  And but

24   otherwise, I don't certainly have any information.

12:56:01  25             You're all still in process, and I certainly have less

1   information than you all.  So I think you need to spend some

2   time figuring it out before I interject myself into that set

3   of issues.

4             MR. AXELROD:  Understood.

12:56:16  5     And that was the last additional discovery issue I had

6   for the Court.

7     Thank you.

8             THE COURT:  All right.

9             Mr. ROSEN:  I guess I'll jump in.

12:56:31 10     Judge, I had one issue, and I, quite frankly, didn't

11   intend to raise it today.  But we're going down that lane,

12   and I don't want it to be how come you didn't say anything?

13   So I'm saying something.

14     And Mr. Abreu and I have been in some brief

12:56:46 15   communications about it.  But I have made a request for a

16   copy of the seized phones and computer devices.  The Court,

17   of course, denied my motion to suppress.  So now that I

18   don't have access to it, I've asked Mr. Abreu.  I gather he

19   has been busy on this other matter.  He did write back and

12:57:04 20   say I just haven't gotten to it yet.  I'm just raising it

21   because we're raising issues.

22     So if Mr. Abreu is able to get back to me on it,

23   that's great.  But I do want it, I guess, on the record that

24   I had made that request by way of a written communication

12:57:22 25   with the Government.

1          THE COURT:  All right.  Thank you.

2          I want to move on to a couple of other issues that I

3     wanted to make sure to address.

4          So there's a motion that the United States filed for

12:57:35  5     reconsideration on severance bifurcation, that broad topic.

6     It's Document Number 339.

7          Mr. Abreu, happy to have you speak to it beyond what's

8     in the motion.  But otherwise, I certainly have thoughts on

9     it.

12:57:54 10          MR. ABREU:  Thank you, Your Honor.

11          Aside from what's in the motion, I don't have much

12     more to say.  I know that I briefly spoke to Mr. McCaffrey.

13     And I didn't have a chance to reconnect with him and

14     Mr. Axelrod and Ms. Engelmyer to get their understanding.

12:58:15 15          I think initially when we received the Court's order

16     for the trifurcation of the trial, I understood it to be a

17     three-phase trial with one jury deciding all three phases.

18     And I believe at the time Mr. McCaffrey thought it was three

19     different juries deciding three different trials sort of

12:58:38 20     back to back.  And I know we both had concerns.  But I won't

21     speak for John.  Maybe his concerns have been allayed.

22          But, obviously, that raises some particular challenges

23     for the United States, which I know the Court has considered

24     some of those challenges, and -- but in light of

12:59:01 25     Mr. Bongiorno's request to -- for a continuance, it would

1      appear that if Mr. Bongiorno were severed from the trial,

2      then the prejudice that at least the Court ruled existed in

3      its order would no longer be present, and we could just have

4      a bifurcated trial with, you know, Counts 1 and 2 together,

12:59:29  5      and then either 49, or any of the obstruction counts, should

6      those be reinstated, or not, right, that that would be

7      handled in the second phase.  And although, again, that

8      creates some complexities, it creates, at least from an

9      evidentiary standpoint, less than bifurcating Counts 1 and

12:59:56 10      2.

11           And I think when -- during argument when we talked

12      about it, Your Honor, at least the United States' approach

13      was -- and what I had given some thought to was relative to

14      Mr. Bongiorno.  And I know that Mr. Axelrod made an oral

13:00:14 15      motion to -- and the Court discussed it in its order -- the

16      oral motion to bifurcate 1 and 2 because it would prejudice

17      a defense, and -- but that wasn't -- I wasn't -- it wasn't

18      clear from the order that the Court found prejudice relative

19      to Mr. Spivak's request for the Count 1 and Count 2

13:00:37 20      bifurcation.

21           And if the Court was inclined to sever Mr. Bongiorno,

22      then we would request, Your Honor, a chance to be able to

23      brief the issues as to why Counts 1 and 2 being tried

24      together does not prejudice Mr. Spivak, and that they should

13:01:05 25      be tried together.  Just because I don't think we fully

1    explored that issue during argument because that's not an

2    issue that was briefed, and the only prejudice that was

3    raised was prejudice to -- a potential prejudice to a

4    defense, which I'm not sure is cured by separating Counts 1

13:01:23  5    and 2, the two conspiracies from each other.

