1                     UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF OHIO
2                            EASTERN DIVISION


3
      UNITED STATES OF AMERICA,     ) Case Nos. 1:21-cr-491-1
4                                   )           1:21-cr-491-2
                  Plaintiff,        )           1:21-cr-491-3
5                                   )              and
            vs.                     )           1:21-cr-491-9
6                                   )
      PAUL SPIVAK,                  ) Wednesday, July 17, 2024
7     OLGA SMIRNOVA,                ) Cleveland, Ohio
      CHARLES SCOTT,                )
8          and                      )
      CHRISTOPHER BONGIORNO,        )
9                                   )
                  Defendants.       )
10

11

12

13          TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS

14              *HELD VIA ZOOM VIDEOCONFERENCE*

15          BEFORE THE HONORABLE J. PHILIP CALABRESE

16                 UNITED STATES DISTRICT JUDGE

17

18

19

20
      Official Court Reporter:   Gregory S. Mizanin, RDR, CRR
21                               United States District Court
                                 801 West Superior Avenue
22                               Court Reporters 7-189
                                 Cleveland, Ohio 44113
23                               216.357.7036
                                 Gregory_Mizanin@ohnd.uscourts.gov
24

25       Proceedings recorded by mechanical stenography; transcript
              produced with computer-aided transcription.

1     APPEARANCES:

2     On behalf of the Government:

3           **Alejandro A. Abreu, AUSA**
            **Elliot D. Morrison, AUSA**
4           **Megan R. Miller, AUSA**
            U.S. ATTORNEY'S OFFICE - CLEVELAND
5           801 West Superior Avenue, Suite 400
            Cleveland, OH 44113
6           216.622.3600

7

      On behalf of Defendant Paul Spivak:
8
            **David L. Axelrod, Esq.**
9           **Lauren W. Engelmyer, Esq.**
            BALLARD SPAHR LLP
10          1735 Market Street, 51st Floor
            Philadelphia, PA 19103
11          215.665.8500

12

      On behalf of Defendant Olga Smirnova:
13
            **John F. McCaffrey, Esq.**
14          **Izaak Horstemeier-Zrnich, Esq.**
            TUCKER ELLIS LLP
15          950 Main Avenue, Suite 1100
            Cleveland, OH 44113
16          216.592.5000

17

      On behalf of Defendant Charles Scott:
18
            **William R. Martin, Sr., Esq.**
19          BARNES & THORNBURG
            555 12th Street, NW, Suite 1200
20          Washington, DC 20004
            202.289.1313
21
            **David M. DeVillers, Esq.**
22          **Samantha Pugh, Esq.**
            BARNES & THORNBURG
23          41 South High Street, Suite 3300
            Columbus, OH 43215
24          614.628.0096

25

```
 1                    WEDNESDAY, JULY 17, 2024

 2                          - - -

 3            (Proceedings commenced at 1:35 p.m.)

 4                          - - -

 5            THE COURT:  Hi.  Good afternoon, everyone.

 6        We're on the record in Case Number 1:21-cr-491, the

 7   United States of America versus Paul Spivak and others.

 8        Counsel, will you please state your appearances for

 9   the record, beginning with counsel for the United States.

10            MR. ABREU:  Good afternoon, Your Honor.

11        Assistant U.S. Attorney Alex Abreu for the United

12   States of America; and joining me today are Assistant

13   U.S. Attorneys Elliot Morrison and Megan Miller as well.

14            THE COURT:  All right.  Good afternoon.

15            MR. MORRISON:  Good afternoon, Your Honor.

16            THE COURT:  Thank you for joining on short

17   notice.  More to come on that, but I appreciate it.  Thank

18   you.

19        Counsel for Mr. Spivak.

20            MR. AXELROD:  Good afternoon, Your Honor.

21        David Axelrod and Lauren Engelmyer on behalf of Paul

22   Spivak.

23            THE COURT:  All right.

24        Counsel for Olga Smirnova.

25            MR. MCCAFFREY:  Good afternoon, Your Honor.
```

```
 1          John McCaffrey and Izaak Horstemeier-Zrnich on behalf

 2     of Ms. Smirnova.

 3               THE COURT:  All right.  Thank you.

 4          Counsel for Charles Scott.

 5               MR. DEVILLERS:  Good afternoon, Your Honor.

 6          David DeVillers, Billy Martin, and Samantha Pugh for

 7     Mr. Scott.

 8               THE COURT:  Good afternoon.

 9          And counsel for Christopher Bongiorno.

10               MR. ROSEN:  Good afternoon, Your Honor.

11          Michael Rosen for Mr. Bongiorno.

12               THE COURT:  All right.

13          Well, thanks, everyone, all of you, for joining on

14     short notice.  And my apologies on that; this is about the

15     only stretch of time I have between now and the end of the

16     week, so thanks for accommodating me on that.

17          A couple items of business from my perspective, and I

18     want to start with the motion to continue.  I know there are

19     a couple specific days mentioned, final pretrial and trial

20     date, but generally we'll refer to it as the motion to

21     continue, which I have reviewed briefly.

22          Happy to hear responses to that motion from any of the

23     defendants.

24               MR. AXELROD:  Well, Your Honor, I guess I can

25     start.
```

1      And I'm sure others will have their opinions, but Paul

2   Spivak strongly opposes a motion to continue.  This case, I

3   mean, has been indicted for three-and-a-half years.  The

4   trial date was set back in January; and since that trial

5   date was set, we've spent significant time and resources

6   gearing up for an August trial, which includes, you know,

7   all of us shifting our schedules around building in time for

8   this, blocking off time, getting our expert reports done,

9   getting our disclosures done.

10      And, Your Honor, the timing of the motion does strike

11   me as unusual given that we had just completed all of our

12   disclosures, including our expert disclosure and our

13   reciprocal discovery, and then the motion to continue gets

14   filed, which I find problematic.  If the government was

15   going to file a motion to continue, I don't know why it

16   didn't do this weeks -- if not earlier than -- before that.

