IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:21CR491 |
| | ) | |
| Plaintiff, | ) | JUDGE J. PHILIP CALABRESE |
| | ) | |
| v. | ) | |
| | ) | |
| PAUL SPIVAK, et al., | ) | GOVERNMENT'S FACTUAL |
| | ) | RESPONSE TO DEFENDANT PAUL |
| Defendants. | ) | SPIVAK'S MOTION TO DISMISS |

The United States of America, by undersigned counsel, submits this initial response to

Defendant Paul Spivak's motion to dismiss (R. 381).

I.   **INTRODUCTION**

As detailed below, Spivak omits material facts, misstates other facts, and draws incorrect

and unreasonable inferences.  Such deficiencies are reason enough to deny Spivak's motion on

the facts, but the Court should also deny his motion because, as a matter of law, Spivak has

failed to show any real intrusion into the attorney-client privilege and, more importantly, has not

established prejudice warranting the drastic remedy of dismissal.  *See United States v. Morrison*,

449 U.S. 361, 364-65 (1981) (reversing dismissal order; finding dismissal "plainly

inappropriate" due to lack of prejudice "even though the [alleged Sixth Amendment] violation

may have been deliberate."); *United States v. Steele*, 727 F.2d 580, 582-87 (6th Cir. 1984)

(rejecting Sixth Amendment violation claim for post-charge invasion of the attorney-client

privilege due to lack of resulting prejudice); *see also United States v. Dobson*, 626 F. App'x 117,

124 (6th Cir. 2015) (rejecting similar Sixth Amendment claim; explaining that defendants must

surmount an "onerous" hill to demonstrate actionable prejudice).

In short, the core of Spivak's motion is the claim that privileged materials from devices seized in the search of USLG's offices *must* have been used to obtain one or more of the indictments here.  The problem with this claim is that it is based on assumption and innuendo. The indictments allege that Spivak and others misled attorneys to obtain opinion letters.  Because the devices seized apparently have communications with one such attorney, Spivak assumes that the case team reviewed them and presented them to the grand jury.  But no one on the investigative team even had *access* to—much less reviewed and used before the grand jury—any data from the devices until *after* the government presented the first superseding indictment.  True enough, by the time of the second superseding indictment, the case team had access to the seized data.  But that later indictment was returned only to convert Christopher Bongiorno from anonymized co-conspirator to charged defendant, remove defendants who had pled guilty, and add obstruction charges.  The relevant allegations are materially identical.  No new basis was needed, and none was given.  Further, a detailed review the forensic logs shows that no one on the case team has reviewed the documents Spivak has identified.

In accordance with the Court's order (R. 383), the government's response focuses on addressing the factual allegations in Spivak's motion based on the review and investigation that has been performed to date, reserving the right to address legal contentions and to supplement this response accordingly.  The government can provide additional documentary support for the information provided below if the Court desires it.

II.     **BACKGROUND**

        A.     **THE INVESTIGATION AND CHARGES**

                1.     **Investigators obtain and execute an arrest warrant for Spivak and search warrant for USLG's offices, and return seized devices.**

This prosecution began over three years ago with a complaint.  On June 7, 2021, the Honorable Jonathan D. Greenberg, Magistrate Judge, issued the arrest warrant on the government's complaint against Spivak.  (R. 1: Complaint and Affidavit, PageID 1-17). Simultaneously, Magistrate Judge Greenberg found probable cause to search US Lighting Group, Inc.'s ("USLG") offices, located at 1148 East 222nd Street, Euclid, Ohio 44117.  The warrant issued did not include a filter protocol.

The very next day, June 8, 2021, federal agents executed the search warrant on USLG's offices and seized computing devices, including one computer server, 10 computers (desktops and laptops), two external hard drives, and seven flash drives.  After imaging the devices, the government returned the devices to USLG on June 21, 2021.  (*See* R. 163: Government's Brief on Discovery, PageID 1009-19 (detailing list of imaged devices and rooms in which they were located)).

It is not disputed that the investigative team was aware that Spivak and USLG had been engaged in litigation with the SEC.  Under current procedures, based on the perceived likelihood of potentially privileged materials in the corpus of seized materials, the government would have requested a warrant that would include a filter protocol, and instituted such a filter protocol before giving the case team access to the materials.  However, this search was conducted under the prior practice of, absent unusual circumstances, allowing agents to perform preliminary review, especially term searches for voluminous data sets.  When potentially privileged material was encountered, including in review of metadata in search results, the review would be paused,

and the agent would contact the AUSA about implementing a filter procedure.  The government

acknowledges that this prior practice carries a risk that agents, who are generally not lawyers,

might mistakenly continue review despite warning signs.  As a result, warrants requested in

circumstances like these will now generally provide for a filter procedure to be implemented at

the outset.  But the question is not whether procedures for this June 2021 search were optimal,

but whether they deviated from what the warrant authorized, whether any privileged material

was reviewed, and if so, whether Spivak suffered any prejudice.  Again, there was not deviation

from the warrant, which did not require a filter.  Next, a described below, it does not appear that

anyone on the current case team reviewed any potentially privileged material.  Finally, the record

shows that Spivak was not—and could not have been—prejudiced.