6        And so my intent was to have a conversation with

7    Mr. Axelrod, Ms. Engelmyer, Mr. McCaffrey, and Izaak --

8        Sorry, Izaak.  I wasn't going to try to pronounce your

9    last name right now.

13:01:44  10        -- to see what their positions were on that issue.

11    But I guess that really depends on whether the Court was

12    going to sever Mr. Bongiorno, who, based on the filing

13    Mr. Rosen made, seems to present some good cause for

14    delaying his trial.

13:02:05  15        And so that's why we raise the issue now, just so that

16    it wasn't a surprise to the Court at this juncture, that we

17    would be making that request.

18            THE COURT:  Well, why don't we fast forward to

19    that motion, then, return to this one.

13:02:25  20        So, Mr. Rosen, happy to have you speak to your motion

21    to continue the trial, which I have read, and I've read the

22    supporting documents and exhibits and so forth.  But happy

23    to hear further from you.

24            MR. ROSEN:  Yes, sir.

13:02:39  25        Well, first of all, Judge, thank you for allowing me

1    to file it under seal.  Obviously, it's very sensitive

2    information, and just so the Court knows, I, of course,

3    obtained Mrs. Bongiorno's permission to do that.  That was

4    very important to me.

13:02:57  5         And you may or may not remember, Judge, back on our

6    hearing on April 25th, I -- when we were having -- actually,

7    I think it was outside of everybody else being there, there

8    was an issue with Mr. Bongiorno and pretrial services.  And

9    I actually referenced the fact that I may be filing a

13:03:16 10   motion.

11         This whole situation, obviously, has been going on and

12   known to me, of course.  It's clearly impacted my ability to

13   represent Mr. Bongiorno.  I will say that to the Court.

14   Many days will go by when we're supposed to speak.  And when

13:03:37 15   I finally do hear from him, it's been, you know, my wife's

16   been in the hospital, and, you know, all those things are in

17   there.

18         The hope, of course, is that with the surgery that's

19   now scheduled, I think, for August 6th, that's going to

13:03:52 20   alleviate a lot of her issues.  And then followed up with

21   the protocols and procedures on her spine that all came from

22   this car accident, you know, I didn't know who was going to

23   doubt or challenge it, so I put a lot of stuff in there, the

24   windshield, and the Geico claim, and all of that stuff.

13:04:13 25         So, of course, my request first was, can we continue

1    the entire trial?

2         Obviously, that impacts on everybody.  And I think I

3    received Mr. Abreu's response the day before I was going to

4    file it.  I kept -- as the Court can tell, getting these

13:04:37  5    kinds of exhibits aren't easy, and that was one of the

6    delays.  I kept having to deal with hospital records and

7    doctors' authorizations and so on to get this.  And then I

8    saw Mr. Abreu's comment that how the Government -- how this

9    is impacting on the Government.

13:04:53  10         So my request is that Mr. Bongiorno have his trial

11    either postponed -- and I picked March.  I did that,

12    obviously, for several reasons, Judge, and I'm sure you're

13    scratching your head, like, really?  March?  But I wanted to

14    give the family an opportunity to heal.

13:05:17  15         You know, her kidney issues, which, you know, just

16    layer onto all of this is obviously a chronic situation.

17    And so the hope is that that's going to be far more capable

18    of being dealt with by virtue of having her spine and her

19    chest, the surgeries taking some relief there.

13:05:40  20         So either -- I'm asking the Court to either continue

21    the trial -- and there are certainly enough issues floating

22    around at the moment, discovery issues, or that

23    Mr. Bongiorno gets severed, tried alone, so that these

24    unusual, if not unique circumstances, can be addressed.  And

13:06:00  25    I just -- I guess I want to impact with the Court the fact

1     that Chris has had very little opportunity to really work

2     with me because of all these issues.

3          I also included the child custody issue.  Obviously,

4     not a medical issue.  But I wanted the Court to understand

13:06:17  5     the dynamics of what's been happening with this family for

6     six months.  You know, the perfect storm of horrible things

7     could happen, he's been living it.

8          So I'm asking the Court to, unusual request, to grant

9     either a continuance or a severance.

13:06:34  10          THE COURT:  So let me work backward a bit and

11     preface everything with, it is difficult from where I sit to

12     imagine Mr. Bongiorno and his family dealing with much more.

13     He's certainly got a lot going on.

14          Regarding the custody battle, that's on appeal at the

13:06:55  15     moment, so there's not much to do, in any event.  So I don't

16     really give that all that much weight.  I know it's hanging

17     over the family, as I'm sure this indictment is as well.