17      I also find the government's reasons for a continuance

18   not very strong.  We produced about 500 documents.  They're

19   all listed on our -- on our exhibit list, they're given a

20   name.  It's very easy to go through.  There's nothing

21   surprising.  There's no metadata issue there, though I know

22   Mr. McCaffrey can cover that in more -- in more depth if

23   needed.

24      Our expert report shouldn't be a shock.  We said we

25   were -- we're going to have an expert report for a long

1   time.  That just strikes me as typical trial planning.  I

2   don't know why reviewing our expert report would necessitate

3   a continuance.

4       Moreover, as you know, we filed I guess a motion to

5   exclude the government's expert, we think that that is a

6   very good motion that the government's expert report is --

7   is very deficient.  So, again, I just -- I don't see that as

8   a reason to continue the trial.  These are all basic trial

9   preparation issues.

10       There is a privilege issue.  I don't really want to

11   get into it today because, just to be brief, we've

12   discovered that the government has produced about 200

13   privileged documents.  I haven't been able to get full

14   information about this from the government, so I'm not

15   really prepared to go in and talk about that today.

16   Still -- there's still some research to be done.

17       But really the most important thing is my client.  My

18   client was indicted in 2021.  And unfortunately, in this

19   country, the law may presume you innocent, but society

20   doesn't presume you innocent while you're awaiting trial.

21   And what that means is that since 2021 he's been put in

22   purgatory.  Banks won't do business with him; his business

23   is hanging on by a thread; his life is hanging on by a

24   thread.  You know, quite honestly, he's been pushing me to

25   get this thing to trial.  You know, when I came on last

1     year, he said, "Can't we get this thing to go to trial

2     immediately?"  I said, "Paul, slow down.  I need to actually

3     look at discovery."

4          So I -- I just -- you know, from -- from just the

5     basic fairness of this thing, we're three-and-a-half years

6     in, and I just don't think it's fair to my client, to the

7     other defendants, assuming they're -- they feel the same

8     way, to postpone this trial any longer.

9          Thank you.

10               THE COURT:  Any other defendant with

11     materially different views or positions?

12               MR. MCCAFFREY:  Judge, I'll just add that with

13     respect to the reciprocal discovery issue, we produced 509

14     documents in reciprocal discovery.  Mr. Abreu in his motion

15     raised the issue of metadata.  Mr. Petruzzi was not

16     available for this conference, but I have had the

17     opportunity to speak with him.  We can work through that

18     issue.  It's a very finite number of documents that are

19     involved.  But essentially the reason that the metadata is

20     not complete is because we utilized the assistance of the

21     client in collecting some of these documents, and the file

22     paths were such that it was disclosing attorney-client

23     information.

24          There is a way to -- to kind of correct that and

25     address the -- the government's concern, and we think we can

1    do that in short order, and we can certainly have further

2    communications on that issue offline with their e-discovery

3    professional in the office and...

4                    THE COURT:  All right.  Thank you.

5                    MR. MCCAFFREY:  And I would just add to one

6    other...

7                    THE COURT:  Sure.

8                    MR. MCCAFFREY:  Judge, I -- I just think one

9    other note in line with what Mr. Axelrod stated.  I mean,

10   this is -- this is a company that's a going concern, they're

11   actually manufacturing products.  They have shareholders

12   that they have not been able to speak to because the

13   government has cast them as, quote/unquote, victims, and

14   that has been very difficult.

15                    THE COURT:  All right.  Thank you.

16        I think Mr. DeVillers was trying to jump the line

17   ahead of you, Mr. McCaffrey.

18        So I'm happy to hear from you.

19                    MR. DEVILLERS:  Yes, Your Honor.

20        Just to clarify, some of the stuff in the government's

21   motion for continuance, it talks about not getting the

22   expert disclosures.  It actually got the expert disclosures

23   well over a month ago.  That is who and what they're

24   generally testifying about and their background.  These are

25   the expert reports via discovery that they were -- were

1    produced yesterday and Friday, yesterday as a -- or Monday

2    as an exhibit and Friday as reciprocal discovery.

3         Also in the reasons for a continuance, Mr. Abreu

4    indicated that there was an issue with the share site that

5    we provided to him.  I think that's true not because there

6    was anything wrong with our share site, because everyone

7    else -- all the co-defendants could open it up; it's more

8    because of security issues with DOJ and -- and opening up

9    share sites.  That was -- on Monday Ms. Pugh spent near

10   her -- the entire day loading all that onto the USAfx, and

11   that has now been resolved.  So they do have our exhibits,

12   which were only 30-something exhibits, Your Honor.  So I

13   just don't think that -- and a lot of those exhibits were

14   provided by the government via discovery.  So I just don't

15   think there's a lot of room there to -- to ask for a

16   continuance based on those issues.

17        And, Your Honor, we've been the attorney for Mr. Scott

18   since -- since day one.  This is three-and-a-half years,

19   it's been said.  We've, you know, asked for continuances or

20   asked our client to permit continuances over and over again,

21   and in January -- you know, quite frankly, we promised him,

22   "Hey, this is -- this is a dead bang, August 12th; trust us,

23   it's not going to get continued anymore."  We're losing

24   credibility with our own client by assuring them that it's

25   going to go to trial August 12th.  We -- we didn't even tell

1    our client yet about this motion for continuance because we

2    don't know how he's going to respond to it, and we were

3    waiting to find out how this would be -- would be taken care

4    of.

5         So we just -- I think it's probably pretty clear from

6    my statement -- we would very much object to a continuance

7    in this -- in this case.

8                   THE COURT:  All right.

9                   MR. ROSEN:  Your Honor, I'm just going to add

10   one comment because I'm not going to repeat what everybody

11   said except of course we are strongly in support of getting

12   this case tried on August 12th.  I just -- the only reason

13   that -- that Mr. Bongiorno had asked for a continuance

14   before was because of some very critical medical issues with

15   his wife, which unfortunately has been postponed because of

16   additional issues without -- I'm not going to get into all

17   of that; that's already before the Court.

18        But I just wanted it to be clear that but for that

19   very unusual medical situation, which is no longer present,

20   we're ready and prepared to proceed to trial and would

21   object to a continuance.