In addition, at no time during the search or its aftermath did Spivak or his lawyers inform

the government that privileged materials were present on the seized devices.  Nor did they do so

when the government returned of all seized devices.  Nor did they do so when the government

produced the first extraction of the devices.  Nor when images were provided that were deemed

too difficult to work with.  Nor when discussing at length another production to meet their

required parameters, or in numerous discovery-related status conferences with the Court.

The government's initial failure to implement a filter team did not result in the use of

privileged communications to obtain *any* indictment in this case, as Spivak incorrectly infers.

(*See* R. 381, PageID 3759).  That fact is apparent from the charging documents and the records

concerning the seized devices.

> **2.    Grand jurors charge Spivak by indictment, and then charge Spivak and others through a superseding indictment.**

As explained below, in § II.B.1, the government did not have the ability to review data

from the seized devices until September 16, 2021.  Yet, on June 23, 2021, a federal grand jury in

the Northern District of Ohio charged Spivak with one count of conspiring to commit securities

fraud, in violation of 18 U.S.C. § 371.  (R. 13: Indictment, PageID 42-53 (filed June 23, 2021)).

Similarly, the government presented the superseding indictment to the grand jury on

September 15, 2021, coincidentally one day before anyone on the case team could possibly have

reviewed any data from the seized devices.  (R. 33: Superseding Indictment, PageID 282-323

(filed on September 16, 2021, but presented on September 15, 2021)).  That indictment charged

Spivak, Smirnova, Scott, and others with conspiring to commit securities fraud, in violation of 18

U.S.C. § 371 (counts 1-2), securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff and Title 17

C.F.R. § 240.10b-5 (counts 3-22), and wire fraud, in violation of 18 U.S.C. § 1343 (counts 23-

47).

Not only was it impossible for the government to reference any data seized from USLG's

offices during its September 15 grand jury presentation, but it is clear from the transcript that no

such data, or any attorney communications, were offered to or discussed before the grand jury.

> 3. **The later second superseding indictment mirrors the superseding indictment in all material respects, adding Bongiorno as a defendant to the already-alleged conspiracy, and adding obstruction charges.**

Approximately two years after the grand jury's return of the superseding indictment, the

grand jury returned the second superseding indictment ("SSI") in this case.  (R. 206, PageID

1409-64 (filed on June 29, 2023)).

In the SSI, the grand jury charged Spivak, Smirnova, Scott, and Bongiorno with crimes

like those in the superseding indictment and added counts against Spivak for conspiracy to

obstruct justice, in violation of 18 U.S.C. § 1512(k) (count 48), false declarations before the

court, in violation of 18 U.S.C. § 1623(a) (count 49), and obstruction of a federal investigation,

in violation of 18 U.S.C. § 1519 (count 50).  The government intentionally omitted certain

counts because the only charged defendants in those counts (Mallion and Church) had pled guilty.

A comparison of the superseding indictment and the SSI shows that, but for the new charges against Spivak (and the government's intentional omissions), there are no material differences between the two charging documents. Of particular importance is paragraph 30 of the SSI, which according to Spivak demonstrates the government's alleged "use[] [of] privileged information to obtain the indictment." (R. 381: Motion, PageID 3764).

The chart below shows that Spivak's assertion is baseless speculation. Simply put, the language used in paragraph 28 of the superseding indictment mirrors the language in paragraph 30 of the SSI, and the same is true for other related paragraphs in the charging documents. And, as explained above, it was technologically impossible for the government to use any seized data in its September 15 presentation to the grand jury on the superseding indictment because the data had not even been processed for review.