18          The schedule -- the surgery, as you say, is scheduled

19     for August 6th.  The trial is currently scheduled to start

13:07:15  20     on August 12th so he would have the ability to be present

21     for the surgery and so forth.

22          The one thing I don't see in the motion papers and the

23     like is any representation even that he's the only person,

24     the only family member, the only friend who is able to

13:07:32  25     provide some support and assistance to his wife as she

1    recovers from surgery.

2              MR. ROSEN:  So let me address that, Judge.

3         Mrs. Bongiorno's father lives with them.  He has had,

4    I think, two or three strokes, and -- because I just did not

13:07:54  5    want to get into his medical issues and layer that in here.

6    Short of that, there is actually nobody else in the family

7    that is capable of taking care of the one-year-old, and, of

8    course, Mrs. Bongiorno at the same time.  His parents live

9    up in the far northeast, and I think they have their own

13:08:22 10    medical issues that they have been attending to.

11         So that's the reason why I didn't add something in

12    there about it, because, you know, I was not unaware of what

13    I didn't include.  But those would have been it.  And

14    because of the medical issues of both sides of those family

13:08:41 15    members, that was the only place they could go.

16         So that was -- that was the primary reason I didn't

17    include it.  But I'm glad the Court raised it because it's a

18    notable factor.

19         But, again, the father would be the one there, but he

13:09:02 20    is physically incapable -- I mean, I've met the man.  He is

21    physically incapable of taking care of her or, of course,

22    the one-year-old.

23              THE COURT:  So one thing I've learned from

24    watching the Browns over the years, it can always get worse,

13:09:17 25    and you just made it worse.  So thank you for that.

1        The one thing I also need to ask you about is

2   Exhibit 8 where it's one of the physicians involved in care

3   and treatment of Mr. Bongiorno's wife indicates that there's

4   a broader support system that she has, that he is one part

13:09:35  5   of that.  So it does sound like there's additional support

6   and resources there to help in that period, where we start

7   trial currently as scheduled on August 12th.

8              DEPUTY CLERK:  So if I remember, Judge, and

9   I've lost my Internet so I can't access a lot of the

13:09:56 10   documents here.

11              THE COURT:  See, it always gets worse.

12              MR. ROSEN:  Workarounds are what we have to

13   do.

14        If I recall Exhibit A, that was, I think, from the

13:10:06 15   original doctor back in 2022.  And that doctor -- well, it's

16   irrelevant.  They switched doctors for a lot of reasons.

17   But to answer the Court's question, I think I have.  It

18   would have been her father, and he is truly incapable of

19   doing it.  So -- and it would have been his parents that

13:10:33 20   have their own medical issues going on, and they live, I

21   think, in Vermont.

22        So we certainly looked at the possibility of having

23   anybody do this.  I mean, that was, obviously, the

24   situation.  And the other part of it was, I think that the

13:10:51 25   nurse, who is a chiropractor who had been treating her, had

1    talked about six months, and I think the surgeon talked

2    about three months of, you know, her not being able to do

3    anything.  So I don't know if the Court wanted me to comment

4    on that.

13:11:10  5         But I mean, the distinction between those two time

6    periods was, the surgeon was looking at it for her own

7    capabilities and what she couldn't do from the surgery.  The

8    chiropractor nurse, registered nurse, was looking at it from

9    a broader time frame of after the surgery, she still has

13:11:33 10   spinal issues to deal with.

11        So there was a broader view from the chiropractor and

12   the nurse than the surgeon, who had a three-month time span

13   of her not being able to lift anything of any significance

14   as she's recovering.

13:11:51 15        So we were talking about -- I'm not sure what the

16   length of this trial is going to be.  I mean, I'm thinking

17   personally, one to two months is my ballpark time frame,

18   when you factor in defendants and defenses and so on.

19        So it was simply not somebody that we had an ability

13:12:11 20   to turn to.