22                   THE COURT:  Let me make an observation, and I

23   have just some questions for counsel for the United States.

24        My big concern, as I indicated the last time we were

25   together, is that in any -- any time the Court summons

1    average citizens from their daily life and compels them to

2    serve as jurors, I think that's a significant imposition on

3    them in my experience -- I won't say citizens are happy to

4    do that, but by the end they usually enjoy the experience --

5    but because of the imposition and the disruption to, you

6    know, in a typical case 14 and in this case probably more

7    like 16 citizens, is just making sure that we are using

8    every minute of the jurors' time effectively so that, you

9    know, we're taking as few breaks as possible.

10        In my experience, jurors want, you know, less time off

11   and more time in the courtroom and so forth.  And so one of

12   my concerns in that regard becomes that when parties

13   generally speaking are not ready, that interferes with the

14   efficiency and makes the trial take more time and not less.

15   So that's the approach that I take to how we need to proceed

16   with the jury trial.

17        So my observation and large concern when we were last

18   together and in the run-up to it and since then is that I'm

19   not sure, based on what I've seen, that anybody is really

20   ready for this trial.  I'm not sure that anybody's really

21   put in the work to maximize the jury's time and so forth.

22   Now I'm not -- I'm not interested for the moment -- we might

23   get there, but that's just a general observation, and there

24   might be some finger pointing in both ways and so forth.

25        But, you know, one of my concerns becomes, you know,

1     when I see a large number of witnesses, when they're ready,

2     they're on and they're off and the crosses are short and

3     punchy -- and jurors see that too -- and when they're not,

4     the witnesses take two or three times as long to do and the

5     crosses take four times as long.

6          So that's my general observation as I'm not sure

7     that -- using our last hearing nine or ten days ago or

8     whatever the date was as a reference point, I'm not sure

9     anybody was really ready.  I'm not sure anybody's really

10    ready now.

11         But with that, let me turn to Mr. Morrison and

12    Ms. Miller and just try to get some sense from you because

13    I -- on the one hand, I take the point that we set this

14    trial date back in January, you know, so that was six months

15    ago, almost seven by the time we get to trial.  Mr. Abreu

16    advised that he was moving on to different things; I don't

17    know what that is, I still have many questions, but this is

18    not the appropriate time or place for that.  But I do think

19    that, just as Mr. Spivak changed counsel and was afforded

20    some time for them to get up to speed, I think the same is

21    true with the United States.  I think any litigant is

22    entitled to that.  I don't think that this was a tactical

23    changing counsel.  I don't think Mr. Spivak's change of

24    counsel was a tactical change of counsel to secure an

25    extension or anything like that.

1          But my question just becomes, Mr. Morrison,

2     Ms. Miller, where are you in the process of getting up to

3     speed, and what does that look like from your perspective?

4               MR. MORRISON:   Thank you, Your Honor.

5          AUSA Elliot Morrison.   And I plan to be lead counsel

6     on this trial when it goes forward, whether that's

7     August 12th or thereafter.

8          And I think you hit it exactly on the head in terms of

9     our concerns on trying to go forward on August 12th.   The

10    reality is, as you say, we are not prepared at this time.

11    I'm not going to make any bones about that.

12         Now we filed our notices of appearance this morning.

13    Does that mean that's the first I knew of this case?   No.

14    I've been supervising this case for almost a year now as the

15    chief of the White Collar Crime Unit, and so I'm aware of it

16    well before today and have been working with Alex since I

17    learned that -- of his planned departure, I think I learned

18    shortly before July 4th.   And I'll say that this has been

19    the highest priority case in that process.

20         That being said, Alex has dozens of matters that need

21    to be reassigned, and it's been a very complicated process

22    to figure that out.   But because this is our top priority

23    amongst all of those, given the trial date and the concerns

24    you identify, this is the first one for which we've been

25    filing notices of appearance and substantively getting into

1   the case.  So I can say that I have been working with him

2   behind the scenes to a certain degree on -- in recent weeks

3   knowing now how important it is to get up to speed and to

4   have other AUSAs get up to speed.

5       That being said, I think the entire history of this

6   case is replete with every single person on this Zoom

7   emphasizing how complex it is, how much discovery there is,

8   how much information there is, and how hard it is to get up

9   to speed in a short amount of time on even a small piece of

10  that let alone all of it.

11      So I think while we would -- as the government, we're

12  always going to be ready to go to trial when we have to.

13  There's ready and there's ready.  And the reality is you say

14  is we would not be as prepared on August 12th as we would be

15  30, 60, 90 days later.  And each additional kind of month of

16  preparation time AUSA Miller and I have is a -- a greater

17  amount of organization and planning and knowledge of the

18  case that we would have to be able to efficiently and

19  quickly work through issues, to develop a rapport with these

20  defense counsel who for half of them I'm seeing for the

21  first time and I think they're seeing me for the first time

22  here.

23      So I won't say that it's impossible to start a trial

24  on August 12th.  I will say that it is not sufficient time

25  for effective preparation for an efficient and fair trial

1      that gets at the truth.  And I understand often defense

2      counsel say, "Well, look, it's the government's problem,

3      they want us to go to trial," but we're as not as ready as

4      we could be.  And, you know, that's -- I might do the same

5      thing if I were in their shoes.  I understand that.  But I

6      don't think that's what the Speedy Trial Act is concerned

7      with.

8           I don't think, as you said, there's a reason to have a

9      different approach when it's the government, especially

10     when, as you say, there certainly is no tactical move here.

11          I have actually tried to convince AUSA Abreu to stay

12     and to change his departure date unsuccessfully, and believe

13     me --

14                    THE COURT:  Would it help if I put on an

15     order?

16                    MR. MORRISON:  This is going to be -- as much

17     respect as AUSA Abreu has for the Court, I don't know that

18     his wife has the same respect.  I think their central

19     concern is getting their children ready for a new school

20     year in a new place, and so it was too difficult to persuade

21     him to do that, much as I tried.  And I don't think anyone

22     on this Zoom would -- would try and push through that wall.