| Superseding Indictment (R. 33). | Second Superseding Indictment (R. 206). |
| --- | --- |
| ¶ 28 – "The Defendants and others provided attorneys with fraudulent information to obtain legal opinions under Title 17, Code of Federal Regulations, Section 230.144, et al., often referred to as Rule 144. These Rule 144 legal opinions contained misrepresentations concerning the relationship between the customer and the issuer, the customer and an affiliate of the issuer, the consideration paid (if any), and other material misrepresentations. The Defendants and others provided these Rule 144 legal opinions to brokerage houses and transfer agents to satisfy legal requirements for depositing the stock and lifting share restrictions." | ¶ 30 – "SPIVAK, and others, arranged for the shares he and the company controlled to be held in the names of co-conspirators, including SCOTT and Church, and others to avoid restrictions on SPIVAK's ability to sell the shares in the market. In doing so, SPIVAK, SCOTT, and others provided false, incomplete, and fraudulent information to attorneys to obtain legal opinions under Title 17, Code of Federal Regulations, Section 230.144, et al., often referred to as Rule 144, that stated the shares met legal requirements for deposit and sale on the open market. These Rule 144 legal opinions contained misrepresentations concerning the relationship between the customer and the issuer, the customer and an affiliate of the issuer, the consideration paid (if any), and other material |

6

| Superseding Indictment (R. 33). | Second Superseding Indictment (R. 206). |
|---|---|
| | misrepresentations. SPIVAK, SCOTT, and others, provided these Rule 144 legal opinions to brokerage houses and transfer agents to satisfy legal requirements for depositing the stock and lifting share restrictions." |
| ¶ 51(i) - "SPIVAK, MALLION, SCOTT, CHURCH, and others, either directly or through others they controlled, sought out and provided false, incomplete, and fraudulent information to attorneys to obtain Rule 144 legal opinions containing misrepresentations to satisfy legal requirements for depositing the stock for sale." <br><br> ¶ 56(c) – "CHURCH, SCOTT, and others sought out and provided false, incomplete, and fraudulent information to attorneys in order to obtain Rule 144 legal opinions containing misrepresentations to satisfy legal requirements for depositing USLG stock for sale." | ¶ 45(c) - "Church, SCOTT, and others sought out and provided false, incomplete, and fraudulent information to attorneys in order to obtain Rule 144 legal opinions containing misrepresentations to satisfy legal requirements for depositing USLG stock for sale." |

In sum, contrary to Spivak's incorrect and unreasonable inference that privileged communications must have been used to obtain the SSI (*see* R. 381, PageID 3759), the government did not present any such evidence to the grand jury because it was impossible. The above parallel allegations are, instead, general inferences that are drawn from common sense, non-privileged evidence, and other allegations in the charging documents. Again, the transcript of this proceeding similarly confirms no such use of the any privileged communications, or any communications with any attorney. Undersigned counsel offered to provide the relevant excerpts of these transcripts if Spivak's counsel doubted this. Spivak instead filed this motion.

## B.      GOVERNMENT'S DISCOVERY PRACTICE

The timeline of the data review and charges alone guts Spivak's claim that the government used privileged communications to obtain the Superseding Indictment or the SSI.

But even leaving the timing aside, the details of the limited review of the materials shows

Spivak's motion to be based on mistaken assumptions.  And Spivak's motion also omits key

aspects of discovery in this case.

### 1.    Initial Data Extraction & Review by Case Agents

For starters, as noted above, no member of the original or current investigative or

prosecution team had the ability to review any data from Spivak's seized devices until, at the

earliest, September 16, 2021, the day after the grand jury voted on the superseding indictment.

Forensic logs from BIDMAS, the review tool that the FBI employed in this case, provide the

timeline.

As the below snapshot from those BIDMAS forensic logs shows, between September 15,

2021 and September 16, 2021, technicians extracted and processed data from the seized devices

into BIDMAS.  The first arguable review did not occur until September 17, 2021.  On that day,

FBI Forensic Accountant Chuna ran a search for data processed over those two days in an

attempt to create a folder for that data under the label of "USLG," which was created, and then

began to be used for any further review of that material:

| | | | | | |
|---|---|---|---|---|---|
| 09/17/2021 13:35:22 EDT | Search | (Advanced): [Processing: 09/15/2021 09:46 ] | | 413019 | 428399 |
| 09/17/2021 13:39:08 EDT | Search | (Basic): Entire Corpus | | 1705810 | 1766672 |
| 09/17/2021 13:39:31 EDT | Search | (Advanced): [Processing: 09/16/2021 09:00 ] | | 42 | 42 |
| 09/17/2021 13:40:37 EDT | Search | (Advanced): [Processing: 09/15/2021 09:46 ] | | 413019 | 428399 |
| 09/17/2021 13:43:15 EDT | Search | (Basic): Entire Corpus | | 1705810 | 1766672 |
| 09/17/2021 13:44:38 EDT | Search | (Advanced): [Processing: 09/15/2021 09:46 ] | | 413019 | 428399 |
| 09/17/2021 13:46:12 EDT | Search | (Basic): ([USLG])  SPIVAK | USLG | 5587 | 5597 |
| 09/17/2021 13:47:08 EDT | Search | (Basic): ([USLG])  HOWARD | USLG | 983 | 984 |
| 09/17/2021 13:48:12 EDT | Search | (Advanced): [Any: [howard]][Stemmed] in [All fields] where [Processing: 09/15/2021 09:46 ] | | 2190 | 2244 |
| 09/17/2021 13:49:20 EDT | Search | (Advanced): [Processing: 09/15/2021 09:46 ] | | 413019 | 428399 |
| 09/17/2021 13:55:58 EDT | Tagging | 413,019 documents (selected by user) from search [Processing: 09/15/2021 09:46 ] | USLG | 413019 | 428399 |
| 09/17/2021 15:27:02 EDT | Timeout | | | 0 | 0 |