21                  MR. ABREU:  Your Honor.

22                  THE COURT:  Just one second.

23        So the doctor was Amanda Alley in a letter signed on

24   June 19th of this year referencing a broader support

13:12:27 25   network.

```
 1              But I'm not sure who I cut off.  Sorry.

 2                     MR. ABREU:  Oh, Your Honor, sorry about that.

 3         I only wanted to make it worse.

 4                     THE COURT:  Good.  Good.

 5                     MR. ABREU:  And it doesn't exactly go to

 6         Mr. Bongiorno's motion.  But I think I'd incur the wrath of

 7         the Court more than I ordinarily do by waiting too long to

 8         tell the Court that I'm leaving the office soon, before

 9         August 12th, and so the office is in -- we are preparing to

10         transition my responsibilities in this case to another AUSA,

11         or AUSAs.  And I likely would be making a motion to continue

12         independently as well.

13              And I didn't want to wait too long to tell you that,

14         Judge, as you consider Mr. Bongiorno's motion.

15                     THE COURT:  So many questions, but I want to

16         ask them on the record.  But I appreciate the notice on

17         that.  Thank you.

18              Let me put a couple of other things on the table,

19         given that eventuality.

20              First, let me turn back to the original

21         reconsideration motion that we had a little detour on to

22         deal with Mr. Bongiorno and his unfortunate circumstances.

23              But I wanted to make sure, Mr. McCaffrey, Mr. Axelrod,

24         that it sounded like you might have had some discussions or

25         perhaps aborted discussions with Mr. Abreu.  I just wanted
```

1    to make sure that you all were clear on kind of what the

2    proposal I had outlined in the omnibus ruling was.

3              MR. AXELROD:  Yeah, Judge.  This is

4    Dave Axelrod.  I'll just add, I have not spoken to Mr. Abreu

13:14:47  5    about the trial proposal, and ever since you issued it on

6    5-31, we have been engaged in preparation for a trifurcated

7    trial, and have spent great effort doing so.

8              MR. McCAFFREY:  I've had no communication with

9    them.

13:15:08 10        And, Alex, I'm shocked.  Man, I wish -- wish you the

11    best.

12              THE COURT:  So I take it that means you're not

13    going to Tucker Ellis.

14              MR. McCAFFREY:  Having just --

13:15:18 15              THE COURT:  But we don't need to talk about

16    that on the record.

17              MR. McCAFFREY:  Having just stolen one person

18    from the office last month.

19              THE COURT:  The thought crossed my mind, but

13:15:28 20    we don't -- we don't need to have that discussion now.

21        Let me do this.  So here's my view of the

22    reconsideration issue.  And I'll take it in two -- three

23    steps.

24        The first step is just to clarify that, in my view,

13:15:45 25    the jury trial right is to have the case tried to a jury.

48

1    That's one jury.  So I think one jury has to decide all the

2    issues, whether it's at one phase, three phases, or 16

3    phases, or whatever structure ultimately makes the most

4    sense in any given case.

13:16:05  5    In terms of the structure that I outlined in the

6    order, I think there were many factors that went into that.

7    So it was not simply either the potential of prejudice,

8    given the potential predisposition defense on Count 2 that

9    we talked about there, and that was that one subject

13:16:41 10   addressed in the ruling, it was not just a potential for

11   prejudice to Mr. Bongiorno, or anyone else, but there were a

12   host of considerations that went into that.

13   And I do want to, Mr. Abreu, give you some assurance

14   that I did not take the comment about the chronological

13:17:05 15   presentation of evidence to mean that the evidence neatly

16   segregated into Counts 1 or 2.  I think that's -- I never

17   thought that was the case, and that presents different

18   issues.

19   But one of the issues that I really have very great

13:17:23 20   concern about is the potential for confusion on the jury.

21   And I did include some discussion of that in that ruling.

22   All of that said -- and this will be my final point on

23   that -- Mr. Abreu, you had indicated in the briefing and

24   again today that you were interested in an opportunity fully

13:17:44 25   to brief that issue.  So, I mean, you're certainly entitled

49

1    to make a record, you know, so I would encourage you to do

2    that if that's what you want to do.

3        I will say, I came into the proceedings today, based

4    on review of that motion, as well as Mr. Bongiorno's motion,

13:18:06 5    inclined to deny both.  That's how I remain.  I remain of

6    that view.  However, there's a little bit of additional

7    information that Mr. Rosen has provided, and there's some

8    additional information that you've provided as well.  And so

9    I do need to think that through a little bit.

13:18:26 10        And the only other comment I'll put on the table about

11    any of it, you know, the work, in my experience, for lawyers

12    tends to expand to fill the amount of time you have, and so

13    I'm mindful of that.

14        Do you have any sense, Mr. Abreu, who is stepping into

13:18:53 15    your role on this case?