23          So I think -- I hear what all the defense counsel are

24     saying.  I hear that they have been looking forward to this

25     trial.  On the other hand, I don't think we're asking for a

1    yearlong continuance.  We -- there has been numerous

2    continuances including when new counsel came on, and I think

3    we all share a goal of having an efficient and successful

4    trial, one that makes the best use of not only our time but,

5    as you said and most importantly, of the jury's time.

6         And I do think as -- Judge, I want to briefly address

7    what counsel for Mr. Spivak raised in terms of the timing of

8    the government's motion.

9         I just want to be clear, there's no gamesmanship

10   there.  That is essentially as I understand it -- and I

11   wasn't there for the conference -- AUSA Abreu previewed that

12   there would be such a motion, that we expect to file one,

13   but it didn't make sense to file that motion before seeing

14   their reciprocal discovery when we could then present kind

15   of "This is what we now understand to be the full universe."

16   Prior to Friday we didn't know what the full universe was of

17   all the tasks to be done between now and trial.  We now have

18   a much better sense of that.  And I won't pretend we have a

19   complete sense of it, but we have a much better sense of it.

20        And there is, as I understand -- they say it's a

21   certain number of documents.  As I saw it, it was close to

22   4,000 pages.  And as Mr. Abreu indicated, there's some

23   issues with the metadata.  And, again, as Mr. McCaffrey

24   said, I have no doubt that we will work through that with

25   them and without having to involve the Court, and we've

1       worked with Mr. Petruzzi before, but that all takes time.

2       And working through it without involving the Court's time

3       and still having sufficient time for AUSA Miller and I to be

4       prepared to proceed, it's just not -- I can't see a world in

5       which that happens and we aren't, frankly, fumbling around

6       and wasting people's time at the start of August 12th.

7                    THE COURT:  Well, let me ask you this.  One

8       other concern I have -- as you know, I've given what time

9       today I can to these issues, and one of the things that

10      jumped out to me regarding that metadata issue was there was

11      a two-week extension.  I'm sure you're kind of aware of that

12      procedure and so forth and the background.  So that to me

13      might justify -- and I'm not saying it does, but that might

14      justify a week or two of a continuance to work through those

15      issues and that sort of thing.

16           But help me understand the basis for a request for 90

17      days, which seems a little much.

18                    MR. MORRISON:  Well, I think there is --

19      there's no magic to knowing when we're going to be ready,

20      right?  We're predicting the future.  I think what we were

21      thinking about is our understanding of when, for example,

22      Mr. Spivak obtained new counsel after the second superseding

23      indictment, it was from that point that summer until January

24      is when they decided they were ready to set a trial date.

25      Whether they said they were ready to go to trial on that

1       date, I don't know.  But what we're trying to do is say,

2       look, that's them coming in with prior defense counsel in

3       the same way that we're coming in with prior government's

4       counsel, and they had approximately that amount of time

5       until they set the new trial date.

6            If the Court wants to shorten the 90-day time period,

7       the government's open to that of course, but we -- we need

8       as much time as we can get.  I'm not going to pretend

9       there's any magic to 90 days versus 60 and -- or even 30 or

10      21, right?  I would much prefer a longer time period to know

11      we have our ducks in a row, so-to-speak.

12           But I think you raise a good point, which is there is

13      nothing specific to 90 days; there's nothing that happens on

14      the 90th day that changes the status here.  And so from our

15      perspective, we're trying to think of what's a comparable

16      amount of time to what the defense has been given.  And of

17      course for them, it was coming on in the summer and then

18      setting a trial date the following summer and not going to

19      trial in January.  But we're just asking for approximately

20      the time between when they started and when they said they

21      were ready to set a date.

22                      THE COURT:  One thing I did have a chance to

23      do is to go back and look at my notes from that hearing on

24      January 16th of this year, and I looked at the transcript as

25      well.  You know, this is why we have the transcripts because

1          what we remember and what actually happened can be two

2          different things, which is kind of interesting to think

3          about from a witness testimony standpoint, but that's a

4          different matter.

5                 Because if you had asked me before I looked, I would

6          have said, "Well, we set this trial date based on, you know,

7          blocking out the amount of time we needed for things," and I

8          think that's true, but then I would have said, "Well, we

9          blocked out the number of days we did because I had some

10         discussion with Mr. Abreu at the time about, you know, what

11         he thought the witnesses would be, what number, and how long

12         they would testify and so forth and what I probably added on

13         top of that."  And in fact that did not happen.  And so that

14         greatly concerns me because I don't like to set trial dates

15         that are artificially compressed or anything like that

16         because it's just not fair to others, for example.

17                So I think I know the answer to this question, but

18         I'll ask it.  You've appeared today, are you ready to commit

19         to which witnesses you're going to call and how long your

20         case is going to be?

21                And I appreciate that there's a moving target in terms

22         of Count 1 versus Count 2 and so forth, and I'm working

23         through all that.  It would help me to work through all of

24         that if I weren't dealing with these emergency motions and

25         so forth, but such as life, but -- so recognizing that

1    that's a bit of a moving target, which is an additional

2    unfairness, I'm still going to ask you the question.

3                    MR. MORRISON:  And I think you're -- I

4    appreciate the lead-in, that's very kind and generous

5    because the answer is no, I don't think I could commit; but

6    I could commit to working through that in short order with

7    Mr. Abreu and the agents and of course AUSA Miller.  I think

8    we have a witness list that's been provided, and a

9    deanonymized version was provided earlier today.  We have a

10   large number of exhibits that have been identified, and I

11   know you're going to get into that piece of this next, so I

12   won't delve into the details there.

13        And I do think, from our perspective, you're

14   absolutely right that -- and as I understand, an initial

15   estimate of the trial was two weeks.  We do think,

16   especially under the current trifurcated system, it would

17   take significantly longer.  And I'll let Mr. Abreu speak to

18   his best estimate of that, but I think we have a specific

19   number of witnesses, and many of them would have to testify

20   in two or three phases of a trifurcated trial, which I --

21   you know, I think just adds to kind of the transaction

22   costs, so-to-speak, of a witness testimony.