Once the data was accessible for review, FBI investigators started to run several searches, but they did not engage in any review of the details of the documents.

Between September 17, 2021 and April 25, 2023, three investigators (Special Agent Fry, Special Agent Joyce, and Forensic Accountant Chuna) ran searches across USLG-related files. They did not search for any documents involving any attorney.  Nor did they review any documents that pertained to contacts between Spivak and any attorney.  But the Court need not rely solely on the investigators' recollection because the BIDMAS activity logs reflect the investigators' activity, and the logs confirm that the investigators ran searches using basic search terms and then simply examined the search results for a few minutes or seconds.

Starting with the first search, on September 17, 2021, Chuna searched the USLG folder for "SPIVAK" and "HOWARD."  He did so in less than one minute and then timed out of the BIDMAS system without taking any other action, except for tagging the 400,000 plus documents processed on September 15 and 16 so that those documents would reside in the "USLG" folder. This activity is reflected in the snapshot above.

9

On September 28, 2021, Fry also searched the USLG data.  In under one hour, he ran 20 searches that brought back results ranging from five documents to 24,000 documents.  In total, he tagged two documents, neither of which involved privileged attorney communications according to the government's later-installed filter team.

| | | | | | |
|---|---|---|---|---|---|
| 09/28/2021 11:31:22 EDT | Login | | | 0 | 0 |
| 09/28/2021 11:32:40 EDT | Search | (Basic): Entire Corpus | | 1705810 | 1766672 |
| 09/28/2021 11:34:53 EDT | Search | (Basic): ([USLG]) "Mallion" | USLG | 363 | 363 |
| 09/28/2021 11:38:18 EDT | Tagging | | | 1 | 1 |
| 09/28/2021 11:38:42 EDT | Tagging | | | 1 | 1 |
| 09/28/2021 11:43:53 EDT | Search | (Basic): ([USLG]) "forrest church" | USLG | 63 | 63 |
| 09/28/2021 11:44:38 EDT | Search | (Basic): ([USLG]) "Duwayne Graham" | USLG | 101 | 101 |
| 09/28/2021 11:49:04 EDT | Search | (Basic): ([USLG]) "thomas collins" | USLG | 38 | 38 |
| 09/28/2021 11:49:47 EDT | Search | (Basic): ([USLG]) "bongiorno" | USLG | 17 | 17 |
| 09/28/2021 11:50:36 EDT | Search | (Basic): ([USLG]) "jason arthur" | USLG | 173 | 173 |
| 09/28/2021 11:52:40 EDT | Search | (Basic): ([USLG]) "charles scott" | USLG | 286 | 287 |
| 09/28/2021 11:57:22 EDT | Search | (Basic): ([USLG]) "tip top" | USLG | 86 | 86 |
| 09/28/2021 11:59:26 EDT | Search | (Basic): ([USLG]) "manzanilla" | USLG | 5 | 5 |
| 09/28/2021 12:00:28 EDT | Search | (Basic): ([USLG]) "de leon" | USLG | 77 | 77 |
| 09/28/2021 12:01:27 EDT | Search | (Basic): ([USLG]) "don howard" | USLG | 225 | 225 |
| 09/28/2021 12:04:09 EDT | Search | (Basic): ([USLG]) "larry matyas" | USLG | 30 | 30 |
| 09/28/2021 12:05:20 EDT | Search | (Basic): ([USLG]) "stock day media" | USLG | 68 | 68 |
| 09/28/2021 12:11:24 EDT | Search | (Basic): ([USLG]) "hdg global" | USLG | 30 | 30 |
| 09/28/2021 12:12:03 EDT | Search | (Basic): ([USLG]) "commission" | USLG | 5055 | 5096 |
| 09/28/2021 12:13:15 EDT | Search | (Basic): ([USLG]) "marketing" | USLG | 24951 | 25570 |
| 09/28/2021 12:13:55 EDT | Search | (Basic): ([USLG]) "lead generation" | USLG | 550 | 550 |
| 09/28/2021 12:17:00 EDT | Search | (Basic): ([USLG]) "upwork" | USLG | 1766 | 1766 |
| 09/28/2021 12:21:10 EDT | Search | (Basic): ([USLG]) "craigslist" | USLG | 131 | 131 |
| 09/28/2021 12:24:51 EDT | Logout | | | 0 | 0 |