16            MR. ABREU:  I believe they've identified at

17    least one AUSA that is likely to, Your Honor, but --

18            THE COURT:  No one is willing to voluntary for

19    a tour of duty, right?

13:19:09 20        You don't have to comment on that.

21            MR. ABREU:  Yeah.  Fair enough.  Fair enough,

22    Judge.

23        I don't exactly know.  I actually asked this morning

24    if a decision had been made, and it's -- I've been told that

13:19:22 25    that decision will be coming shortly.

1          MR. McCAFFREY:  Is that in addition to the two

2     AUSAs that have already entered an appearance?

3          MR. ABREU:  I don't think anybody else has

4     entered a appearance.

13:19:35  5          MR. McCAFFREY:  Yeah, there were.  I think

6     there were two -- there were two AUSAs that had entered an

7     appearance in this case.  I'm --

8          Izaak, help me.  Who's --

9          THE COURT:  So at the moment, my records, for

13:19:55 10   what it's worth, although, I'll say I work for the

11    Government, so this may not be entirely accurate.  But as

12    far as I can tell, Mr. Abreu is the only counsel of record

13    for the United States.

14          MR. McCAFFREY:  Oh.

13:20:09 15          MR. AXELROD:  I think that's right.  I'm

16    looking at the ECF, and I think that's right as well.

17          Though, I think what Mr. McCaffrey might be

18    referencing is on multiple communications with the U.S.

19    Attorney's Office, specifically about the reverse proffer

13:20:23 20   that took place a couple of weeks ago, there were two other

21    AUSAs involved.  And I think from our prospective, we

22    thought that that was the prosecution team.

23          THE COURT:  Then I'll wait to be surprised as

24    to who it might be.

13:20:43 25          MR. ABREU:  Thank you, Your Honor.

1          MR. DeVILLERS:  Your Honor, may we brief this

2    issue as well?

3               THE COURT:  The bifurcation issue?

4               MR. DeVILLERS:  Yes, Your Honor.

13:20:57 5               THE COURT:  Yes.  So let me ask one broader

6    question.

7          So, again, coming into the hearing, kind of my

8    sensibilities were -- I say this lovingly having been in

9    your shoes all too often.  This is the phase of, "Oh, my

13:21:17 10   gosh.  I can't believe we have to try this case in a month,

11   and there's a lot of work to do."  And, you know, it's the

12   bargaining phase where we've got to get out of this.

13         So part of my view was, we just got to push through

14   and hold the trial date, which he -- at least Mr. Rosen saw

13:21:35 15   in a couple of orders.  That's still my gut instinct.

16         But under the circumstances, do you have views as to

17   whether we should be planning on August 12 or not?

18         I mean, I will say, part of the issue from my

19   perspective is that I've held the dates open, I've scheduled

13:21:54 20   accordingly to the prejudice of other litigants and cases,

21   but happy to get your thoughts, given the totality of

22   information and issues we're working through.

23         I think I know Mr. Abreu's view, which is he doesn't

24   care very shortly.

13:22:16 25               MR. DeVILLERS:  Your Honor, Mr. Scott's view

1    is he would prefer to go to trial as scheduled.

2                   MR. AXELROD:  And, Judge, this is Dave

3    Axelrod.

4        And I think, you know, I need to talk to my client and

13:22:28 5    confirm this because this is all new information.  But I

6    assume that his interest is going to trial, too.  They've

7    been waiting, and I think that that would be their -- they

8    would like to push forward -- or he would like to push

9    forward.  I won't speak for Mr. McCaffrey.

13:22:49 10                  Mr. ROSEN:  Judge, you know my position.

11                  THE COURT:  I do.

12        Mr. McCaffrey.

13                  MR. McCAFFREY:  Yeah.  I would need to talk to

14    Ms. Smirnova about it.

13:23:02 15                  THE COURT:  All right.  So let's do this.  For

16    the moment, we'll leave the trial date set as scheduled.  I

17    won't rule on Mr. Rosen's motion on behalf of Mr. Bongiorno.

18        To the extent that anyone wants to file briefs either

19    on the issue of trifurcation that Mr. Abreu put on the table

13:23:20 20    in his motion for reconsideration, which was Document

21    Number 339, from -- given what's on my plate and everything

22    I'm working through, I would say, if you could get those to

23    me by Friday, that would be ideal.  Monday at the latest.

24    And by Monday at the latest, I mean, probably, like, open of

13:23:43 25    business Monday at the latest.