23                    THE COURT:  And I do want to hear Mr. Abreu

24   speak to that, but -- and I mean no disrespect to him in

25   this regard -- and I'll just be blunt.  Again, intending no

1    disrespect.  Since he's exiting and there's nothing you or I

2    apparently can do about that -- I'm not sure -- I mean, I

3    value that opinion on the one hand because he's got the

4    familiarity with the case, but you and Ms. Miller are not

5    going to try the case the same way, even though it's the

6    same witnesses, the same evidence and so forth, it's going

7    to -- you know, you're just different, you're different

8    lawyers, and so that -- I mean, there is going to be an

9    inherent difference there.  So I take everything Mr. Abreu's

10   about to say with a grain of salt, but intending no

11   disrespect to that regard.

12        So, happy to get your best estimate on the moving

13   target at this point.

14              MR. ABREU:  Thank you, Your Honor.

15        Yes, I think I've -- I've said we estimate anywhere

16   from two to three weeks, two weeks on the short end.  I

17   think with a trifurcated trial we would have certain law

18   enforcement witnesses who would have to testify twice, and

19   that -- that could be, at least in terms of FBI agents, a

20   handful of them and the forensic accountant and then

21   potentially our expert.

22        The victims would be -- if the trial remained

23   trifurcated -- would be in that first phase of the trial,

24   and that's probably where the most uncertainty is right now.

25   These are pretty elderly individuals.  And so, not really

1    trying to hide the ball, I just didn't know who was

2    available, whether they remain living, and if not, if those

3    counts will need to -- we will have to address, you know,

4    the proof in those counts or if they go away.  And that's

5    something that we're working through now.

6        But I would anticipate an overlap in witnesses, and so

7    best estimate I'd say three, maybe four weeks potentially,

8    depending on how much overlap was needed.

9            THE COURT:  On the defense side, again, it's a

10   bit of a moving target, but you've made witness disclosures

11   as well.  I've seen them; I've not had a chance to study

12   them in any depth.  You have cross-examination of

13   potentially witnesses of your own.  What's your best

14   estimate as to how much time that adds to the amount of time

15   we need to be budgeting for trial at this point?

16           MR. AXELROD:  Well, Your Honor, it is a moving

17   target, and of course as you know, we don't have a burden at

18   all, which -- and I'll just briefly go back to one part.

19       I don't find the reason for a continuance compelling

20   based on reciprocal discovery because of course we have no

21   burden to produce anything.  And quite often in many courts

22   you have -- there is no obligation to produce any reciprocal

23   discovery because you don't know what you're going to do

24   until you see the government's case.

25           And as I've said -- and I'll put it on the record

1    here -- I still haven't seen *Jencks*, and I don't know what

2    the government's witnesses are going to say.

3         So we produced a witness list -- to answer your

4    question -- that is overinclusive largely because I don't

5    know what the government's case is going to look like.  I

6    think that there are probably six witnesses roughly that I

7    think we would most certainly call, but there could be more

8    based on how the government's case shapes out.

9         I think the argument about overlap, though, between

10   the counts I don't think is accurate.  If you look at

11   Count 1 versus Count 2, there is actually no overlap at all.

12   There's different years.  And Count 2 is a government sting

13   case.  You know, I'm not going to tell the government how to

14   try their case, but it looks like they're just going to use

15   cooperators and recorded calls and FBI agents to talk about

16   what happened there, and none of that role testimony is --

17   is duplicative of Count 1.

18        So it's a very circuitous answer, but, I mean, I think

19   probably our case-in-chief, once the government gets done,

20   is probably three days to a full week.  But that's kind of

21   broken over those three different scenarios.

22                    (Pause in proceedings.)

23                    MR. MORRISON:  Your Honor, did you want the

24   government to respond to that?

25                    THE COURT:  If you think there's something you

1    need to respond to.

2                    MR. MORRISON:  No.  I just don't know if you

3    were waiting on us.

4                    THE COURT:  No.  I'm looking at a few things.

5    Sorry.

6                    MR. MORRISON:  Oh, no.  No problem.

7                    (Pause in proceedings.)

8                    THE COURT:  Let me shift to a different topic

9    and return to this one.  And I -- I will apologize here, and

10   I don't mean to dive into these issues in great detail for

11   the moment.  There was the emergency motion yesterday where

12   there's some competing versions of what, you know, did and

13   did not transpire and so forth, and I'm not trying to get

14   into that.

15       I want to talk about we have the final pretrial

16   schedule for Monday, and I had a -- I'm in the middle of two

17   TRO proceedings, so that's where I apologize because there's

18   a few things going on, so I might have not appreciated -- I

19   thought there was agreement on moving the date or the time

20   of that, I should say.  So if there's a confusion about the

21   time of it, that's likely my fault.

22       I do want to -- I do want to have a hearing on Monday.

23   I need to decide whether it's the final pretrial conference

24   or something else.  So what time on Monday does -- I have a

25   few things, but I -- I think I can move -- I've already

1     moved one of them.  I mean, I have the morning time, 10:30,

2     but, you know, we might have to take a break or two, but we

3     can -- I can schedule around the rest of you.  Whether it's

4     in person or by Zoom we can talk about next, but I at least

5     want to talk about what we're doing on Monday, at what time

6     to start.

7                     MR. AXELROD:  Yeah.  So -- Your Honor, so I'm

8     probably the source of some of that confusion, and I do

9     apologize.  I reached out to all counsel about moving the

10    time for the schedule -- last scheduled pretrial because of

11    some travel difficulties that I won't explain to you, and I

12    thought Mr. Abreu was good with that.  So when I told your

13    clerk that all parties had agreed, you know, I guess I was

14    wrong on that.

15         But -- so the earlier is better for me, but if the

16    Court is inclined to unfortunately not make this a final

17    pretrial and make this something else, my preference would

18    be to do a virtual and save a trip to Cleveland, as much as

19    I love Cleveland with the nice breeze blowing off the lake

20    in -- in mid July.  But, yeah, I'd prefer a virtual if it's

21    not going to be a final pretrial.

22                     MR. ROSEN:  Judge, I'll just note that the

23    Court ordered the defendants to be in court, so I just

24    wanted to remind Your Honor depending upon how all of this

25    plays out.