Further review after this time lacked substance or was not related to the USLG data.  On October 21 and 26, 2021, Chuna conducted a few more quick searches that were not in the USLG folder and do not appear to be related to this case.

| | | | | | |
|---|---|---|---|---|---|
| 10/21/2021 14:40:29 EDT | Login | | | 0 | 0 |
| 10/21/2021 14:41:48 EDT | Search | (Basic): Bryant | | 1870 | 1872 |
| 10/21/2021 14:43:50 EDT | Tagging | 17 documents (selected by user) from search Bryant | | 17 | 22 |
| 10/21/2021 14:44:32 EDT | Tagging | 17 documents (selected by user) from search Bryant | | 17 | 17 |
| 10/21/2021 14:45:32 EDT | Search | (Basic): Jamie Bryant | | 3095 | 3104 |
| 10/21/2021 14:46:27 EDT | Search | (Advanced): [All: Jamie Bryant][Stemmed] in [All fields] | | 1023 | 1023 |
| 10/21/2021 14:49:14 EDT | Search | (Advanced): [All: Newman Shaun][Stemmed] in [All fields] | | 492 | 493 |
| 10/21/2021 14:51:34 EDT | Tagging | | | 1 | 1 |
| 10/21/2021 15:01:42 EDT | Tagging | | | 1 | 1 |
| 10/21/2021 16:32:51 EDT | Timeout | | | 0 | 0 |
| 10/26/2021 13:22:56 EDT | Login | | | 0 | 0 |
| 10/26/2021 13:22:56 EDT | Logout | | | 0 | 0 |
| 10/26/2021 13:23:07 EDT | Login | | | 0 | 0 |
| 10/26/2021 13:23:48 EDT | Search | (Basic): "qbw" | | 585 | 586 |
| 10/26/2021 13:25:47 EDT | Search | (Advanced): [Type: Prog or otherps or Other][Doc Size: 500 MB +] | | 19 | 19 |
| 10/26/2021 14:56:55 EDT | Timeout | | | 0 | 0 |

Chuna returned to the BIDMAS platform on January 21, 2022.  Using no specific search terms, he searched for all data processed between October 27, 2021, and December 3, 2021, and then moved all 1,585 documents into the "USLG" folder.  He then timed out of the BIDMAS system.

| | | | | | |
|---|---|---|---|---|---|
| 01/21/2022 10:19:39 EST | Search | (Advanced): [Processing: 12/03/2021 12:07 Data-December-3-2021 and 10/27/2021 11:58 Data-October-19-2021] | | 1585 | 1585 |
| 01/21/2022 10:20:33 EST | Tagging | 1,585 documents (selected by user) from search [Processing: 12/03/2021 12:07 Data-December-3-2021 and 10/27/2021 11:58 Data-October-19-2021] | USLG | 1585 | 1585 |
| 01/21/2022 11:50:54 EST | Timeout | | | 0 | 0 |

On January 28, 2022, SA Joyce logged on to the BIDMAS system and then simply searched for the entire universe of data contained within the review platform.  He then filtered documents tagged "hot," but none of those documents related to this case—as no documents had been tagged hot since the USLG data was loaded.  Instead, those "hot" documents related to a separate case, as the BIDMAS platform space used for USLG also had data related to a separate

11

prosecution.  That is why, in the snapshot below, the "entire corpus" of documents equates to

1,707,395, as opposed to the approximately 413,000 USLG-sourced documents that were

processed in September 2021.

| 01/28/2022 15:10:13 EST | Login | | | 0 | 0 |
|---|---|---|---|---|---|
| 01/28/2022 15:12:15 EST | Search | (Basic): "hot docs" | | 0 | 0 |
| 01/28/2022 15:14:58 EST | Login | | | 0 | 0 |
| 01/28/2022 15:17:29 EST | Search | (Basic): Entire Corpus | | 1707395 | 1768257 |
| 01/28/2022 15:41:20 EST | Search | (Basic): Entire Corpus | | 1707395 | 1768257 |
| 01/28/2022 15:42:29 EST | Tagging | All documents (all search results) from search Entire Corpus | | 1707395 | 1768257 |
| 01/28/2022 16:45:00 EST | Timeout | | | 0 | 0 |
| 01/28/2022 16:59:45 EST | Print (PDF) | All items (all search results) from search Entire Corpus (filtered by tag Review Hot) | | 947 | 1319 |
| 01/28/2022 17:37:00 EST | Timeout | | | 0 | 0 |