1          And if you want to include in that positions, you

2     know, Mr. Axelrod, Mr. McCaffrey, having talked to your

3     clients about whether we should proceed on August 12th or,

4     perhaps, move back a couple of weeks or what have you, we

13:24:04  5     can figure all that out.

6          But the sooner you can get me briefs on those issues,

7     the better.

8          And I know Mr. Rosen's position, so you don't need to

9     give me another brief.

13:24:16 10               MR. McCAFFREY:  Judge, I'll just tell you, if

11     it's a continuation of only a couple of weeks, I'm going to

12     have -- I've got -- I've got my son's wedding outside of --

13     it's in a completely different state.

14               MR. DeVILLERS:  And I have a trial in front of

13:24:34 15     Judge Watson, Your Honor, in early October, second week in

16     October.

17               THE COURT:  Well, that's one of the issues.  I

18     mean, I indicated that I scheduled with this trial date for

19     some time, and I know others have as well.  So I don't mean

13:24:51 20     to prioritize, you know, my schedule and so forth above

21     yours.  But that would certainly be one issue we have to

22     deal with.

23          And we will plan to keep the hearing, final pretrial

24     conference on the 22nd.  And I do think under the

13:25:09 25     circumstances, it makes sense to do all that in person.

1          Are you still going to be with the office at that

2    point, Mr. Abreu?

3                    MR. ABREU:  Yes, Your Honor.

4          I might be in trial, but I will be here.

13:25:22  5              THE COURT:  Well, in any event, you might want

6    to bring or send counsel who is stepping in, and they can

7    figure out what they're walking into, and you might be safer

8    in trial.

9                    MR. ABREU:  I think that's right, Your Honor.

13:25:35 10              THE COURT:  Anything else we should try to

11   accomplish today?

12         There might be other issues that you all have.  That

13   was everything on my list.  That was a small list.

14         But anything else we should address?

13:25:47 15         Mr. Abreu?

16                   MR. ABREU:  Nothing else on behalf of the

17   United States.  No, Your Honor.

18                   THE COURT:  Mr. Axelrod?

19                   MR. AXELROD:  Your Honor, just briefly one

13:25:57 20   issue.  You know, I looked at your -- because there's no

21   motion for reconsideration in the criminal, quote/unquote,

22   system, I looked at your local rules with respect to motions

23   for reconsideration -- and, you know, I'll paraphrase.  You

24   said if you think a motion for reconsideration requires

13:26:15 25   response briefing, you'll let us know.

1      I was kind of operating under that procedure for

2  Counts 48 and 50.

3      But tell me if I got it wrong and if you'd like a

4  response.

13:26:26  5          THE COURT:  I think that's up to you.  I think

6  if there's anything you would like to say, you can certainly

7  address it.

8      As I indicated, I haven't even read it yet, so I don't

9  know what it says, or what I might have to do with it.  So

13:26:41 10  that's one of the things I will be turning to in the next

11  couple of days.

12      My general view is that reconsideration motions don't

13  require a response.  So if you don't respond, I'm not going

14  to take anything from that.

13:26:56 15          MR. AXELROD:  Okay.  Thank you.

16          THE COURT:  Mr. McCaffrey, anything else on

17  behalf of Ms. Smirnova?

18          MR. McCAFFREY:  No, Judge.

19      Thank you.

13:27:03 20          THE COURT:  All right.  Mr. DeVillers?

21          MR. DeVILLERS:  No, Your Honor.

22          THE COURT:  Mr. Rosen?

23          MR. ROSEN:  Thank you, Judge.

24      No.

13:27:12 25          THE COURT:  All right.  Well, I will see you

1    all -- I believe we're in person in a couple of weeks.  So

2    I'll plan to see you then.

3           You know, maybe Mr. Abreu, maybe not.

4           But I'll see you in a couple of weeks.

5           Thanks.

6                   MR. AXELROD:  Thank you, sir.

7                   MR. ABREU:  Thanks, Judge.

8                   MR. DeVILLERS:  Thank you, Judge.

9                        -  -  -

10           (Proceedings concluded at 1:27 p.m.)

11

12

13                **C E R T I F I C A T E**

14

15       I certify that the foregoing is a correct transcript

16    from the record of proceedings in the above-entitled matter.

17

18

19    */s/ Donnalee Cotone*              *11th of July, 2024*
     DONNALEE COTONE, RMR, CRR, CRC                    DATE
20    Realtime Systems Administrator

21

22

23

24

25