1              THE COURT:  No.  Fair enough.

2         So I guess for the United States, what's your

3    availability on Monday?

4              MR. MORRISON:  I think 10:30 works for us.

5    That's fine, Your Honor.

6              THE COURT:  All right.  Why don't we plan on

7    10:30.

8         So here's -- here's where I'm at on a few different

9    issues that are pending at the moment.  I'm going to take

10   the motion for continuance under advisement.  In terms...

11        So here's what I'm struggling with a little bit.  I

12   just need -- Ms. Miller and Mr. Morrison, I need you to get

13   up to speed yesterday.  I have a few concerns writ large,

14   which I'll just state they're not a surprise based on this

15   record, the first being that we set the trial date many

16   months ago.

17        Second, my experience and practice is that in any case

18   of this size -- I mean -- I mean, this as a bit of a credit

19   to Mr. Abreu, but if my management saw that I was handling a

20   case like this as the only counsel of record, my managing

21   partner would sit in my office and not leave until there was

22   another appearance filed.

23        So Mr. Abreu's been the only lawyer on the file.  I

24   appreciate that the U.S. Attorney's Office over the last few

25   years has had some management challenges, which are not the

1    fault of the office; that fault lies with the

2    administration, with the Senate.  Those are different

3    problems; again, we're not going to solve those here today.

4    But, you know, I think some of the bind that the United

5    States is in is to some degree -- not entirely to be sure --

6    a product of its own making in that regard.

7         But I do think that the United States, as each of the

8    defendants is, is entitled to present an effective defense

9    and to have counsel who are going to, you know, well and

10   truly try the case and do that to the best of their

11   abilities, and I have no doubt that each of you will.  You

12   need a certain amount of time.

13        Now, just to put all my priors on the table, I'll tell

14   you 11 years ago I had a case that one of my partners worked

15   up and a federal judge in another district -- 11 years ago

16   next month -- scheduled it for trial 60 days out -- it was a

17   complex commercial case, four years of discovery, multiple

18   witnesses, thousands of documents and so forth -- scheduled

19   it to start trial a week after her due date, which she was

20   not able to accommodate, and that judge did not continue the

21   trial date.  So I stepped in on six weeks' notice and tried

22   that case.

23        So I have no doubt that you guys can step in.  You've

24   already had at least two weeks and maybe more, so you've got

25   a bit of a head start, so I'm not inclined to continue this

1    out very much.  My inclination as I sit here is to talk on

2    Monday about what the trial really looks like.  I understand

3    that each of you are -- I'm going to use the word

4    "posturing."  And I don't mean that in any kind of negative

5    or pejorative sense; you're trying to preserve your options,

6    that's what we all try to do.  But I need to know who you're

7    really calling.

8         I need you to start producing the *Jencks* material.  I

9    need to know the names of the witnesses and so forth.  And I

10   need to know what the directs look like.  And from a time

11   standpoint, how much time is this really going to take?

12        And I need to know from the defense lawyers the same

13   things.  What's the cross look like?  How are you going to

14   allocate the time among yourselves?  What documents are you

15   each going to use?

16        The point of this first round of disclosures in the

17   pretrial order, Second Amended Pretrial Order 5, is to use

18   at the final pretrial conference -- what are the objections

19   to these witnesses, if any?  What are the objections to

20   these documents, if any?  Again, so that when the jury's

21   here, we are -- we have dealt with all of that to the

22   greatest extent possible and are maximizing their time.

23        So I think the way I see this is this is still all

24   hands on deck.  We have to have a longer conversation on

25   Monday about this.  We can start it at 10:30, and we'll do

1    it remotely; the defendants don't have to appear at this

2    point.  In a perfect world I would say I'd like to start the

3    trial the following week, but that might or might not be

4    possible depending on how fast everyone can get up to speed

5    and so forth.

6        That raises the issue in the emergency motion.  And,

7    again, I'm not trying to cast blame or figure out like who's

8    complying or who's not complying with the orders, but I

9    think I've explained the purpose here.  I think everybody

10   needs to know who these people really are and who's really

11   being called.  Not necessarily even what order; I don't

12   think anybody needs to know that at this point, but we'll

13   talk about that when we get closer.  But I think we need to

14   start figuring out like how our -- how is everybody

15   preparing for the case.  And if it turns out that it's just

16   not possible to get prepared in this amount of time, then so

17   be it; we'll cross that bridge when we come to it.

18       But that's how I see it right now.  I'll take it under

19   consideration, and we'll talk further about it on Monday.

20                 MR. ROSEN:  Judge, if I can just speak up for

21   one second.  Michael Rosen.

22       While the government is in the process of responding

23   to the Court and preparing, because the -- the Court has now

24   separated Counts 1 from Count 2, particularly for

25   Mr. Bongiorno, I would ask the Court to direct the

1      government to specify, of its witnesses and documents, which

2      ones of those are going to be applicable to Count 1, the

3      first trial.  I think that will help all of us -- probably

4      them as well -- prepare time, energy, and knowledge.  So

5      that is the request I would make.

6           And second, of course the Court did mention early

7      *Jencks*, and I think this is really the perfect opportunity

8      for the government to produce it during this hiatus, if

9      there's going to be one, so we don't have the delay of juror

10     time.

11                THE COURT:  Well, I did -- with respect to

12     *Jencks* and other disclosures, I did ask for an in-camera

13     submission.  I'll state for the record I asked for that by

14     Monday.  There was none forthcoming, so I trust that there's

15     no issue regarding cooperation or witness security or

16     anything like that.  If there was, I would have expected to

17     see that by now.  So I think we're past those concerns.  So

18     I think it's time to start rolling this out and -- you know,

19     for the sake of having an effective trial.

20          I'm going to commit, to the greatest extent possible,

21     to rule on the pending motions.  Not the 702 motion; I know

22     that's been filed; I have reviewed it.  But my time and

23     attention's frankly focused on the reconsideration motions,

24     the ones regarding Counts 48 and 50 and then the sequencing

25     Count 1, Count 2, and those obstruction charges.  I will do

1     my absolute best to get those two reconsideration motions

2     decided by Monday.  If I can do it sooner, I will.