On June 13, 2022, sixth months after Joyce's activity reflected above, Chuna returned to

BIDMAS and ran several quick searches, including in the USLG folder but applied no tags.  It is

the government's understanding these searches were done to determine whether any data from

the other separate case had been erroneously added to the "USLG" folder.  Nothing in the

snapshot below is indicative of a substantive document review, and the only search terms relate

to defendants in another matter:

| 06/13/2022 13:25:18 EDT | Login | | | 0 | 0 |
|---|---|---|---|---|---|
| 06/13/2022 13:27:48 EDT | Search | (Basic): ([USLG]) | USLG | 414604 | 429984 |
| 06/13/2022 13:38:33 EDT | Search | (Advanced): ([USLG]) [Processing: 12/03/2021 12:07 Data-December-3-2021] | USLG | 553 | 553 |
| 06/13/2022 13:39:54 EDT | Search | (Advanced): ([USLG]) [OCR: 10/27/2021 14:12 ] | USLG | 86852 | 87469 |
| 06/13/2022 13:40:38 EDT | Search | (Advanced): ([USLG]) [Processing: 10/27/2021 11:58 Data-October-19-2021] | USLG | 1178 | 1178 |
| 06/13/2022 13:41:45 EDT | Search | (Advanced): ([USLG]) [Processing: 09/16/2021 09:00 ] | USLG | 0 | 0 |
| 06/13/2022 13:42:31 EDT | Search | (Advanced): ([USLG]) [Processing: 09/15/2021 09:46 ] | USLG | 413019 | 428399 |
| 06/13/2022 13:50:25 EDT | Search | (Basic): ed951982.png | | 1 | 1 |
| 06/13/2022 13:52:01 EDT | Search | (Basic): Entire Corpus | | 1707395 | 1768257 |
| 06/13/2022 14:41:57 EDT | Search | (Advanced): [Cust: 1 or 2 or 3 or 4 or 5] | | 413061 | 428441 |
| 06/13/2022 14:42:22 EDT | Search | (Basic): SPIVAK | | 8867 | 8892 |
| 06/13/2022 14:44:16 EDT | Search | (Advanced): [Cust: CharlesBIDMAS or DrorBIDMAS or EliBIDMAS or GoogleBIDMAS or HotmailBIDMAS or RuggeriBIDMAS or YahooBIDMAS] | | 1293825 | 1339307 |
| 06/13/2022 16:18:17 EDT | Timeout | | | 0 | 0 |

Finally, on April 25, 2023, Fry returned to BIDMAS and ran a series of general searches, using terms like "quickbooks" and "craigslist."  The snapshot below shows, once again, that Fry moved from search to search in a matter of minutes and applied zero tags.  In other words, he did not engage in any meaningful review.

| 04/25/2023 15:07:44 EDT | Login | | | 0 | 0 |
|---|---|---|---|---|---|
| 04/25/2023 15:10:19 EDT | Search | (Basic): Entire Corpus | | 1707395 | 1768257 |
| 04/25/2023 15:11:15 EDT | Search | (Basic): ([USLG]) "quickbooks" | USLG | 2793 | 2801 |
| 04/25/2023 15:14:03 EDT | Search | (Basic): ([USLG]) "quick books" | USLG | 53 | 53 |
| 04/25/2023 15:22:54 EDT | Search | (Basic): ([USLG]) "collins" | USLG | 2034 | 2060 |
| 04/25/2023 15:24:59 EDT | Search | (Basic): ([USLG]) "tom collins" | USLG | 15 | 15 |
| 04/25/2023 15:25:27 EDT | Search | (Basic): ([USLG]) "bongiorno" | USLG | 21 | 21 |
| 04/25/2023 15:26:33 EDT | Search | (Basic): ([USLG]) "matyas" | USLG | 43 | 43 |
| 04/25/2023 15:28:06 EDT | Search | (Basic): ([USLG]) "craigslist" | USLG | 135 | 135 |
| 04/25/2023 15:32:26 EDT | Search | (Basic): ([USLG]) "UPWORK" | USLG | 1779 | 1779 |
| 04/25/2023 15:45:56 EDT | Search | (Basic): ([USLG]) "bucki media" | USLG | 1 | 1 |
| 04/25/2023 15:46:51 EDT | Search | (Basic): ([USLG]) "Nov 06 2020" | USLG | 5 | 5 |
| 04/25/2023 16:03:13 EDT | Timeout | | | 0 | 0 |

Here, the initial review by FBI personnel was exceedingly brief, and the investigators report reviewing the details of very few documents, and not encountering anything that might