3          Like I said, I've lost the better part, you know, over

4     the last 24 hours on that.  Again, not -- not blaming anyone

5     for that, but I had hoped to get one of those today.  That's

6     not going to happen now.  Got to spend time today and

7     tomorrow on TROs, and then we'll turn back to those.

8          So I think -- you know, I understand what you're

9     asking, and I think it will make some sense, but I think

10    we're not quite there yet.  I think the government needs to

11    spend some time -- to the extent it hasn't already -- kind

12    of going through its witness list and segregating them out

13    that way in the event that those motions are denied.  But I

14    don't think we're quite there exactly, but we're near the

15    finish line on that.

16                    MR. ABREU:  Thank you, Your Honor.

17         And just briefly on that in-camera issue, the concern

18    that I expressed on our last pretrial conference, it mainly

19    relates to identification of -- the true identity of the

20    cooperating human source and the undercover agents, which is

21    more of a law enforcement privilege thing, not really

22    anything in terms of that there would be in camera review.

23    The witness list spells out the names of the cooperating

24    co-defendants, and so it is what it is.

25         I guess, Your Honor, I will likely -- I guess I should

1      make a motion to restrict those exhibits or at least redact

2      their names from the attachments in the emergency motion so

3      that it's not on the public record.

4                   THE COURT:  Any issues or concerns with that

5      request from the defense side?

6                   MR. AXELROD:  No.

7                   MR. ROSEN:  Not for Mr. Bongiorno, Judge.

8                   MR. AXELROD:  And not for Mr. Spivak either.

9                   MR. DEVILLERS:  None for Mr. Scott.

10                  THE COURT:  All right.  We'll just -- we'll

11     just restrict that document.  I think doing so is consistent

12     with the governing law and -- you know, that there's good

13     cause for that.

14          You know, to the extent it helps, I understand there

15     might be some issues between defense counsel and their

16     clients in terms of preparing for trial and so forth.  As I

17     look through, I don't even know which witness list I'm

18     looking at at the moment, so my apologies.  There's a few of

19     them floating around.

20          You know, I'm -- you know, the -- you know, undercover

21     agents who are identified by number and so forth, I think to

22     the extent it facilitates counsel's trial preparation, if

23     it's helpful, we can keep that information on a counsel-only

24     basis for the immediate short term.  As we get closer, there

25     might be a reason not to do that.  But, again, I'm just

1   trying to facilitate the use of the trial time so that

2   everyone is getting up to speed as quickly as possible and

3   getting prepared, I should say, ready to do the examinations

4   and so forth.

5        Any other issues we should discuss today before we

6   reconvene on Monday?

7        I have some work to do; I owe you things; I know that.

8   So -- but anything -- you all have a lot to do as well.

9   Anything else while we're together?

10              MR. AXELROD:  Well, Your Honor, I hate to take

11  us back to the problem that started this all, but yesterday

12  we filed the emergency motion asking for identifiers, Bates

13  labels or just copies of a -- documents on the government's

14  exhibit list.  Mr. Abreu gave us some amount of those.  I

15  think it's not a great amount, but we still like don't have

16  an ability to identify what's on the government's exhibit

17  list.  So if we were to have the final pretrial on Monday, I

18  would show up and I wouldn't be able to tell you what issues

19  I had with the exhibits because I can't identify them.  So

20  that issue does remain partially outstanding.

21              THE COURT:  So happy to hear from -- I have a

22  thought on that, but before going there, I'll hear either

23  from Mr. Abreu or Mr. Morrison or Ms. Miller.

24              MR. ABREU:  Thank you, Your Honor.

25              THE COURT:  I think you went on mute.

1        MR. ABREU:  Thank you, Judge.

2        The specifics related to the exhibit list are, as I

3    stated in the motion asking for this hearing, the documents

4    for the substantive counts have been provided in folders to

5    the defense counsel, they were provided -- half of them were

6    provided back in June.  We were compiling the rest to put

7    them in folders, even though it's produced in discovery.  I

8    take the point that no one wants to look through thousands

9    of pages of bank statements to find the one.  So we were

10   doing that as part of our trial prep and I -- I produced

11   half of that in June.

12       The -- the scanned search warrant documents, the names

13   that are identified as the exhibits are the actual folder

14   names that were produced in the load file to defense

15   counsel.  So if they opened up the load file and went to the

16   PDF folder, it would match one to one with what's on the

17   exhibit list.

18       And the recordings is -- is quite literally the date

19   of the recording, the 1D number, which all of the calls were

20   provided in a folder by 1D number and the -- the

21   nongovernment individuals who were on the call.  And since

22   then I have -- we have one where we can identify the UC

23   number so that it matches the witness list, and they would

24   know who the speakers are on the government's side on those

25   recordings and we can -- we can update that to provide it.

1       So I think the issues that -- that are had in terms of

2   identifying specific documents we can work through if -- if

3   counsel wants to work through that collaboratively, I don't

4   see the point of duplicating it again with Bates labels.  We

5   plan on Bates-labeling them anyway and providing indexes

6   with that information.

7       And then there are some general placeholders, as Your

8   Honor has seen, like certificates of authenticity.  I didn't

9   have all 104 of them at the time that I wrote the exhibit

10  list.  I didn't have them in a separate folder.  Now I do,

11  and I've provided that to defense counsel this morning.

12      And so we -- we can work through these issues.  I have

13  no problem giving them the exact documents or the Bates

14  labels.  I guess it's -- but I'd like to work through that

15  collaboratively as opposed to as sort of, you know,

16  answering to demands in a few hours' time while we're all

17  working through lots of other issues.  And I don't mean that

18  pejoratively or anything; it's just that that -- that's what

19  it is.