13

have raised privilege concerns.  Admittedly, that brief review does not immediately square with the great effort undertaken to obtain the search warrant and execute it.  There are at least two reasons for this.  First, investigators learned during the execution of the search that some USLG employees made comments to the effect that nothing of use would be found on the computers, or that they were instructed not to save things to the computers.  With that reason for concern, they then reviewed on a search term basis, and found confirmation of those concerns.  The total number of records in the universe—approximately 413,000—was abnormally small for such a large number of seized computers and other devices (much smaller, for example, than the number of records obtained from many fewer devices in the other matter in the database).  And the number of search term hits was abnormally low.  For that reason, as well as the availability of other evidence and avenues for investigation, investigators chose not focus on review of these devices.  It turns out that, as defense counsel would later point out in many discovery conferences, the extraction into BIDMUS were not sufficient for full review, and review of later extractions of the devices may well have been more fruitful than investigators realized.

In addition to the three FBI investigators, the original prosecutor on this case, former Assistant U.S. Attorney Abreu, also had access to the BIDMAS system, but he too did not search for any privileged communications on the platform.  He, in fact, did not engage in any review of the USLG data on the BIDMAS platform, as shown in the snapshot below, again from the BIDMAS forensic logs.

| | | | | | |
|---|---|---|---|---|---|
| 10/14/2022 15:21:06 EDT | Login | | | 0 | 0 |
| 10/14/2022 15:21:06 EDT | Logout | | | 0 | 0 |
| 10/14/2022 15:21:19 EDT | Login | | | 0 | 0 |
| 10/14/2022 16:52:46 EDT | Timeout | | | 0 | 0 |
| 10/17/2022 09:09:27 EDT | Timeout | | | 0 | 0 |

### 2.      Second Data Extraction & Review by AUSA Abreu

As discussed in the next section, when Defendants lamented the quality of the extractions from BIDMAS, extensive discussions and discovery conferences ensued, resulting in the government providing complete extractions of all the devices, initially through FTK and then through Relativity with a load file.  The extractions at issue in Spivak's filing are from the Relativity platform.  (While FBI manages the use of the BIDMAS tool, Relativity is provisioned by U.S. Attorney's Office technology partners.)

Former AUSA Abreu had access to that Relativity platform with those more detailed extractions.  Like the data on BIDMAS, the data on Relativity was not accessible to anyone before the grand jury's return of the original or superseding indictment.  In fact, the USLG Relativity workspace was not opened until May 17, 2022, and the platform did not have reviewable data until June 23, 2022.

It is the government's understanding that Mr. Abreu made limited use of his access to this database.  Using the list of privileged documents that Spivak has provided, the government has asked the Office's eLitgiation staff to analyze whether Mr. Abreu had viewed any of the approximately 200 allegedly privileged documents that the government produced back to Spivak. (*See* R. 381-1).  The government was able to determine that Mr. Abreu did not review any of the listed documents.

Mr. Abreu had informed undersigned counsel that in his review in 2024, he found results in emails that led him to believe he could view privileged information, and so he sought assistance from the filter team, indicating to the filter AUSA that he believed the metadata showed access to a Spivak PST file (a repository for emails).  In reviewing Mr. Abreu's review history, it does not appear that he searched for documents involving Spivak or USLG's attorneys on the Relativity platform.  In reviewing his history associated with his pausing his review and

seeking filter assistance, it appears that, in that process, he viewed one document that the filter team has since categorized as potentially privileged (SPIVAK-0208922). But again, this review occurred in 2024, many months after the return of any indictment. With the exception of limited activity to facilitate the filter or to return to documents previously viewed and known not to be privileged, Mr. Abreu did not continue to search and review documents after asking for the filter team's assistance.

Last, the current prosecutors—AUSAs Elliot Morrison, Megan Miller, and Stephanie Wojtasik—have never had access to the USLG data on either BIDMAS or Relativity, and thus have never even had the opportunity to view any data, much less the communications that Spivak raises in his motion. Similarly, the investigating agents had only the very limited activity in BIDMAS described above, and they have had no access to the Relativity extraction, from which it appears that Spivak has located all of the documents claimed to be privileged.

### 3. Production History Context

As a final matter, Spivak's recounting of the government's document productions is incomplete; additional context is important. During this yearslong case, the government has made numerous productions to Spivak, including complete data extractions provided at Defendants' express request and by order of the Court.