20      So we're happy to work through those issues of...

21              MR. AXELROD:  Well, to that point, Your Honor,

22  I mean, I'm looking at the government's exhibit list now,

23  and there's a whole category of exhibits.  There's 200 to

24  251, which are these folders.  I assume within these

25  folders -- I don't know what the folders are because I

1    haven't looked at them, they're in discovery, that there's

2    multiple if not tens or hundreds of documents inside those

3    folders.  So I guess -- I don't know.  I try cases, I have

4    never seen an exhibit list that lists as an exhibit a folder

5    provided in discovery.  I don't think a request to note

6    specifically what a specific exhibit a party intends to

7    introduce into evidence is unreasonable.

8         And I think that, you know, if we're trying to promote

9    the process of being efficient and both sides preparing for

10   trial, understanding which of the consulting agreements

11   inside Folder 211 the government's going to use, it's not

12   unreasonable to know which of those documents inside the

13   folders the government's going to use and what specific

14   Bates numbers are attached to those documents.  And if it's

15   all of them, that's great, at least we know that.  But if

16   it's some of them, I think we have -- we're entitled to know

17   that so we're not playing a guessing game of is it document

18   A?  Is it document C?  Which one is it?  I just -- I just --

19   I don't know how that's efficient in preparing for trial.

20              THE COURT:  Well, what I hear Mr. Abreu saying

21   is that he's prepared to work with you and kind of takes the

22   point on it -- I'm not sure that there's a -- necessarily a

23   point in providing Bates label by Bates label information

24   necessarily, given the way this discovery is organized and

25   provided and the like, but I think certainly you should be

1    working through these issues between now and Monday.  Again,

2    the point ultimately is at the final pretrial conference --

3    not on Monday -- but at the final pretrial conference to be

4    dealing with the objections so that we can move forward

5    efficiently.

6         That does raise one other issue I want to put on the

7    table, and I will ask defense counsel on Monday when we're

8    together.  One thing that drives me crazy is -- unless

9    there's a good reason, I expect stipulations on

10   authenticity.  I've been on the bench five years; I've seen

11   one case where there's reason not to stipulate to

12   authenticity and that was where there was a question about

13   whether a particular e-mail in a case was actually

14   fraudulently created or not, so that's obviously a question

15   of fact.  But nobody should be calling witness after

16   witness -- I can't imagine from a juror's standpoint any

17   less good use of time than that.

18        So I will be asking your positions on authenticity

19   come Monday just so we can move past that and hopefully

20   streamline things just a little bit on the margins.

21        Any other issues today?

22        Like I said, we all have a lot of work to do, so

23   unless there's nothing further, without further ado, we'll

24   get to it, reconvene Monday, and see where we land.

25        Anything else?

1          MR. DEVILLERS:  Your Honor, I don't mean to

2    beat a dead horse, but I too am looking at these exhibits

3    lists, and, for example, 3.1 is an HFX Investments -- if --

4    if he were to hand that to a witness or show it to a

5    witness, I wouldn't know what that is.  We just don't -- it

6    doesn't correspond to a spreadsheet in discovery, like the 3

7    point -- 3-1, is it the 3-1 in discovery is a -- Church

8    e-mails.  So even if we're going to continue this a week, we

9    still -- we don't know what these exhibits are.  And it

10   only -- we're not asking them to print them.

11        For example, even if there -- if it goes to like a

12   specific count, I still don't know -- whatever is in that

13   box, I won't know what that exhibit is without knowing the

14   Bates stamp number.  The Bates stamp numbers in discovery

15   are there, so just tell us what they are.  It's not

16   organized -- I think it's not organized in such a way where

17   there is a discovery spreadsheet that corresponds with the

18   exhibits is my point.

19          THE COURT:  So I take the point, and what I

20   hear -- I mean, look, I think that this is where -- we're at

21   the stage where everybody needs to be preparing for trial,

22   and this is no longer go find the needle in the haystack.

23        And, look, I take that people make good faith effort

24   estimates and the like and things change at trial and so no

25   one's holding you strictly to those sorts of things, but I

1    don't think it's fair for either side to say, "Hey, in this

2    box of documents we're going to use one or two of them."  I

3    think you need to provide some specificity to allow people

4    to prepare their cases.

5         Again, I -- I think there is a trial fairness

6    dimension to that for everybody as a -- certainly a certain

7    amount of, you know, good lawyering and lawyer prep involved

8    in that both ways as well, but I think above all else, my

9    concern is on the burden to the jury and what we're -- what

10   we're going to be expecting and asking of them when we get

11   there, which will hopefully -- hopefully be in short order.

12        So I -- you know, Mr. DeVillers or Mr. Axelrod, in

13   that regard, I'm not sure there's anything I can do to --

14   you know, today to say, well, let's sit here and go through,

15   you know -- you know, folder whatever, and start matching it

16   up.  I mean, I think you have to do that offline, and I just

17   cannot emphasize enough that you guys need to be talking to

18   each other a lot in general at this point.  I think we're

19   going to be seeing a lot of each other at trial and in the

20   days leading up to it, so it's time to have those

21   conversations.  We'll -- you know, I hope on Monday when

22   we're together this issue will be at worst in process and at

23   best behind us.

24                   MR. AXELROD:  Understood, Your Honor.  Thank

25   you.

1              THE COURT:  Any other issues?

2              MR. MARTIN:  Your Honor, the only question I

3    had, have we waived the presence of our clients on...

4              THE COURT:  Yes.

5              MR. MARTIN:  I appreciate it.  Thank you.

6    Thank you.

7              THE COURT:  I mean, they're always welcome,

8    but not sure that they're going to -- they're always

9    welcome.  It's the case that affects them, so --

10             MR. MARTIN:  No.

11             THE COURT:  -- they can come if they want.

12             MR. MARTIN:  It was only the order since they

13   were ordered to be there.  Thank you, Judge.

14             THE COURT:  I'm sure they will find

15   fascinating the talk of hash values and so forth.

16        All right.  If there's nothing else, I will see you on

17   Monday.  Thank you.

18             (Proceedings concluded at 2:32 p.m.)

19

20                 **C E R T I F I C A T E**

21        I certify that the foregoing is a correct transcript

22   of the record of proceedings in the above-entitled matter

23   prepared from my stenotype notes.

24             */s/ Gregory S. Mizanin          July 19, 2024*
             GREGORY S. MIZANIN, RDR, CRR            DATE

25