To begin, on June 21, 2021, the government returned all seized devices to USLG. After that initial return, the government made a series of productions, which were previously summarized in the government's discovery brief filed on September 28, 2022. (*See* R. 163). In sum, the government produced the following, in addition to other discovery materials:

- on March 18, 2022, "a load file containing scanned, processed paper documents that were seized from USLG offices";

16

- on May 16, 2022, "a load file containing content from the computers seized from and returned to USLG in June 2021" (the BIDMAS extractions);

- on May 19, 2022, "a reproduction of the load file for the scanned paper documents to replace a load file that contained corrupted data"; and

- on August 12, 2022, "forensic images (FTK images) of the computers and devices seized from and returned to USLG," plus a description of the "room where each device was located, the search warrant return, and the sketch made by the FBI during the execution of the search noting the letter designation for each room."

(*Id.*).

Defendants had complained about the form of the BIDMAS extraction, but did not raise privilege concerns.  (R. 165, PageID 1088).  Nor was the return of the original devices sufficient for Spivak.  Nor the availability of FTK images.  Ultimately, the government presented four possible paths forward.  (R. 169, PageID 1127).  The discussion at that time focused on balancing the administrative cost to the government of providing all the seized data in a more complete and usable form against the benefits to Defendants of that more complete and usable form.  In those discussions, the government had emphasized that the investigators had not materially reviewed the contents of the devices and at that time had no intent to use the contents at trial.  This Court found that the government had substantially complied with its discovery obligations (*see* R. 169: Order, PageID 1122-33), but nevertheless ordered the government to reproduce data from the seized devices, in effect choosing one of the options the government had described.  So, in accordance with the Court's order and Defendants' requests, on December 29, 2022, the government reproduced all extracted files from the seized devices, even though the

government had not reviewed the content.  (*See generally* R. 381-6: Abreu Letter, PageID 3791 (attached as Exhibit F to Spivak's motion; explaining the production's genesis)).

In addition, after receiving a request from Spivak's former counsel for a production of Spivak's phone in March 2023, the government provided a full extraction of the phone to Spivak's counsel on June 1, 2023, in addition to a filtered version of the phone extraction.  (*Id.*). The government also produced documents from a flash drive provided by S.T, a former USLG employee.  (*See* R. 381: Motion, PageID 357-58).

<h4>4.    Defendants raise concerns about the government's potential review of privileged information.</h4>

In June 2024, Spivak's and Smirnova's counsel reached out about privilege concerns. They identified a single assertedly privileged document that they found on the S.T. flash drive, and the government explained that the drive had been obtained not by search warrant, but by her voluntary production, and was only reviewed to try to locate a particular document, such that most of the drive, including the document at issue, was not reviewed.  No one on the case team has ever reviewed that document.

Next, on July 9, 2024, the defense identified what the government understands to be the primary source of the concerns that Spivak has raised in this motion: approximately 200 assertedly privileged documents from the USLG devices.  Those documents are discussed in great detail above.

Finally, in recent days, Spivak has taken the position that materials that were filtered contained some privileged information.  First, in the motion, he identified short text message strings from Spivak's iPhone.  Assuming those messages come from the filtered version of the phone provided to Spivak, and not the complete extraction provided, it is still the case that no one on the case team has reviewed those messages.

18

Second, in correspondence with undersigned counsel, Spivak has represented that unspecified emails from the USLG computers that were more recently filtered—but still not provided to the case team, pending review by Spivak's counsel—are privileged.  No one on the case team has reviewed any of these materials even though they have cleared the filter process.  Those materials include what Spivak apparently concedes are numerous documents that are not privileged, because Spivak's counsel has declined, including in response to email requests and in a phone call on August 9, 2024, seeking Spivak's position on which, if any, of those documents are privileged.

The parties were, at a minimum, able to make progress on this phone call, and agree that emails with Mallion, a third party, are not privileged.

## III.   CONCLUSION

The above facts show that Spivak's motion to dismiss is meritless.  The government did not use privileged information to obtain any indictment, and Spivak has come nowhere close to establishing prejudice warranting the drastic remedy of dismissal.  The Court should deny Spivak's motion.

The government also is prepared to supplement the facts as the Court needs, and to provide additional legal argument.  Further, if questions about the scope of privilege arise, the government would address, for example, the extent to which Spivak waived privileges in litigation with the Securities and Exchange Commission, both by expressly stating he was doing so, and by asserting an advice of counsel defense.

Respectfully submitted,

REBECCA C. LUTZKO
United States Attorney

By:    /s/ Elliot Morrison
Elliot Morrison (OH: 0091740)
Megan R. Miller (OH: 0085522)
Stephanie A. Wojtasik (OH: 0097858)
Assistant United States Attorneys
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3919/3855/3856
Elliot.Morrison@usdoj.gov
Megan.R.Miller@usdoj.gov
Stephanie.Wojtasik@usdoj.gov