```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
 2                         EASTERN DIVISION


 3
      UNITED STATES OF AMERICA,     ) Case No. 1:21-cr-491-3
 4                                  )
                 Plaintiff,         )
 5                                  )
           vs.                      ) Cleveland, Ohio
 6                                  ) Wednesday, September 11, 2024
      CHARLES SCOTT,                )
 7                                  )
                 Defendant.         )
 8

 9              TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                         PHASE 2, DAY 1
10           BEFORE THE HONORABLE J. PHILIP CALABRESE,
                   UNITED STATES DISTRICT JUDGE
11
      APPEARANCES:
12
      For the Government:        Elliot D. Morrison, AUSA
13                               Megan R. Miller, AUSA
                                 Stephanie Wojtasik, AUSA
14                               U.S. ATTORNEY'S OFFICE - CLEVELAND
                                 801 West Superior Avenue
15                               Suite 400
                                 Cleveland, OH 44113
16                               216.622.3600

17    For the Defendant:         David M. DeVillers, Esq.
                                 Samantha Pugh, Esq.
18                               BARNES & THORNBURG
                                 41 South High Street
19                               Suite 3300
                                 Columbus, OH 43215
20                               614.628.0096

21    Official Court Reporter:   Gregory S. Mizanin, RDR, CRR
                                 United States District Court
22                               801 West Superior Avenue
                                 Court Reporters 7-189
23                               Cleveland, Ohio 44113
                                 216.357.7036
24                               Gregory_Mizanin@ohnd.uscourts.gov

25       Proceedings recorded by mechanical stenography; transcript
              produced with computer-aided transcription.
```

2

1                          **I N D E X**

2
                                                          PAGE
3
        GOVERNMENT'S OPENING STATEMENT.....................  19
4
        DEFENDANT'S OPENING STATEMENT......................  44
5

6       WITNESSES                                         PAGE

7       **JASON DEAN**
            DIRECT EXAMINATION.............................  54
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      WEDNESDAY, SEPTEMBER 11, 2024

 2                              - - -

 3               (Proceedings commenced at 10:56 a.m.)

 4                              - - -

 5                   (The following proceedings were had out of the

 6                   presence of the jury.)

 7               THE COURT:  Before we bring the jury out,

 8       there's a couple things I wanted to address.  You may have

 9       some other items.

10           So, the first item on my list, in terms of giving some

11       orienting instructions to the jury -- I might have mentioned

12       this yesterday -- I'm just going to -- I'm not going to go

13       through the full litany from Phase 1, but I'm going to give

14       some short reminders about this is a criminal case, here's

15       the important things.  I'm going to give just the high-level

16       elements for the charges as to Mr. Scott.

17           I do think after doing that I'm going to give an

18       instruction or say a word about the absence of Mr. Spivak at

19       this point.  In theory, you could have a phase trial where

20       Mr. Spivak's not at all implicated in Phase 2.  That's not

21       this case, so I think they're going to figure out not only

22       is he physically not here, but he's going to be a figure in

23       Phase 2 no matter what.

24           So there's a Sixth Circuit instruction from a case

25       called Phillips, which, you know, I have been kind of
```

1    working off of, which in more words than this basically says

2    don't infer anything from that; it shouldn't bear on your

3    consideration; don't give it any thought.  And the reason

4    for that is because in our system, as previously said, each,

5    you know, liability -- criminal liability is individual to

6    each defendant, so they have to make that determination

7    anyway.  So I do think it's appropriate to give that

8    instruction.  I think that was the major item I wanted to

9    address.

10        I think then in terms of scheduling, as we go forward,

11   today's Wednesday, so we'll -- we should be able to get two

12   full days in notwithstanding what I said earlier.  I think

13   the jurors have cleared schedules for full days.  I don't

14   mean 8 to 8 or anything like that, but two full days to get

15   as much of the evidence in as possible, and then my sense is

16   we probably get done early next week.

17        All right.  Any other issues before we bring them?

18              MR. MORRISON:  I don't know if the jury even

19   remembers you talking about there being obstruction charges

20   and a phase 3, but you might want to just tell them this is

21   now the last phase, I just -- in terms of orienting them

22   that -- let's put it this way, I wouldn't want them thinking

23   there's more coming against him when there isn't.

24              MR. DEVILLERS:  I mean, I would be shocked if

25   they remember that, quite frankly.  And in that --

1          THE COURT:  I don't remember it; I don't know

2     how they do.

3          MR. DEVILLERS:  Right.  My point exactly,

4     Judge.  So I don't think it's necessary, but I don't have an

5     objection to if you'd like to --

6          THE COURT:  I think what I would say is as we

7     move into this phase, my expectation is we'll wrap up very

8     early next week and -- you know, for your planning purposes,

9     you know, with the entirety of the trial, just something to

10    that effect.

11         MR. MORRISON:  Okay.

12         THE COURT:  Any other matters before we get

13    underway?

14         MR. DEVILLERS:  Yes, Your Honor.

15         I do want to renew my objections to the hearsay

16    statements, particularly in this case Mr. Spivak.  I mean, I

17    think you're going to hear from opening on that this case

18    is -- primarily against my client is Mr. Spivak's

19    statement -- only Mr. Spivak's statements.  We believe that

20    this is -- this is hearsay.  We don't -- again, they chose

21    not to have a pretrial hearing to prove by preponderance of

22    the evidence that there is a conspiracy.  We also believe a

23    lot of that in that statement isn't in furtherance of

24    conspiracy, it's talk about the past.

25         And furthermore, Your Honor, we would object to -- we

1    got a PowerPoint, and we only got the paper version of it,

2    and there's audio on it, it appears, if I'm not mistaken.

3                    MR. MORRISON:  Yes.

4                    MR. DEVILLERS:  I don't know what's going to

5    be played.  I know the exhibit numbers on them, but there's

6    hours of this stuff, so I don't know what they intend to get

7    into in opening statement.  We would object to audio being

8    played at this point.  We don't know -- that's evidence for

9    trial.  Clearly they can talk about it, but we don't know

10   what's going to get in and not get in, and I think it would

11   prejudice my client.

12                   MR. MORRISON:  I guess, Your Honor -- taking

13   this in order -- as to co-conspirator statements, it's true

14   that there are a number of statements of Mr. Spivak.  It's

15   also true that we believe that it will be proven by a

16   preponderance that there was a conspiracy that Mr. Scott was

17   a member of the conspiracy and that all of the statements

18   offered by Mr. Spivak were in furtherance of that

19   conspiracy.

20       It's also true that there is talk about the past.

21   That is specifically in furtherance of the conspiracy

22   specifically charged here insofar as it's the explanation

23   for how he has the shares he's coming to sell, and they

24   reference at various times -- both Mr. Spivak actually and

25   Mr. Church reference the 2018 arrangement by which he was --

1    he received the 1.5 million shares at that time, which is

2    roughly half of his position at the time of the 2021 events.

3                    THE COURT:  Let me interject here.

4         I know there's one more issue that Mr. DeVillers

5    raised I'll ask you to speak to, but on this issue, my

6    view -- I haven't looked at -- you know, I'm looking forward

7    to opening statements.  This will be -- you know, you have,

8    Mr. DeVillers, more of a sense of what's coming than I do,

9    so this whole...

10        Shouldn't have had the other cup of coffee, I won't

11   need it.  I'll be interested and engaged.

12        But what I would say is I take the point on the

13   hearsay exception and the statements.  My view on that is

14   something like this:  Opening statements are that; they are

15   opening statements.  I think I said this before.  You know,

16   anything that is not "Ladies and gentlemen, we anticipate

17   that the evidence will show" is probably outside the proper

18   use of an opening statement.

19        Now, subject to that, if the United States thinks that

20   these statements are going to fall within the

21   co-conspirators exception, you know, I think they -- I would

22   trust that they have a good faith belief in that.  And if

23   counsel wants to go out on a limb, that's always kind of the

24   lawyerly judgment that gets made in opening statement.

25   That's kind of where I'm at.  I think that what polices it

1   is how far -- you know, how strong that limb is that they're

2   out on, if they go onto one.  I'm happy to give you a

3   standing objection on this issue throughout the trial, so I

4   think that the issue -- sooner or later...

5       So let me just say two things.  Based on Phase 1,

6   again, we have two separate conspiracies charged, so I --

7   you know, I trust that the United States will be able to

8   prove by a preponderance at least that this co-conspirator

9   exception here is going to apply.  You know, if they don't,

10  we'll deal with that.  You know, I trust you'll file the --

11  you know, make a motion at the appropriate time at that

12  point.  And that's where I'll give you the standing

13  objection.

14      What I would say is like if there's a particular

15  statement that you think would not fall within the

16  co-conspirator exception, even if the conspiracy is

17  established by a preponderance, that's where I think we need

18  to have some either objection or discussion at sidebar or

19  the like.

20              MR. DEVILLERS:  I'll front this for Your

21  Honor.  I do believe that there's kind of a spoke-and-wheel

22  conspiracy in this particular case I think because there is

23  the allegation of conspiracy with Mr. Spivak and Mr. Scott,

24  but then there's an entirely separate conspiracy with

25  Mr. Spivak and Mr. Church.  So I don't know how Mr. Church's

1    statements are the furtherance of his conspiracy.  They're

2    all indicted in one conspiracy.  Don't get me wrong, I'm not

3    denying that.  But there isn't -- there isn't this sort of

4    agreement between the three of them.  There's

5    agreement allegedly between Mr. Spivak and Mr. Scott and

6    Mr. Spivak and Mr. Church.

7         So I'll front that, that's an objection that I'll be

8    making.

9              MR. MORRISON:  And I don't think our response

10   will be a surprise to you.

11        From what you heard in Phase 1, it's that it was

12   essentially the two of you have the same role in this -- in

13   the execution of this conspiracy.  And that Mr. Church we

14   anticipate will testify he did speak directly with Mr. Scott

15   about it.  That this is not a -- this is not -- it would be

16   okay if it were just two spokes, but actually it's a

17   triangle.  And, in fact, it's not just a triangle because

18   it --

19              THE COURT:  So the conspiracy itself is a

20   pyramid scheme.  This is great.

21              MR. MORRISON:  Yeah.  We're going to build a

22   lot of shapes.

23        And so we do think it will connect up between -- and I

24   think essentially in a way that mirrors what you saw in the

25   first phase.

1              THE COURT:  All right.

2          So all of that remains to be proved.  You have an

3      objection on that, but if there's specific statements or

4      issues we need to talk about, I'll gladly do that as

5      necessary throughout the trial.

6              MR. DEVILLERS:  Thank you, Judge.

7              THE COURT:  Then Mr. DeVillers also put on the

8      table the issue of the audio.

9              MR. MORRISON:  And I guess my understanding --

10     the way we've done this before is if we have a -- have high

11     degree of confidence that these are going to be admissible,

12     there's nothing wrong with playing them for the jury.  And,

13     as you said, we might find ourselves out on a limb on one or

14     more and we might be taken to task for that at a later time,

15     but that we have -- certainly have a good-faith belief that

16     all these recordings that we're going to play will be

17     admissible.

18         I think we've flagged what pieces by identifying not

19     only exhibit numbers but exhibit excerpt numbers.  And

20     essentially for most of the things that we're playing,

21     virtually the whole transcript of what's being played or at

22     least the start and the end is on the slides that have been

23     provided to Mr. DeVillers.  And so I don't think...

24         And to be clear, I can understand him being concerned,

25     "Look, you said, you know, 453A or 451-this, that's a number

1    of minutes long, are you really going to play nine minutes?"

2    The answer is no.  We have maybe two clips that are longer

3    than a minute.  My goal was to keep all the clips in the,

4    you know, 20- to 45-second range to keep the jury's

5    attention here.

6                    THE COURT:  All right.

7            So, with that, I think we're ready for the jury.

8                    (The following proceedings were had in the

9                    presence of the jury.)

10                   THE COURT:  Good morning, ladies and

11   gentlemen.

12           Thank you for your service on this jury.  As I said

13   previously, each of you is here at a sacrifice, and all of

14   us appreciate your time, your work, and your attention.

15   Thank you.

16           As I also told you previously, I have broken down a

17   much longer case into a couple smaller pieces to try to make

18   it a little more manageable and to try to make the

19   experience easier for you, all while assuring that the

20   parties receive a fair trial.

21           One advantage of this approach is that we do not need

22   to repeat all the instructions you've already heard.  So as

23   we move into this next phase of the trial, I will not repeat

24   everything I've previously told you and that you've already

25   heard about your duties as jurors and how the Constitution

1     and laws of the United States apply to the trial of a

2     criminal case.  I will also tell you now that, based on my

3     discussions with counsel, I anticipate that you will have

4     the case fully and finally submitted to you early next week.

5          Before we begin this phase of the trial, I simply want

6     to remind you of a couple things, again, without repeating

7     everything you've already heard.

8          First, nothing the Court may say or do during the

9     course of the trial is intended to indicate or should be

10    taken by you as indicating what your verdict should be.

11    That is up to you alone.  And you discharge your sworn

12    duties to serve as the judges of the facts in this case.

13         Let me remind you a few things about the evidence from

14    which you will find the facts.

15         The evidence consists of the testimony of witnesses,

16    documents, and other things received into the record as

17    exhibits and any facts that the lawyers agreed to or

18    stipulate to or that the Court may instruct you to find.

19    Again, certain things are not evidence, and you should not

20    consider them.  I will give you a list of them now.

21         Statements, arguments, and questions by lawyers are

22    not evidence.

23         Objections to questions are not evidence.  Again,

24    lawyers have an obligation to their clients to make

25    objections when they believe that evidence being offered is

1    improper under the rules of evidence.  You should not be

2    influenced by the objection or by the Court's ruling on it.

3            Testimony that the Court excludes or tells you to

4    disregard is not evidence, and you must not consider it.

5            And anything you may see or hear outside the courtroom

6    is not evidence, and you must disregard it.  You are to

7    decide the case solely on the evidence presented here in the

8    courtroom.

9            It will be up to you to decide which witnesses to

10   believe, which witnesses not to believe, and how much of any

11   witness's testimony to accept or reject.

12           In this criminal case I do just want to remind you of

13   a few important rules.

14           First, that the defendant is presumed innocent until

15   proven guilty.  The indictment brought by the government,

16   the second superseding indictment in this case, is only an

17   accusation.  It's nothing more.  It's not proof of guilt or

18   anything else.  Therefore, the defendant starts out with a

19   clean slate.

20           Second, the burden of proof is on the United States

21   until you reach a verdict.  The defendant has no burden to

22   prove his innocence or to present any evidence or to

23   testify.  Since the defendant has the right to remain

24   silent, the law prohibits you from arriving at your verdict

25   by considering that he might not have testified.

1          Third, the government must prove the defendant's guilt

2     beyond a reasonable doubt.  You have my instructions in the

3     first phase of the trial, so you know that proof beyond a

4     reasonable doubt means proof which is so convincing that you

5     would not hesitate to rely and act on it in making the most

6     important decisions in your own lives.

7          As we turn to opening statements and the presentation

8     of evidence in this phase of the trial, let me tell you the

9     charges that the parties will focus on now.

10          Count 2 charges that Charles Scott conspired with

11     others to commit securities fraud in connection with the

12     sale of USLG stock from February 15th, 2021, through

13     June 7th, 2021.

14          As a reminder, the United States must prove each of

15     the following elements beyond a reasonable doubt.

16          First, two or more persons conspired or agreed to

17     commit the crime of securities fraud.

18          Second, the defendant knowingly and voluntarily joined

19     the conspiracy.

20          And third, a member of the conspiracy committed

21     certain similar overt acts for the purpose of advancing or

22     helping the conspiracy.

23          In Count 20, the United States charges securities

24     fraud against Mr. Scott.  On this count, the United States

25     must prove beyond a reasonable doubt that in connection with

1      the sale of USLG stock, the defendant did any one of the

2      following.

3            Employed any device, scheme, or artifice to defraud.

4            Or made any untrue statement of a material fact or

5      omitted to state a material fact necessary to make the

6      statements made not misleading in light of the circumstances

7      under which they were made.

8            Or engaged in any act, practice, or course of business

9      which operates or would operate as a fraud or deceit on any

10     person in connection with the sale of USLG stock.

11           These counts also -- this count, Count 20, also

12     requires the United States to prove beyond a reasonable

13     doubt that Mr. Scott acted willfully, knowingly, and with

14     intent to defraud, and that he knowingly used or caused to

15     be used any means or instrumentality of interstate commerce

16     in furtherance of fraudulent conduct.

17           Finally, in Counts 45 and 47, the United States

18     charges wire fraud.  On these counts, the United States must

19     prove all of the following beyond a reasonable doubt.

20           First, Mr. Scott knowingly participated in, devised,

21     or intended to devise a scheme to defraud in order to

22     deprive another of money or property.

23           Two, the scheme included a material misrepresentation

24     or a concealment of a material fact that the defendant had

25     the -- second, that the scheme included a material

1    misrepresentation or concealment of a material fact.

2         And three, the defendant used or caused to use wire

3    communications in interstate commerce in furtherance of this

4    scheme.

5         Again, you have all my instructions from the first

6    phase of the trial at much greater length on each of those.

7    I just wanted to give you that very high level overview to

8    help focus you as we turn to this phase of the proceedings.

9         As you can see, one of the defendants who started this

10   trial is no longer part of the proceedings.  For legally

11   sufficient reasons, which I'm not going to go into at this

12   time, he is no longer a part of the trial.  I instruct you

13   that is not and should not be of concern to you in dealing

14   with the guilt or innocence of Mr. Scott in this phase of

15   the proceedings.  You are not to speculate about why

16   Mr. Spivak is no longer standing trial, and his absence

17   should not control or influence your verdict in any way

18   whatsoever with respect to the defendant who is still here.

19        The reason for this is even when defendants are tried

20   jointly, the jury is called upon to determine the guilt or

21   innocence of each defendant separately.  As you know from

22   the first phase of the trial, even when there are

23   co-defendants, the jury is called on to consider the

24   evidence separately as to one defendant and the other.  The

25   purpose of a joint trial is not to implicate one defendant

1    with the other; it's just a matter of convenience and saves

2    the Court time.

3        The fact that we have only one defendant left in this

4    trial should be of no concern to you because whatever your

5    verdict is, if you're able to reach a verdict, it has to be

6    based solely on the evidence that's received in this

7    courtroom as it relates to this defendant, Mr. Scott.

8        I want to emphasize again that Mr. Scott, our

9    remaining defendant, has entered a plea of not guilty and

10   has denied the charges against him.

11       You have been a good and attentive jury, so let me

12   just give you a few very brief last reminders.

13       Although you deliberated at the first phase, until

14   retiring to deliberate on these charges, you may not discuss

15   this case with anyone, even your fellow jurors; and you must

16   not do outside research or check the Internet, social media,

17   or anything else to try to find out information that might

18   bear in any way on this case.  Again, this is to make sure

19   that all of the parties receive a fair trial, not to burden

20   or inconvenience you.

21       Do not form any opinion until all the evidence is in.

22   Keep an open mind until you start the deliberations at the

23   end of this phase.

24       A reminder about your notes.  If you do decide to take

25   notes, be sure that your note taking does not interfere with

1    your listening to and considering all of the evidence.

2    Also, if you do take notes, do not discuss them with anyone

3    before you begin your deliberations.  Do not take your notes

4    with you at the end of the day.  Be sure to leave them in

5    the jury room.

6        If you choose not to take notes, remember that it is

7    your individual responsibility to listen carefully to the

8    evidence.  You cannot give this responsibility to someone

9    else who might be taking notes.  We depend on the judgment

10   of all members of the jury.  You all must remember the

11   evidence in this case.

12       Finally, regarding your questions to the witnesses, I

13   will discuss at sidebar with counsel whether the rules of

14   evidence permit the question to be asked of the witness and

15   in what form.  Do not discuss your question with other

16   jurors.  Do not make an inference should I not allow the

17   question to be asked or if I rephrase it.  Again, the rules

18   of evidence seek to ensure a fair trial for all the parties,

19   so some questions may not be asked or might need to be asked

20   in a particular way.

21       With that, we will proceed with opening statements for

22   this phase of the trial.  First, the United States will make

23   an opening statement.  Defense counsel then may -- but does

24   not have to -- make an opening statement.  Opening

25   statements are neither evidence nor argument.

1           Mr. Morrison, for the United States.

2                 MR. MORRISON:  Yes, Your Honor.

3                **GOVERNMENT'S OPENING STATEMENT**

4                 MR. MORRISON:  Ladies and gentlemen, we're

5      starting as we started before, but in very different

6      circumstances.

7           Obviously I'm here to tell you what the government

8      will present to you in this phase of the trial, and in this

9      phase of the trial we're allowed to complete the picture.

10     There's evidence that we're now allowed to present to you

11     that you have not heard and have not been able to hear that

12     will prove to you beyond a reasonable doubt that Mr. Scott

13     did intend to defraud investors, did intend to act with --

14     did intend to defraud people who he knew would be investing

15     in this company, who would be victims of a scheme to

16     manipulate the price of USLG and for him to then pay

17     kickbacks back to USLG from profiting off of that scheme.

18     You will also come to understand what the full story is of

19     how this investigation came to take place.

20          So what you did not hear before and who you will hear

21     in this phase is how this investigation began was with an

22     undercover operation.  We referred to other steps that

23     Special Agent Fry had taken before conducting that search

24     warrant and that you will now hear that in the lead-up to

25     that search warrant was a months-long undercover operation

1      that involved numerous recordings of Mr. Spivak, of

2      Mr. Scott, of Mr. Church, people you're by now well familiar

3      with.

4            Who are you going to hear from?  Who will you hear on

5      these recordings?  As I told you at the outset of the last

6      trial, the government's evidence would take you through from

7      the inside and the outside.  You would hear the inside and

8      the outside.  In this phase, frankly, it's really just going

9      to be the inside because what you're going to hear is you're

10     going to be hearing from the people who helped make those

11     recordings, who participated in that investigation.

12           Beginning with the confidential source here, he used

13     the name "Jason Dean."  Mr. Dean initially presented as an

14     investor, somebody interested in USLG stock.  And of course,

15     as you would not be surprised to find out, Mr. Spivak was

16     very happy to take his money and, in the course of taking

17     his money, came to have discussions with Mr. Dean about what

18     Mr. Dean could do to help the company.

19           What could Mr. Dean do?  Well, he could effectively

20     agree to serve as the new Richard Mallion, the person who

21     would set up a call room and keep pumping the price of the

22     stock so that they could get the stock up to a target price,

23     tell how everyone to profit again off the sale of restricted

24     stock and the sale of free-trading stock.

25           You'll hear also that Mr. Dean made arrangements with

1    Mr. Spivak and with Mr. Scott and Mr. Church to effectively

2    pay USLG for its share of the profits, and to do so through

3    Mr. Scott and to do so through Mr. Church in an arrangement

4    that will sound familiar.  They buy stock from Mr. Scott and

5    Mr. Church; Mr. Scott and Mr. Church turn around and

6    reinvest, quote/unquote, that money in the company.  25,000

7    goes on the first go-round; 25,000 to Mr. Scott; and he

8    immediately turns around and sends 15,000, as you'll see,

9    with the plan to do that over and over again for much larger

10   amounts.

11        And you'll hear that there was a plan to conceal the

12   money that the source was going to receive for serving as

13   the new Richard Mallion; that he was going to receive over a

14   million shares of USLG as his payment for setting this all

15   up, for setting up the call rooms to manipulate the stock

16   price, for setting up major investors to buy these shares

17   off of Mr. Scott and buy these shares off of Mr. Church.

18        So who are the people who are the other people

19   involved in this undercover operation?

20        First, there was an undercover agent, Matt Bianchi.

21   He posed effectively as the whale.  You've heard that term

22   already.  He was the big money, the person who would write

23   the checks.  This was the mark in their scheme, but a mark

24   who was somewhat aware that there was some slightly shady

25   things going on.

1      You'll hear about his right-hand man, somebody going

2  by the name "Peter Harris."  Matt posed as someone who was

3  extremely wealthy and had a family office that was investing

4  large amounts of money, and that large amount of money was

5  what Mr. Spivak wanted and what Mr. Scott wanted and what

6  Mr. Church wanted.

7      John Lawson was Matt's business partner, often

8  executing documents and taking care of communications for

9  him.

10     Finally, you'll hear about Bryan Kane, who was

11  presented as effectively the stock magician, another

12  undercover agent who was posing as the person working

13  directly with Jason Dean to pump up the price of the stock

14  and make this manipulation happen, and also would receive

15  his compensation for the deal by buying into some of the

16  stock that was then going to be resold in the market.

17     So what's the evidence that you're going to hear?

18     Well, you'll come to learn that the way an undercover

19  investigation like this takes place is it is tightly

20  controlled by FBI.  They work with the source.  And you'll

21  come to find out that this source is a person who previously

22  has been convicted of securities fraud and, after being

23  convicted of securities fraud and after completing his

24  sentence, decided that having cooperated with the FBI, he

25  wanted to continue to work with the FBI, even though he

1      wasn't under any sentence, he wasn't being threatened with

2      any prosecution, he just wanted to help.

3           What he does is he works with the FBI to have a

4      recorder to record all of his conversations that he has with

5      Mr. Spivak and he has with Mr. Scott and Mr. Church.

6                        (Audio played.)

7                   MR. MORRISON:  Now, you might hope that what

8      Mr. Spivak means when he says he knows what not to do is he

9      knows what not to do to not break the law.  But that's not

10     what he means.  The evidence will show that what he meant

11     was he thought he knew how to get away with it.

12          And you'll probably also guess that "Tommy Boy

13     inserted into *Wolf of Wall Street*" was a reference to

14     Richard Mallion.  And what he didn't learn was how to avoid

15     breaking the law like Mr. Richard Mallion.  What he learned,

16     how to get away with it.

17          So you'll find out that, again, Mr. Dean initially

18     posing as an investor communicates with USLG to buy

19     restricted stock.  You'll see that they go through back and

20     forth on subscription agreements, and indeed he buys some

21     restricted shares, $25,000 worth.  And he explains on the

22     front end he's going to do so through an entity, right?

23     Through a friend.  That's this Kane Financial.  He doesn't

24     want to do it in his own name in the same way, so he signs

25     for Kane Financial.

1          There's back and forth about getting it DocuSigned,

2      and then things really kick off, right?  That's kind of more

3      background, how you understand what's going on in the

4      background here.

5          Then Mr. Dean wants to talk about freely tradeable

6      shares.  That was just restricted stock.  He wants to get

7      into the freely tradeable shares, and so he asks about that.

8          He says:  "Are there any freely tradeable blocks that

9      anyone would be willing to sell us?"

10         Mr. Spivak's response is:  "It depends on the price.

11     I have two guys that I consider very -- uhm -- very

12     trusted."

13         And:  "It's hard to find people like that in your

14     life, and they both have about 3 million shares apiece."

15         And he wants to describe what it means that these two

16     guys each have 3 million shares, why he's presenting that to

17     Mr. Dean when Mr. Dean's interested in freely trading

18     shares.

19         Here's what he says.

20              (Audio played.)

21              MR. MORRISON:  So this is that Evergreen

22     scheme, they're going to keep going.

23         "I got these two guys -- technically it's company

24     stock," he says.  He doesn't want them to believe even that

25     these guys even really own it.  They just are holding it for

1       Mr. Spivak.  That's what Mr. Scott and Mr. Church agreed to

2       do.  If there was a doubt about who those people are, who

3       are these very trusted guys, Ms. Smirnova, you're going to

4       hear her chime in, say one's in Virginia -- that's

5       Mr. Scott -- and one's in Alabama -- you know that's

6       Mr. Church.

7           They talk over and over again, but at a certain point

8       Mr. Spivak needs to connect Mr. Dean with Mr. Scott and

9       Mr. Church so they can make these arrangements.  But he has

10      to make clear, "I can't just have you call them out of the

11      blue," right?  "I got to make sure that they know that

12      you're on the team.  You're with us."

13          Mr. Dean is posing as a co-conspirator, and

14      Mr. Spivak's invited them in and he has to tell Mr. Scott,

15      "Don't worry, you can trust this guy.  He's on the inside."

16          So what does Mr. Spivak do?  He begins by giving

17      Mr. Dean some background on Mr. Scott and Church.  We're not

18      going to go through that now.

19          And, again, there is many, many recordings.  You're

20      not going to hear all of them in this trial, and you're

21      certainly not going to hear all of them during this opening.

22      But he connects them, pretty simple.  Sends basically the

23      same text message to each of them.

24          To Charlie Scott and the source:  "You guys need to

25      talk."

1          To Forrest Church and the source:  "You two need to

2     talk."

3          Then Mr. Dean is in contact directly with Mr. Scott

4     and also with Mr. Church, making the connection, trying to

5     arrange, trying to buy those shares as Mr. Spivak has

6     arranged it, right?  "You're going to buy shares from them,

7     they're going to send money to me."

8          So he -- it starts off with:  "I sent the stock

9     purchase agreement over to your guy, Charles."

10                    (Audio played.)

11                    MR. MORRISON:  Mr. Spivak's taking care of

12     arranging it, paving the way for the source to make these

13     arrangements for Mr. Scott and Mr. Church.

14          Now, in the course of this, he repeats over and over

15     again that these guys are just holding onto the stock for

16     him.

17          Sorry.

18          He says:  "The plan was until you guys came along" --

19     right?  They had a plan before Mr. Dean showed up,

20     Mr. Spivak tells them.  "We had this plan already, and the

21     plan was we're holding off, we're waiting until the audits

22     are done.  That's when we're going to do this."

23          And says:  "And they" -- Charlie and Forrest --

24     Mr. Scott, Mr. Church -- "they were going to do what you" --

25     the source, Mr. Dean -- "are going to do."  The pumping up

1     of the stock and selling it into the market.

2          So what do we have?  The stock purchase agreements are

3     executed.  Here, we have with Mr. Scott Matt Bianchi again,

4     the whale.  You recall him.  The source was agreeing not to

5     put up his own money but to put up the money of other

6     investors.  So he has Mr. Bianchi buying $25,000 worth of

7     stock from Mr. Scott over here.

8          Same arrangement for Mr. Church.  This time, however,

9     it's from Kane Financial.  Bryan Kane, that magician that

10    can make the stock move.

11         You'll learn that Mr. Scott has an employee or a

12    person who assists him called Mr. Flood.  Mr. Flood is

13    essentially his right-hand man who is out there providing

14    wire instructions and things of that nature to make these

15    transactions happen.  So here you see him providing the wire

16    details for the source to arrange with his investors to

17    provide that money to him for those shares.

18         You'll see that Mr. Church -- same story.  He receives

19    his wire of $25,000.  And here we are getting in towards the

20    end of March of 2021.

21         Now, Mr. Spivak explains -- what is the deal with

22    Charlie and Forrest?  Who are they in this?

23              (Audio played.)

24              MR. MORRISON:  That's who the friendly hands

25    were.  He went through the history.  He explained to you, "I

1   chose them to hold this stock for me."  It was really the

2   company stock, like he said before.  But if it became

3   actually technically a name company stock, then it's

4   restricted, and that ruins the scheme.  They need it to be

5   freely trading so they can get it out there in the market.

6       And he goes through about how there was plans for them

7   to do the promotion.  Source just wants to make sure, "Hey,

8   do we owe anybody a cut of this?  Is there anyone we need to

9   work into this?  Anyone with whom we need to smooth over any

10  wrinkles?"

11      He says, "No, you can go ahead."

12      There's the friendly hands.

13      So now we have the wire going to Mr. Scott, $25,000.

14  He's receiving his first payment.  Here it is arriving in

15  his bank account, showing up in his Navy Federal Credit

16  Union account.

17      Next up it's time to start paying out, right?  The

18  deal was 25,000 comes in, and we're going to send 15,000 to

19  USLG.  And you'll see those $15,000 wires go over.

20      That was Mr. Church.

21      Now Mr. Scott.

22      Out goes $15,000 to the company.

23      And there's the details showing it's going to US

24  Lighting Group.

25      So you also heard a lot of discussion about why

1    certain things aren't in writing, and you'll hear them

2    explain that they were avoiding that.

3                      (Audio played.)

4                      MR. MORRISON:  They don't want to put nothing

5    in writing.  You'll hear that a few times.

6          You'll see the stock transferring here.

7          Here's a thousand shares going from Mr. Church over

8    to Kane Financial like they planned.  Stock certificates

9    issued.

10         Now, what you'll see is at a certain point Mr. Scott's

11   in direct discussions with the source.  And, in fact,

12   Mr. Scott likes what the plan is so much, this USLG plan,

13   that he wants to start replicating this and doing it with

14   his own company, which is called CareClix, which is using a

15   stock ticker provided by Mr. Spivak.  But he takes some

16   additional precautions.  Just having a nondisclosure and

17   confidentiality agreement, that's not enough for him, so

18   what does he say?

19         "Jason, would you mind installing Signal?"

20         Signal is encrypted for text messaging and voice

21   calls.

22         "Thanks, Charlie."

23         Sends him the link to download the Signal app, which

24   you'll hear is an app to specifically avoid being recorded,

25   to have your communications be encrypted.

1          Now we're at the end of April 2021.

2          You'll also see exchanges between Mr. Spivak and

3    Mr. Scott about how close they are, his "brother from

4    another mother" you heard.

5          As the scheme moves forward, we're into May of 2021,

6    and the plan is to take that $25,000 arrangement and blow it

7    up, make it huge.  "We're going to get over a million."

8                    (Audio played.)

9                    MR. MORRISON:  You're probably wondering what

10   just happened there.  Well, you heard them discussing

11   they're going to do $1.8 million, 6 million shares, 3

12   million each.  Three from Mr. Scott, three from Mr. Church.

13   That's a lot of money, that's a lot of shares.  He wants to

14   wipe them out, right?  I'm not going to use the language he

15   used, but clean them out, with that same plan to reinvest

16   that money back into the company, right?  Pay a share over

17   to the company.

18         And what you hear at the end is they're meeting in

19   person -- you'll hear from the source they're meeting in

20   person at USLG's offices, and what they need to do is --

21   this is where they're getting to the point of the

22   conversation that he's not even comfortable discussing this

23   in person in his own office.  So what he has them do is

24   leave them here -- you're going to hear that's "Leave your

25   phone right where it is.  We're going to take a walk.  I

1    don't want you bringing your phone with you."  So the

2    question is -- he says, "Leave them here."  That's the whole

3    point of getting up here on this walk, right?  So what

4    happens on that walk?  What does he then say?

5         He's got to talk about how he's going to pay the

6    source.  The source has to get an illegal kickback.  He's

7    got to get his money.  So...

8                        (Audio played.)

9                   MR. MORRISON:  He wants to talk about the

10   deal.  He doesn't want to do that with a phone sticking out

11   on the table, even in his own office.  And it turns out he

12   was right, that phone was recording him.  Turns out,

13   however, there was another recorder, and it was in the

14   source's pocket.  So when they walked out, kept on

15   recording.  And all this was recorded, albeit a little

16   harder to hear now.

17        But the conversation goes on.

18                        (Audio played.)

19                   MR. MORRISON:  A little hard to hear at times.

20   You'll be able to listen a little more closely in the

21   future.  Again, this is just -- the evidence is the audio,

22   and you'll hear evidence come in through the witnesses, but

23   what we think you will find is they're discussing how

24   they're going to pay him.  They're going to pay him in

25   shares.  They can't do exactly 1.6 million.  Why?  Too

1    suspicious, right?  They're going to make up a real specific

2    number.  1,587,032 shares.  That's not a fraction of 6

3    million shares, right?  "We're going to try and make it look

4    like it's not a perfect fraction."

5        He also needs some way to disguise that, right?  They

6    know how to make nonsense consulting agreements, and that's

7    exactly what he proposes to do here.  The problem is they

8    never talked about this before, and they don't know who to

9    put in the consulting agreement, right?  "What are we going

10   to say you did?"  They start brainstorming.  RV something,

11   RV sales, RV introduction.  They don't know what to say.

12       And at a certain point he says, "Well, it's just

13   general business."  But Mr. Spivak's point is, "Hold on.  No

14   matter what it is, let's think about this this way.  Assume

15   you are going to get busted."  That's the frame of reference

16   that he has for talking about what to put in this consulting

17   agreement, and he explains why.

18                 (Audio played.)

19                 MR. MORRISON:  That's how this conspiracy

20   operated.  They prepared for everything.  They didn't put

21   things in writing.  They used the encrypted messaging.  They

22   prepare a story for when they're confronted.

23       So what is the story they prepared?

24                 (Audio played.)

25                 MR. MORRISON:  They're preparing.  "What would

1    you say if somebody put you up on the stand?  What could we

2    actually say?  What would someone believe if you said it

3    sitting up there in that stand."  They prepared to come in

4    here and have somebody lie and say something that wasn't

5    even close to true.  They're brainstorming.  What could they

6    possibly say?  I think the quote is, "What could it be in

7    exchange for?"  Right?

8         And why is it important to have this consulting

9    agreement?  Well, it's because it's going to the SEC.

10                  (Audio played.)

11                  MR. MORRISON:  The auditors are going to ask,

12   "What's this for?"  They got to have a story ready not only

13   for up on that stand but for the SEC, for the auditors.

14        They finally have the idea of, "Oh, did you have a

15   friend in Europe?  He can help us."

16                  (Audio played.)

17                  MR. MORRISON:  That was the whole plan.  "We

18   want to make it easy.  We want to make the lies believable."

19        So they have got a discussion of a plan to route the

20   shares through an entity.  They continue.

21        And you're not going to have to listen to all of this.

22   They're including Mr. Dean's Swiss friend, right?  "I've got

23   this international friend, he's Swiss German.  We'll give

24   him a little bit of stock, too."  Right?  Cut him in on the

25   deal.

1          And then the discussion continues.  So "We're going to

2     draft up this fake agreement."

3                    (Audio played.)

4                    MR. MORRISON:  Handshake deal, they're not

5     putting this in writing.  But the deal is once Mr. Scott

6     sends the 900,000, right, it's going to be $1.8 million.

7     900,000 for Mr. Scott; 900,000 for Mr. Church.  Once that

8     money goes over, that's when the source is going to get paid

9     his shares under this fraudulent consulting agreement on a

10    handshake deal.

11                   (Audio played.)

12                   MR. MORRISON:  Again, it's that familiar

13    pattern.  They are going to buy restricted stock at a lower

14    price so they get to pocket some of that money.  "Soon as I

15    get that money, that's when you get yours, Mr. Dean."

16         So they talk about going and -- I'm not going to --

17    I'm going to pass through this.  We've heard enough about

18    these BS consulting agreements in Switzerland.

19                   (Audio played.)

20                   MR. MORRISON:  They're picking out different

21    names, and you'll hear all the details when the witnesses

22    are testifying.

23         But then they get to the point when they're breaking

24    up and they say, "Listen, when we're going to communicate

25    further, how are we going to avoid detection?"

1                      (Audio played.)

2                      MR. MORRISON:  So they talk expressly about

3      how they're going to avoid being recorded, how they're going

4      to avoid being caught.

5          Now, you're going to find out that the source met with

6      Mr. Scott and discussed this plan to broaden the scheme.

7      Mr. Scott explained that he's been in so much of this with

8      Mr. Spivak that Mr. Spivak should be trying to get him rich.

9                      (Audio played.)

10                      MR. MORRISON:  So let's review that.

11          He knows -- and he -- Spivak -- "He knows I" --

12      Mr. Scott -- "know the deal."  He knows what's going on.

13          "And I know you guys are going to make a bunch of

14      money on this."

15          "I know you're going to give me a little."

16          "And I am super-cool with that."

17          Plus it keeps going after that.  Again, it's this

18      Evergreen deal.  Keep paying these kickbacks back to the

19      company in the form of restricted stock purchases.  Means

20      you have more stock then to keep selling to the other

21      co-conspirators.

22          Talks about how close he and Mr. Spivak are to be

23      going through all these deals together.

24                      (Audio played.)

25                      MR. MORRISON:  First time law enforcement

1    shows up, he is wondering if they're looking for him.

2    Doesn't know.  Okay.  But Mr. Spivak's response is, "Don't

3    talk to them.  Get rid of your cell phone."

4        It sounds like he's done this -- played this game

5    before.  The plan is they're going to end up in France the

6    next day if it goes wrong.  That's Mr. Scott's words, that's

7    how he knows Mr. Spivak.

8        Now, you'll learn that as part of this undercover

9    operation and posing as such a big investor, the FBI made

10   arrangements for the undercover agents and the source to

11   meet with Mr. Spivak down in Florida.  Go on a nice trip.

12   They're going to take him out on a boat, make it look like

13   this is the whale.  You know, that rich investor.  He's got

14   all kinds of toys.  As you heard Mr. Spivak say before,

15   "Rich people should have toys."  And the toy he has is a

16   boat.  "And I'm going to take him out on it."

17                    (Audio played.)

18                    MR. MORRISON:  Soon as that trip is over,

19   Mr. Spivak, who's the first person he calls?  Mr. Scott.

20   Mr. Scott's reporting back that seeing that boat, he knew

21   these guys had real money.  They were worth pursuing.

22        So he also talks about how he knows that he's

23   following Mr. Spivak's instructions.

24                    (Audio played.)

25                    MR. MORRISON:  Again, I mentioned they were

1    talking about expanding this.  They're not just going to do

2    USLG, they're also going to do Mr. Scott's own company,

3    CareClix.  Talking about how his deal -- Mr. Scott's, his

4    company, is even tighter.  They can succeed even more doing

5    that.

6         And you heard that reference to an IR program.  You

7    probably already know that IR stands for investor relations.

8    And you'll hear that that's code for call rooms for pumping

9    up the stock price.

10        Talking about the whale, about what he wants to make

11   this investment.

12                    (Audio played.)

13                    MR. MORRISON:  So, at the end there, Mr. Dean

14   is talking about -- you'll learn that the source is in

15   person with Mr. Scott and that they have one of Mr. Scott's

16   business associates on the phone, and they're talking about

17   what they're going to do and how they might do a deal.  And

18   at that point he says he tends -- "My guy, he tends to like

19   a blend of freely tradeable shares."

20        And at the mention of freely tradeable shares, what

21   does Mr. Scott do?

22        "Hey, we're on the phone."

23        Again, he knows what he's doing is wrong, and he

24   doesn't want it even spoken over the phone let alone

25   recorded.  Unfortunately for him, it was recorded.  And he

1    wants to know, "How are we going to pay you?"

2                    (Audio played.)

3                    MR. MORRISON:  Right.  He knows this is

4    something the source is not doing out of the goodness of his

5    heart.  He's doing it for kickbacks.

6         Now, how is this other deal going to work?  How is he

7    going to do this with his own company?

8         Just as Mr. Scott serves as Mr. Spivak's nominee

9    holding the shares for him, pretending to not be affiliated,

10   you're going to learn that Mr. Scott has his own guy like

11   that who's serving in a similar role, Josh, Mr. Flood.  And

12   he starts off with how many shares Josh controls, but then

13   it becomes clear it's actually -- they're not in Josh's

14   name, and what he really means is he's a nominee.

15                   (Audio played.)

16                   MR. MORRISON:  So -- and the question is how

17   many shares, and who owns them?

18                   (Audio played.)

19                   MR. MORRISON:  Mr. Scott cuts in.  He wants to

20   make clear, "Yeah, yeah, yeah" -- he's clarifying --

21   Mr. Flood, he's clarifying, "I only actually personally own

22   one million, but I have the relationship with 10 million."

23   Right?  No.  He controls 11 million.  Again, they're trying

24   to avoid having their names on paper owning all these

25   shares.

1                    (Audio played.)

2                    MR. MORRISON:  The evidence will show he knew

3      exactly what Mr. Spivak was doing with the money.  He knew

4      exactly the arrangement was investor money comes in and it

5      gets reinvested into the company in a form of restricted

6      buybacks, that there's a prearranged kickback arrangement.

7           And he says, "That's how we could do it here with my

8      company because the hard part -- it's easy to pay Mr. Dean,

9      it's easy to pay that first step.  The next step, it's

10     getting money back to Mr. Scott and his company that's

11     hard."

12          He says, "Well, we can do something like Paul's doing,

13     using Josh."

14          So we're getting close to the end of the scheme here,

15     and things are looking like they're going to get bigger.

16          We're at the end of May of 2021.

17                    (Audio played.)

18                    MR. MORRISON:  So they're bringing it around.

19     They're saying, "Look, we got to finish this USLG side of

20     things."  Right?  And they start talking about just how much

21     stock Mr. Scott is going to sell to Mr. Dean and his people.

22     He's got 1.7 million free trading ready to go, and he's got

23     more on the way, right?  He's going to get more.  And what

24     Paul tells him to do, he's going to do what he suggests.

25          And, again, Mr. Scott is explicit because he's getting

1   his little bit, right?  He's getting his $0.30 a share.  And

2   he's encouraged because that isn't it, they're going to

3   continue, right?  They're moving on to CareClix.

4       Coming back to Mr. Spivak, how do we finalize this?

5   How do we get all the payments made?  Mr. Spivak wants to

6   know more about getting the corporation set up, right?  They

7   want to route it through people's actual names.

8           (Audio played.)

9           MR. MORRISON:  They need to hide this from

10  everyone involved except those people who are on that team

11  that he described in the very beginning, right?

12      "We don't want even Matt finding out about this" --

13  the 1.6 million shares -- or not exactly 1.6 million shares

14  that are going to be paid to the source, right?  To

15  Mr. Dean.

16      And he makes it explicit.  The plan is buy shares at

17  $0.30 from Mr. Scott, Mr. Church, and they are going to then

18  send $0.15 a share.  Half of it's going right to the

19  company.  1.8 million into those two, 900,000 gets paid over

20  right to USLG.  And once that happens, that's when the

21  source gets his cut.

22      And they talk about how this is going to work, right?

23  They got to get these call rooms.  And he's even talking

24  about "Let's put this offshore.  Let's set up a call room in

25  Barcelona, someplace out of the United States."  That's what

1   he's focused on.

2          He says essentially this is what he learned from being

3   in a lawsuit with the SEC.  "They're not going to pay

4   attention if you do this abroad."  Right?

5          What he also learned is avoiding that mathematical

6   formula.  Don't have it be an exact percentage.  That's why

7   it's not going to be 1.6 million.  It's going to be

8   1,585,032 shares, right?  And what he says is, "They'll

9   never figure it out.  They'll never figure it out."  The

10  evidence will show that we did figure it out, and it's going

11  to be presented to you.

12         Moving to June 8th, you will learn that on that day,

13  Mr. Spivak was arrested, same day those searches were

14  conducted.  At that point they're talking about dummying up

15  this contract some more.  The source actually shows up to

16  sign the contract, to get pen and paper for everything, and

17  it begins with some good old-fashioned backdating.

18         Well, actually let's put it back to the 2nd because

19  that's when this happened.  6-2.

20                    (Audio played.)

21                    MR. MORRISON:  Now you learned they're about

22  to meet with the investors, they're about to have this

23  meeting, and so he has this fake consulting agreement.  And

24  Mr. Spivak's instruction is don't let nobody see it.  Can't

25  even see this consulting agreement.  Can't even know that it

1      exists, even with all the lies that are contained.

2           So they talk about where to put it in his bag.

3                (Audio played.)

4                MR. MORRISON:  "Here's where you put it so

5      nobody sees it."

6           They're about to meet with Matt.  "Matt can't see

7      this."  Right?  "If he does, we're both dead."  He knows

8      what he's doing is wrong.

9           And as you heard Mr. Scott saying on the recording,

10     and you will hear when witnesses come to testify, Mr. Scott

11     knew the plan, Mr. Scott was in on the plan.

12          Here's the consulting agreement.  You'll see there's

13     some handwritten edits that get put right in there, right?

14     Let's make this a little more believable.  European

15     Consulting.  You'll see the signed version is found right on

16     Mr. Spivak's desk at the time of his arrest.

17          So at the end of this you're going to be asked to

18     deliberate on a much smaller number of counts this time.

19          Count 2, the conspiracy.  Mr. Scott agreed with

20     Mr. Spivak and others including Mr. Church to commit this

21     crime of securities fraud.  They are out there to defraud

22     these investors, to profit from the operation, to manipulate

23     up the price, to hide what they're doing from the investors,

24     to avoid the requirements of who can and can't sell freely

25     trading stock.  And you will have heard all these recordings

1     about how they agreed to avoid all of these rules and to

2     accomplish their illegal purpose.

3          That in essence is the conspiracy.  They are

4     manipulating the stock and hiding what they're doing from

5     investors and seeking to profit all the while with this fake

6     consulting agreement to then compensate Mr. Dean for his

7     work.

8          So we have Count 20 is a substantive count of

9     securities fraud, and that essentially concerns when the

10    undercover purchases actually 100,000 shares of USLG stock

11    from Mr. Scott for $25,000 in that wire you saw.

12         Finally, Counts 45 and 47, that same purchase is going

13    to be one of them, right?  Sending that bank transaction,

14    sending the $25,000 when the undercover sends payment.  And

15    then in turn, again, remember the arrangement was for there

16    to be money kicked back to the company.

17         So Count 47 is when Mr. Scott goes in.  And just like

18    they planned, just like was rehearsed on those phone calls,

19    Mr. Scott sends dutifully that $15,000 back to Mr. Spivak.

20    And then the conspiracy continues obviously, moving on up

21    to -- from 25,000 to 900,000, times two to get to that

22    1.8 million.

23         And at the end of all this evidence, the government

24    will come back before you, and we will ask you to return the

25    only verdict that is consistent with all of these recordings

1    and all of the testimony that you will hear, all the

2    documents that you will see, and that is a verdict of guilty

3    beyond a reasonable doubt on each of these charges.

4          Thank you very much for your time and for your

5    service.

6                    THE COURT:  Mr. DeVillers.

7                **DEFENDANT'S OPENING STATEMENT**

8                    MR. DEVILLERS:  Here we are again.  I'm going

9    to try to make this quick, simple as possible.

10         You're not going to hear anything coming from Charlie

11   Scott regarding any sort of intent to defraud at all.  It

12   just isn't -- thank God that they did tape him, because he

13   is -- he's on tape.  He's talking to Mr. Dean.  All these

14   other people that they're talking about, these other

15   undercover FBI agents, doesn't know him, doesn't see him.

16   The only person he's ever talked to was Mr. Dean, but every

17   second is recorded.

18         You now know what to do.  You now know what to look

19   for.  And when you hear those recordings, they're going to

20   cherry-pick stuff.  They're not going to want to play all of

21   it.  We're going to try to play all of it.

22         But what they're going to show you, you're not going

23   to hear a thing about setting up boiler rooms to defraud

24   investors, no illegally promoting stock.  You're not going

25   to hear that at all.  There is no illegally promoting stock.

1    He doesn't talk about it at all.

2         He doesn't talk about getting investors to invest in

3    restricted stock and lying about it being only six months.

4    None of that.  Not a whisper of it.

5         Nothing about concealing commissions.  Nothing.

6         Nothing about manipulating stocks.  Nothing.

7         Yeah, he's buying restricted stock.  He's not hiding

8    it.  He's doing the same thing he's been doing for a long

9    time.

10        Okay.  So let's kind of talk about how they're going

11   to try to convict Charlie.

12        They're going to try to convict Charlie not with

13   Charlie's words, not with his statements, not with his

14   evidence, but with a bloviation by Paul Spivak.  Paul Spivak

15   is -- you're going to hear him talk and talk and bloviate

16   and bloviate.  That's how they're going to try to convict

17   him.  There's a zero percent chance.  They tried and tried

18   and tried, and he did not corroborate anything; he did not

19   talk about a plan; he did not talk about anything.  In fact,

20   what he was trying to do is get them to invest in his

21   company.

22        USLG's an afterthought at this point with Charlie.

23   Charlie's in Virginia running companies.  He's not talking

24   to Spivak.  He's not talking to these agents.  He's not

25   doing anything like that.  He's got his own life to live.

1          So you got three people, all right?  Kind of three

2     people to think about as you go through this.  And they're

3     competing interests.  And they are competing.  You've got

4     Paul Spivak.  You've got Mr. Dean, the government, right?

5     You got what they want.  And you got Charlie.

6          So here's what the evidence is going to show.  He has

7     Spivak's plan, all right?

8          What does Spivak want?

9          Spivak wants USLG to go out on the NASDAQ, right?  So

10    he wants the price of the stock to go up, and then he can go

11    on the NASDAQ and he can build his company.  Fine.  But he

12    wants to do it in ways that are fraudulent.  We can see

13    that.  It's pretty clear from what he's talking about.  But

14    he's not talking to Charlie Scott about it.  You're not

15    going to hear any conversation with Paul Spivak and Charlie

16    Scott.  None.  You're not going to hear any conversation

17    with Mr. Dean or any of these undercovers in a room or on a

18    phone call with Charlie Scott.  There isn't any.  It doesn't

19    exist because there was no plan.

20         Okay.  So what is Paul Spivak's intent here?

21         Well, Charlie Scott isn't doing anything with the

22    stock.  And it is his stock.  He bought the stock.  Spivak

23    never bought the stock and gave it to him.  He bought the

24    stock.  He bought it in 2012.  That was converted in 2016

25    with his money.  He bought it in 2018.  And then he bought

1       restricted stock long-term over and over and over again.

2       That's the stock we're talking about.

3              Now, you heard him on the recording in opening

4       statement where he realizes Charlie's just sitting on this.

5       He's not promoting it.  He's not doing anything.  "I need to

6       take those fuckers out."  That's what he says.  And that's

7       what the evidence will show.  He's not working with Charlie;

8       he's working against Charlie.  He wants him to sell all of

9       his free-trading stock to these guys, these millionaires,

10      who will then presumably promote the stock, and presumably

11      in some sort of nefarious manner.  Charlie has no part of

12      that.  He wants to get the stock from Charlie.  So this

13      mysterious, you know, rich benefactor is supposed to buy the

14      stock and promote it.  Okay.  And he wants to take Charlie's

15      stock.

16             All right.  So Scott -- rather Spivak bloviates that

17      he really controls Charlie's stock.  Well, we know that's

18      not the case.  In fact, you're not going to hear in the

19      conversations with Mr. Dean that; you're going to hear the

20      opposite.  "It's my stock; I'll do what I want with it."

21             Even in opening he said -- didn't say Mr. Scott or

22      Mr. Spivak demanded he sell the stock or controls the stock;

23      he says he'll listen to his suggestion.  And we'll get into

24      why he's listening to his suggestion in a second.

25             Okay.  So what's Mr. Scott -- Mr. Spivak need?

1          He needs these people to believe he controls Charlie's

2     stock.  He needs that.  And he needs Charlie's stock to sell

3     it.  We agree, that's what he needs.  That's what he wants.

4          But he also has something that he knows.  He knows

5     Charlie has a weak spot, especially right now in 2021, and

6     that is this company that he cares deeply about called

7     CareClix.  And that's very important because of all the

8     recordings, 95 percent of it has nothing to do with USLG, it

9     has all to do with CareClix.  And you're going to hear about

10    CareClix.

11         CareClix is a company that is a telemedicine company.

12    They have hundreds of employees, and they're building this

13    company over and over and up and up.

14         One of the chief medical officer and CEO is a guy

15    named Dr. John Korangy, who is also a founder.

16         You've got a CEO and general counsel named Bob Hipple.

17         You're going to hear them on the tapes as well.

18         You've got the chairman and chief sales officer is

19    Charles Scott.

20         And the president is Josh Flood.

21         There's over 200 account execs.

22         You're going to hear them talk about this.  Not just a

23    little bit.

24         What happens is they talk on the phone about buying

25    USLG.  And from the very beginning Mr. Scott wants to talk

1     about and get investment in CareClix. In fact, that's how

2     Paul Spivak sells this. Paul Spivak calls Charlie and says,

3     "Hey, I got a guy that wants to buy your stock, but he's

4     really, really rich, he's got a lot of money, and he'll

5     invest in CareClix."

6          So the undercover -- the government -- Mr. Dean -- is

7     reeling Charlie in the entire time and all of the people

8     that work at CareClix pretending they're going to invest in

9     CareClix. That's how he gets into this. Charlie wants to

10    grow CareClix by getting investments, and Spivak knows that.

11    All right?

12         So let's go now -- what's in Charlie's mind?

13         There's a couple things in Charlie's mind. One is he

14    wants Dean, through this mysterious kabillionaire, to invest

15    in CareClix. And, again, that's what all the conversation

16    was about. It's not USLG. USLG is an afterthought. He's

17    holding the stock long-term. He doesn't really care about

18    USLG. He cares about them investing in CareClix.

19         All right. So that's one.

20         Second, Charlie can take -- actually sell some of the

21    stock, this USLG -- USLG stock, he can take that and from

22    the profits of that invest in CareClix himself. He either

23    gets Dean to do it, or he can take the money from the sale

24    of the stock and do it. That's what he wants to do. That's

25    his plan.

1          Now, the other thing is he's not stupid.  He knows

2     what they're doing, right?  He knows that they're going to

3     buy the stock from him cheap and then invest in USLG and

4     pump it up, and eventually all that stock is going to be

5     worth a lot of money, and he's going to be out because he

6     sold it all cheap.  He knows that.

7          So what's he do?  He buys -- his plan is -- and he

8     talks about and he even tells Spivak this -- "I'm buying --

9     for every dime of USLG free-trading stock, I want to buy the

10    exact amount of stock in restricted shares."  The same thing

11    he did in 2018.  And that's what he does.  He sells a

12    hundred thousand shares of USLG stock to Dean.  Then he buys

13    a hundred thousand shares of restricted stock, which is

14    cheaper of course.  $25,000, which is 15,000, and he holds

15    it.  And he's going to hold it and hold it and hold it

16    because he can buy it cheap, and hopefully the stock price

17    will go up and then he can sell it.

18         But what there is none of, ladies and gentlemen -- and

19    I ask you to keep thinking and thinking and listening and

20    listening and wait till they show you somehow -- anything at

21    all about Charlie trying to illegally promote this stock and

22    make it rise to pump it and to dump it.  There's none of

23    that.  There's none of that with his company.  In fact,

24    ladies and gentlemen, Mr. Dean is going to try to convince

25    Charlie that they should pump up or should promote his stock

1     in CareClix.

2          And what does Charlie say?

3          "We don't want that.  We don't need that.  It's good

4     enough.  We don't want you to do it.  We just want you to

5     invest in it."  That's what he says.

6          So what's the government want?

7          Well, you know, they want Charlie to somehow confirm

8     that it's really Paul Spivak's stock and not his.  And I

9     have no idea where they're getting this from.  We all know

10    they paid for it.  They fail.  They made it clear that it's

11    his stock and he'll sell if he wants to sell it.  They'll

12    play snippets here and there, but it's clear from all the

13    evidence that it's Charlie's stock, not Paul's stock.

14         They wanted to get Charlie to somehow say you're

15    involved in illegal promotions, or you've got this plan to

16    go ahead and raise USLG's stock by some sort of fraud.  Not

17    a word.  Not a word.  They want him to say, you know, "We

18    want you to promote CareClix, too, and we want you to use

19    these illegal boiler rooms and defraud these investors."

20    Nothing.  In fact, it's the opposite.  He says, "I don't

21    need you -- I don't need you to promote stock legally or

22    illegally."  They don't talk about it.  There is no plan.

23    There is no conversation.  There is no statements.

24         The idea of Charlie telling Mr. Dean to use Signal.

25    Mr. Dean spends an entire day with Paul Scott, the CEO, the

1    CFO, the board, five individuals talking about secrets

2    pertaining to CareClix. Business secrets. That's what he's

3    talking about, and that's why he asks them to sign a

4    nondisclosure agreement, an NDA. It's nothing to do with

5    USLG at all. And they know it. And that's what the

6    evidence will show.

7         And, by the way, every second of their conversations

8    on the phone and in person is recorded. And you're still

9    not going to hear anything.

10        I ask you to do this. You've got the elements down,

11   you know what to do. Listen. And if you don't hear a

12   whisper -- and you won't -- about Charlie conspiring to

13   defraud investors, you're not going to hear that, that's not

14   going to happen. And by the end of this, it's going to be

15   not guilty by omission because you're not going to hear it

16   exist.

17        Thank you.

18             THE COURT: Ladies and gentlemen, we will take

19   our lunch break. After lunch we will begin our presentation

20   of evidence this afternoon.

21        It's about 12:30. If you're back by 1:10 roughly,

22   we'll be prepared to start as soon as you're all assembled.

23        During lunch, please remember my instructions. Do not

24   discuss this case with one another. Do not allow anyone

25   else to discuss it with you. Do not discuss it with anyone

1    at all.

2           We will stand in recess.

3                  (Luncheon recess taken at 12:27 p.m.)

4                     (Court resumed at 1:20 p.m.)

5                     (The following proceedings were had in the

6                     presence of the jury.)

7                  THE COURT:  The United States may call its

8    first witness.

9                  MS. MILLER:  Thank you, Your Honor.

10          The United States calls Jason Dean.

11                 THE COURT:  Please raise your right hand.

12          Do you solemnly swear that the testimony you're about

13   to give will be the truth, the whole truth, and nothing but

14   the truth, and this you do as you shall answer onto God?

15                 THE WITNESS:  Yes.

16                    (JASON DEAN, sworn.)

17                 THE COURT:  Thank you.  Please be seated.

18          Please adjust the microphone, and then make sure to

19   speak directly into it for the benefit of our court

20   reporter.

21          And if you would begin by stating your name for the

22   record.

23                 THE WITNESS:  Jason Dean.

24                 THE COURT:  Thank you.

25          Counsel, you may proceed when you are ready.

**Direct - Jason Dean**

1                MS. MILLER:  Thank you, Your Honor.

2                **DIRECT EXAMINATION OF JASON DEAN**

3    BY MS. MILLER:

4    **Q**    Good afternoon, Mr. Dean.

5    **A**    Good afternoon.

6    **Q**    Would you please tell the jury where you're from.

7    **A**    I originally grew up in eastern Ohio, in Columbiana

8    County.

9    **Q**    Living in northeast Ohio at this point?

10   **A**    Yes.

11   **Q**    And how old are you, sir?

12   **A**    52.

13   **Q**    Could you give us a sense of what you do for a living?

14   **A**    Currently, I'm a consultant for a health care company

15   in Florida.

16   **Q**    What is your educational background?

17   **A**    I have a bachelor degree from Kent State University.

18   **Q**    Approximately when did you obtain that?

19   **A**    1995.

20   **Q**    Did you begin working after acquiring your degree?

21   **A**    Yes.

22   **Q**    What did you begin working -- doing?

23   **A**    I took a job at a stock brokerage firm in Pittsburgh,

24   Pennsylvania.

25   **Q**    Tell us the type of work you were doing at the

**Direct - Jason Dean**

1    brokerage firm.

2    **A**    At that firm I learned how to open accounts, how to

3    manage customers.  The firm primarily focused in small-cap

4    stocks, investment banking.

5    **Q**    Did you hold any licenses around that time?

6    **A**    Yes.  I had a Series 7, a Series 63, and a Series 24.

7    **Q**    And, generally speaking, what are those licenses?

8    **A**    The 7 is -- in common terms would be the bar exam to

9    be a broker, to handle other people's money and manage it

10   for them.

11   **Q**    All right.

12        Now, you indicated that you were working in the

13   small-cap market at the brokerage firm?

14   **A**    Yes.

15   **Q**    Could you give us a sense of what you were doing on a

16   day-to-day basis?

17   **A**    On a day-to-day basis opening accounts, raising

18   capital for small-cap companies, penny stocks, managing

19   those clients, and trying to build assets.

20   **Q**    And, specifically, how were you raising capital?  How

21   were you connecting with these investors?

22   **A**    Mainly phone solicitations.

23   **Q**    Would those be folks with whom you had a previous

24   relationship, or would that be a cold call?

25   **A**    That would be a cold call.

**Direct - Jason Dean**

1    **Q**     All right.

2          Now, did you shift gears after that and start working

3    at a different segment at the brokerage firm?

4    **A**     Yes.  I moved up to management of the brokerage firm,

5    but I still managed my own clients as well.

6    **Q**     Any additional responsibilities in management?

7    **A**     Yes.  To oversee the rest of the brokers of the firm

8    and supervise the tickets -- the trades they were writing.

9    **Q**     After the brokerage firm, did you become employed in

10   another capacity?

11   **A**     Yes.

12   **Q**     What were you doing?

13   **A**     I became a consultant to publicly traded companies to

14   raise capital for them independently away from the brokerage

15   firms.

16   **Q**     All right.

17         Now, sir, did you eventually get in trouble in

18   connection with your work as an independent consultant?

19   **A**     I got in trouble as a broker in 1999.  The firm I

20   worked for solicited IPOs through us as brokers.  It turned

21   out the firm didn't have the shares to the IPOs.

22   **Q**     And that was -- I guess what entity was involved with

23   that?

24   **A**     The firm's name was AC Financial.

25   **Q**     And what entity did you get -- find yourself in

Direct - Jason Dean

1    trouble with?

2    **A**    The SEC, Securities Exchange Commission.  It was a

3    civil lawsuit.

4    **Q**    Specifically what did the SEC sue you for?

5    **A**    They sued me for being reckless and not knowing there

6    is a potential fraud.

7    **Q**    Were there any consequences as a result of that

8    lawsuit to you?

9    **A**    Yes.  I was found guilty of being reckless and not

10   knowing in a default judgment, and it cost me my Series 7

11   license.

12   **Q**    And what is the result of losing your Series 7

13   license?

14   **A**    I could no longer work for any brokerage firms or be

15   associated with any brokerage firms where I would personally

16   be handling anybody's money from that point forward.

17   **Q**    After losing your brokerage license, is that the time

18   when you turned to being an independent consultant?

19   **A**    Yes.

20   **Q**    And you were continuing to raise money for small

21   companies at that time, you said?

22   **A**    Yes.

23   **Q**    Focusing your attention in the 2014 time period, what

24   were you doing then?

25   **A**    In 2014 I was still raising money for small-cap

**Direct - Jason Dean**

1    issuers, small public companies.  And I raised quite a bit

2    of money for a company called Lustros that -- in that

3    timeframe.

4    **Q**    And in connection with raising that money, did you

5    ultimately engage in any criminal activity?

6    **A**    Yes.

7    **Q**    Tell us what you did.

8    **A**    I raised $7.5 million for a publicly traded company

9    and failed to disclose my commissions and my financial

10   benefit in the relationship with the company.

11   **Q**    Were you eventually charged for such conduct?

12   **A**    Yes.

13   **Q**    By a state or federal court?

14   **A**    Federal.

15   **Q**    What were you charged with?

16   **A**    I was charged with fraud, conspiracy to commit

17   securities fraud, money laundering, and wire fraud.

18   **Q**    Did you enter a plea to those charges?

19   **A**    Yes.  I pled guilty.

20   **Q**    Approximately when did you plead guilty?

21   **A**    It would have been August of 2015.

22   **Q**    And were you sentenced in connection with that guilty

23   plea?

24   **A**    Yes.

25   **Q**    Approximately when?

**Direct - Jason Dean**

1   **A**    August of 2019 -- August of 2018.  I'm sorry.  August

2   of 2018.

3   **Q**    Did you go to federal prison as a result of that

4   sentence?

5   **A**    Yes.

6   **Q**    And when were you released?

7   **A**    November of 2019.

8   **Q**    Were you required to be on a period of supervised

9   release after your release?

10  **A**    Yes.

11  **Q**    For about how long?

12  **A**    60 months.

13  **Q**    Are you still on supervised release?

14  **A**    No, I'm not.

15  **Q**    When did it terminate?

16  **A**    May of this year.

17  **Q**    And how did it terminate?  As a result of what?

18  **A**    The probation office felt that I had served enough.  I

19  was completely free of any violations whatsoever for five

20  years, so they made a motion to terminate my supervised

21  release at that point.  They felt I was fully rehabilitated.

22  **Q**    And so, total, how much time on supervised release did

23  you spend?

24  **A**    Approximately 54 months.

25  **Q**    Of the 60 months?

**Direct - Jason Dean**

1    **A**    Yes.

2    **Q**    So is your case completely over at this point?

3    **A**    Yes.

4    **Q**    Do you owe restitution?

5    **A**    Yes.

6    **Q**    About how much?

7    **A**    Approximately 6.5 million.

8    **Q**    And do you make payments on your restitution?

9    **A**    Yes.

10   **Q**    About how much?

11   **A**    It's $1,500 a month.

12   **Q**    How is that amount determined?

13   **A**    It was determined by the U.S. Attorney's Office, and

14   that was based upon me handing over all of my income

15   statements, bank statements, everything for the past five

16   years.

17   **Q**    Now, sir, after you got out of prison, did you

18   approach law enforcement?

19   **A**    Yes.

20   **Q**    For what purpose?

21   **A**    When I was released from prison, I had 72 hours to

22   report to my probation officer, who was downtown.  I made a

23   decision while I was in prison that I wanted to do more good

24   than harm in this society, and even though I didn't owe it

25   to them at the time, I decided that I would make myself

**Direct - Jason Dean**

1 available to help them -- help the FBI with any cases going

2 forward, if there's any way I could kick in and kind of undo

3 some of the bad I did in my life.

4 **Q** So, specifically, is that the law enforcement entity

5 you reached out to?

6 **A** Yes, ma'am.

7 **Q** The FBI?

8 **A** Yes.

9 **Q** And what was the FBI's response?

10 **A** Their response was to tell me to kind of cool off and

11 get my feet underneath me, get my family life together, take

12 my time.  And they said that if anything interesting to them

13 came up that they thought I'd be a good fit to help out

14 with, they would reach out to me.

15 **Q** Did the FBI ever reach back out to you?

16 **A** Yes.  Approximately one year later.

17 **Q** So that would put us in what timeframe, sir?

18 **A** That would have been November of 2020.

19 **Q** When FBI reached out -- back out to you, were you

20 asked to do anything?

21 **A** Yes.

22 **Q** What were you asked to do?

23 **A** There was a person of interest that they were

24 apparently investigating, they asked me to make a few phone

25 calls to this person and portray myself as an investor and

Direct - Jason Dean

1    see what the guy's spiel was, what his pitch was.

2    **Q**    And who was this guy that you mentioned?

3    **A**    Paul Spivak.

4    **Q**    All right.

5         Now, you indicated you posed as an investor.  Could

6    you give us a sense of what you were told to do or what that

7    looked like?

8    **A**    Yes.

9         They -- they told me to infer that I was a wealthy

10   investor and that I had an interest through a referral to

11   invest in Paul's company, US Lighting Group.

12   **Q**    Were you given a location from where you were supposed

13   to be from?

14   **A**    Yes.

15   **Q**    Where was that?

16   **A**    Western Pennsylvania.

17   **Q**    And did you agree to in fact do this?

18   **A**    Yes.

19   **Q**    Why?

20   **A**    Like I said before, I wanted to be helpful to them.  I

21   wanted to be able to walk down the street and feel like I

22   was doing more good than harm in this world and trying to

23   undo some of the bad I done before.

24   **Q**    In that December 2020 timeframe, were you still on the

25   supervised release for your federal case?

**Direct - Jason Dean**

1    **A**      Yes.

2    **Q**      And did you have to get permission from the Court to

3    work undercover?

4    **A**      Yes.

5    **Q**      Did you receive such permission?

6    **A**      Yes.

7    **Q**      Now, turning to that time period when you started

8    working, tell the jury, what's the first thing you did?

9    **A**      The first thing I did was reach out to Mr. Spivak.  My

10   initial call was through his investor relations person,

11   Maria Daniel.  And I spoke to her about an opportunity

12   investing with the company, I told her who my character was

13   that the FBI wanted me to portray, and expressed extreme

14   interest in hearing what they had to say about the company.

15   **Q**      Did you get any information generally about how to

16   invest in USLG from Ms. Daniel?

17   **A**      Yeah.  It was pretty nominal information.  It was a

18   subscription agreement she e-mailed to me.  It gave the

19   price of the stock that they were willing to sell to me at

20   the time.  Wasn't a lot of detail from her, and it wasn't a

21   lot of sales from her, and it was just more of "Hey, here

22   you go; if you want to invest, here it is."

23   **Q**      Now, following that kind of introductory conversation,

24   did you have any direct followup with Mr. Spivak?

25   **A**      Yes.  About a week later I called back to Ms. Daniel

1    and asked her if I could speak to the CEO of the company and

2    hear what his interpretation of the company was and what its

3    prospects were going forward.

4    **Q**    Did you -- was there a time that you actually then met

5    Mr. Spivak in person?

6    **A**    Yes.

7    **Q**    Would that have been around the end-of-November time

8    period?

9    **A**    Yeah.  Around there, yes.  I don't have the dates

10   memorized, but yeah -- it was pretty shortly after the

11   initial conversation.

12   **Q**    So in terms of -- so early on in terms of your

13   activity with USLG and Mr. Spivak?

14   **A**    Yes.  In the first couple weeks.

15   **Q**    All right, sir.

16        Now, where did you meet with Mr. Spivak?

17   **A**    The initial meeting was at his office over in Euclid.

18   **Q**    Could you describe that facility?

19   **A**    It's an industrial facility with -- if you could

20   picture it -- it had a big space of industrial product,

21   manufacturing in the back.  In the front of it, it had an

22   office suite with a handful of offices for executives and a

23   handful of cubicles for the other employees, like Ms. Daniel

24   sat right in front.

25   **Q**    About how long did you spend at USLG that day?

**Direct - Jason Dean**

1    **A**    I believe the initial visit was about two hours.

2    **Q**    Was Mr. Spivak with you for all of it?  A portion of

3    it?  Tell us about that.

4    **A**    Yeah.  He took me on a full tour of the facility,

5    showed me every inch of the place and showed me where they

6    were making product, how they were doing it, showed me some

7    of the ideas they had for future products.  And then we sat

8    down in the conference room and spoke for quite a while.

9    **Q**    Were any other employees or individuals present that

10   day?

11   **A**    There were other employees, yeah.  I met Ms. Daniel at

12   the door.  She kind of came and went within the

13   conversations.

14        Mr. Spivak was an aggressive guy, and he kind of took

15   charge of the whole meeting -- of the whole relationship at

16   that point.  The company CFO stopped in and talked to us for

17   a little bit and shared some documents with us.  And

18   Mr. Spivak's wife stopped in and talked to us as well.

19   **Q**    Would that be Ms. Smirnova?

20   **A**    Yes.

21   **Q**    And during that meeting, did there come a time when

22   you started discussing investment potential in USLG?

23   **A**    Yes.

24   **Q**    Tell us about that conversation.

25   **A**    He discussed his goal to get the company on NASDAQ and

**Direct - Jason Dean**

1    take it to $20 a share as quickly as possible, that it was

2    his personal goal to be a self-made billionaire.  The stock

3    at the time was around $0.30 a share, and he thought that as

4    the financials were filed and as a number of other company

5    events that he discussed with me would happen, that the

6    stock would go to the moon.

7    **Q**    And what did you understand Mr. Spivak to be trying to

8    do as it relates to your investment or investment in

9    general?

10   **A**    Yeah.

11         Initially he was trying to get me to write a pretty

12   good size check to invest in the company.

13   **Q**    And did he talk to you about what that investment

14   money would be used for?

15   **A**    Yes.  He talked about company growth, investing in

16   other businesses that the company wanted to start.

17   **Q**    And at some point, sir, did Mr. Spivak discuss his

18   prior experience taking USLG public?

19   **A**    Yes.  Yes.

20   **Q**    And, sir, were your interactions audio recorded with

21   Mr. Spivak?

22   **A**    Every interaction I had with Mr. Spivak was audio

23   recorded and supervised by the FBI.

24   **Q**    Tell us -- describe that process of how you obtained

25   the recording device, what you did with it, the kind of

**Direct - Jason Dean**

1    protocol, et cetera.

2    **A**      Prior to the -- any meetings or phone calls with

3    Mr. Spivak, I would meet with the FBI agents that were in

4    charge of the investigation.  They would normally dictate to

5    me certain points of interest with them, some questions

6    they'd want me to ask, some information they'd want me to

7    obtain from Mr. Spivak.  The recording devices -- you know,

8    they would give me normally two devices to wear on me at a

9    time and bring them into the meetings to make sure that

10   everything was properly gathered up, the information.

11   **Q**      Are you aware of whether FBI was monitoring the

12   recording device in real time?

13   **A**      Yes.  In most cases they were.

14   **Q**      And then what happened after you would meet with

15   Mr. Spivak and the meeting would be over, what would happen

16   at that point?

17   **A**      When I would meet with him at his facility in Euclid,

18   I would normally drive about two blocks around the corner to

19   a big Amazon facility, meet -- at least two of the agents

20   would be there in the car waiting for me, and I would

21   immediately hand over the recording devices to them.

22   **Q**      So you weren't allowed to keep the device in your

23   possession?

24   **A**      No.  I was not allowed to keep them.

25   **Q**      Now, sir, regarding that conversation that I just

**Direct - Jason Dean**

1  mentioned, Mr. Spivak discussing his prior experience taking

2  USLG public, did you have an opportunity to listen to a

3  recording of that portion of your conversation with

4  Mr. Spivak?

5  **A**    Yes.

6  **Q**    And was that a true and accurate depiction of your

7  conversation with Mr. Spivak?

8  **A**    Yes.  It was accurate.

9              MS. MILLER:  Could we please go to

10  Government's Exhibit 404A, please.

11       May we approach?

12              MR. DEVILLERS:  Your Honor, may I approach?

13              THE COURT:  You may.

14              (The following discussion was had between

15              Court and counsel at sidebar.)

16              MR. DEVILLERS:  Is this -- is this a

17  transcript?

18              MS. MILLER:  It's the audio that will be

19  played with the synched transcript.

20              MR. DEVILLERS:  When did you provide us that

21  transcript?

22              MS. MILLER:  The transcript has been provided

23  and marked as exhibits the entire time.

24              MR. DEVILLERS:  Okay.

25       These are exact transcripts?

**Direct - Jason Dean**

1          MS. MILLER:  Yes.

2          And we also proposed a jury instruction where the jury

3     will be told that it's the audio that is the actual

4     evidence, the transcript is only an assistance guide.  If

5     anything conflicts with their memory, it would be the audio

6     that controls.

7               (Sidebar concluded.)

8               THE COURT:  You may publish.

9               MS. MILLER:  Thank you, Your Honor.

10              (Audio played.)

11    BY MS. MILLER:

12    **Q**    Sir, who was the primary individual speaking on that

13    recording?

14    **A**    That's Paul Spivak.  That's Paul Spivak.

15    **Q**    Who was the individual who was laughing?

16    **A**    That was me.

17    **Q**    Okay.

18         Now, sir, how did you leave this initial conversation

19    or this initial meeting with Mr. Spivak vis-à-vis your

20    investment potential?

21    **A**    I left the conversation with him letting them know I'd

22    probably make an investment, that I was impressed with the

23    company, everything I saw, and I would be back in touch with

24    him very soon.

25    **Q**    You mentioned, sir, that you also received some

**Direct - Jason Dean**

1    followup information from USLG?

2    **A**    Yes.

3    **Q**    And that that included a subscription agreement?

4    **A**    Yes.

5                MS. MILLER:  Could we please pull up

6    Government's Exhibit 185.

7            And taking a moment to scroll through this, please,

8    Ms. Wojtasik.

9            Going back to page 1, please.

10   BY MS. MILLER:

11   **Q**    Do you recognize Government's Exhibit 185 in front of

12   you, sir?

13   **A**    Yes.

14   **Q**    What is it?

15   **A**    It's the e-mail from USLG with the followup

16   information I requested.

17               MS. MILLER:  Permission to publish, Your

18   Honor?

19               MR. DEVILLERS:  No objection.

20               THE COURT:  You may.

21               MS. MILLER:  Ms. Wojtasik, can we please zoom

22   in on the top half of this e-mail.

23   BY MS. MILLER:

24   **Q**    Sir, drawing your attention to the "to" line, what

25   e-mail is indicated there?

**Direct - Jason Dean**

1    **A**    1973.jasondean@gmail.com.

2    **Q**    Are you familiar with that e-mail address?

3    **A**    Yes.

4    **Q**    How so?

5    **A**    It was an e-mail address created for me by the FBI.

6    **Q**    Okay.

7          And now did you have unfettered access to this e-mail

8    address, or was it something that you had access to in

9    conjunction with the FBI?

10   **A**    I had no access to it unless I was with the FBI.  I

11   didn't know the password or anything.

12   **Q**    So it was password protected for you to get into this

13   Jason Dean e-mail account?

14   **A**    Yes.  I can only access it when I was with them.

15   **Q**    Okay.

16         And then who is the e-mail from, sir, in the line

17   above?

18   **A**    investorrelations@uslightinggroup.com and Maria Daniel

19   more specifically.

20   **Q**    What is the date of this e-mail?

21   **A**    Monday, November 30th, 2020.

22   **Q**    And what is the e-mail enclosing?

23   **A**    I'm sorry?

24   **Q**    What is the e-mail enclosing?  Are there attachments

25   associated therewith?

**Direct - Jason Dean**

1      **A**      Oh, yeah.  The attachments associated are the

2      subscription agreement and the information to make an

3      investment.

4                     MS. MILLER:  Can we turn to page 2, please.

5      BY MS. MILLER:

6      **Q**      And here, sir, do you see those attachments?

7      **A**      Yes.

8      **Q**      And what specifically are they?

9      **A**      The first one's a subscription agreement, which is

10     essentially the contract you sign when you're going to -- to

11     make the investment before you send the wire or pay the

12     money for the investment.

13         The second one is the information of the stock

14     transfer company that handles the certificates for the

15     company and the securities and stock for them.

16         And the third one is what looks to be a breakdown of

17     the SEC rules pertaining to the stock.

18                     MS. MILLER:  Let's go to page 3, please,

19     Ms. Wojtasik.  Zooming in on that.

20     BY MS. MILLER:

21     **Q**      This looks to be that reference to applicable SEC

22     rules you referenced?

23     **A**      Yes.

24                     MS. MILLER:  Page 4, please.

25     BY MS. MILLER:

**Direct - Jason Dean**

1    **Q**    And this, sir, looks to be the stock transfer

2    information you requested?

3    **A**    Yes.

4    **Q**    Or -- I'm sorry -- you referenced?

5    **A**    Yes.

6                  MS. MILLER:  And then page 5, please.

7    BY MS. MILLER:

8    **Q**    This is that subscription agreement?

9    **A**    Yes.

10                 MS. MILLER:  Can we please zoom in on the

11   middle.  Or that first big paragraph, please, Ms. Wojtasik.

12   BY MS. MILLER:

13   **Q**    And according to this subscription agreement, sir, how

14   much money was USLG intending to raise?

15   **A**    $1,350,000.

16   **Q**    And how many shares of stock?

17   **A**    9 million shares.

18   **Q**    At what price?

19   **A**    $0.15 a share.

20                 MS. MILLER:  You may take that down.  Thank

21   you.

22   BY MS. MILLER:

23   **Q**    Sir, were you ultimately instructed to make an

24   investment in USLG restricted stock?

25   **A**    Yes.

**Direct - Jason Dean**

1    **Q**    For how much?

2    **A**    We invested $25,000 of the government's money at $0.15

3    a share.

4    **Q**    You said it's the government's money, so fair to say

5    that wasn't your money?

6    **A**    Correct.  It was not my money.

7    **Q**    Did you have any involvement in the transfer or

8    movement of funds?

9    **A**    No.  None whatsoever.

10   **Q**    Did you have any involvement in deciding whether to

11   invest?

12   **A**    No.

13   **Q**    How about the actual sum of investment?

14   **A**    No.  That was all determined by the FBI.

15   **Q**    So after having received that instruction, did you

16   discuss your investment with Mr. Spivak?

17   **A**    Yes.

18   **Q**    Did you -- I guess tell us about that conversation,

19   sir.

20   **A**    In the conversation I told them that I wanted to start

21   with a small investment just to make sure that everything

22   went smoothly and I got the certificate and that I would be

23   looking to do bigger and better investments in time.

24   **Q**    Okay.

25        So did you represent that the 25,000 was the sum total

**Direct - Jason Dean**

1    of your investment?

2    **A**    The initial investment, yes, but I inferred to

3    Mr. Spivak and told him directly I was going to invest a lot

4    more on -- down the road.

5              MS. MILLER:  Could we pull up Government's

6    Exhibit 186, please.  And just scrolling through this.

7    BY MS. MILLER:

8    **Q**    Do you recognize this, sir?

9    **A**    Yes.

10   **Q**    And what is this?

11   **A**    It's the subscription agreement for the investment

12   that I made on behalf of the government.

13             MS. MILLER:  Permission to publish?

14             MR. DEVILLERS:  No objection, Your Honor.

15             THE COURT:  You may.

16             MS. MILLER:  Thank you.

17        And, Ms. Wojtasik, could you please zoom in on this

18   first half of the first page.

19   BY MS. MILLER:

20   **Q**    All right, sir.  Here you see that Jason Dean e-mail

21   account then?

22   **A**    Yes.

23   **Q**    And you're sending an e-mail back to Ms. Daniel?

24   **A**    Yes.

25   **Q**    Attaching the executed subscription agreement?

**Direct - Jason Dean**

1    **A**    That's correct.

2    **Q**    And what do you indicate about the submission of the

3    wire?

4    **A**    I indicated that the wire will be processed within the

5    next day or two.

6                    MS. MILLER:  Could we please go to page 2 of

7    this exhibit.

8    BY MS. MILLER:

9    **Q**    And, sir, this is that same subscription agreement

10   that we just discussed, is that fair?

11   **A**    Yes.

12                   MS. MILLER:  Could we go to page 9?

13   BY MS. MILLER:

14   **Q**    The information at the top, sir, what is that?

15   **A**    That's the information I provided as an address from

16   one of the corporations that inferred -- that I told

17   Mr. Paul I was involved in.

18   **Q**    Okay.

19          And this is your handwriting?

20   **A**    Yes.

21                   MS. MILLER:  The bottom half of this page,

22   please.

23   BY MS. MILLER:

24   **Q**    And you see your signature there on the bottom of

25   page 9, sir?

**Direct - Jason Dean**

1    **A**    Yes.

2    **Q**    Is that your signature?

3    **A**    Yes, it is.

4    **Q**    On what date?

5    **A**    December 14th, 2020.

6    **Q**    And what's the purchaser name that you listed?

7    **A**    Jason Dean for Kane Financial LLC.

8    **Q**    What was Kane Financial LLC?

9    **A**    Kane Financial LLC was an LLC that I told Mr. Spivak I

10   was a partner in.

11   **Q**    Did you identify any other individuals that were

12   associated with Kane Financial?

13   **A**    Yes.  I told him about my partner at Kane Financial, a

14   man named Bryan Kane.

15   **Q**    Is Bryan Kane a real person?

16   **A**    Bryan Kane is an FBI agent.

17            MS. MILLER:  Now, can we go to page 8 of this

18   exhibit, please.  First half.

19   BY MS. MILLER:

20   **Q**    And on this part of the subscription agreement, what

21   is indicated for the number of shares purchased?

22   **A**    166,666 shares.

23   **Q**    In what purchase price?

24   **A**    $0.15 a share.

25   **Q**    For a total of?

**Direct - Jason Dean**

1   **A**    $25,000.

2   **Q**    And here the purchaser is again indicated as Kane

3   Financial?

4   **A**    Yes.

5   **Q**    Now, is there any back and forth as to how to actually

6   submit the signed stock purchase -- or -- I'm sorry --

7   subscription agreement to USLG?

8   **A**    Yes.  They wanted me to sign a Docusign initially and

9   we -- I preferred at the direction of the FBI to do it as a

10  print it, sign it old-school, and send it over to them.

11  **Q**    Did you ultimately end up having a signed DocuSigned

12  subscription agreement however?

13  **A**    I don't recall specifically if we did the DocuSign.

14  We avoided it initially, and there was a lot of back and

15  forth on it.

16              MS. MILLER:  And could we go to Government's

17  Exhibit 192, please.  And just scrolling through these two

18  pages.

19  BY MS. MILLER:

20  **Q**    Do you recognize this, sir?

21  **A**    Yes.

22  **Q**    And what is this?

23  **A**    This is back and forth between myself and Maria Daniel

24  about the DocuSign.

25  **Q**    So these are the e-mail communications you were

**Direct - Jason Dean**

1    talking about?

2    **A**    Yes.

3              MS. MILLER:  Can we publish, please?

4              MR. DEVILLERS:  No objection.

5              THE COURT:  You may.

6    BY MS. MILLER:

7    **Q**    All right.  And so here, sir, at the top of the page,

8    this just indicates they wanted the DocuSign, and now it's

9    January 7, 2021.  Is that fair?

10   **A**    Yes.

11   **Q**    And in terms of the DocuSign, who does it indicate

12   from USLG will sign that particular document?

13             MS. MILLER:  Perhaps if you can blow up that

14   top part, Ms. Wojtasik.  Thank you.

15   BY MS. MILLER:

16   **Q**    From that e-mail, who did you understand would be

17   signing the subscription agreement on behalf of the company?

18   **A**    Paul Spivak was to countersign it.

19             MS. MILLER:  You may take that down,

20   Ms. Wojtasik.

21   BY MS. MILLER:

22   **Q**    Now, sir, you mentioned Bryan Kane as an individual

23   that you discussed with Mr. Spivak, correct?

24   **A**    Yes.

25   **Q**    Any additional context to your discussions with

**Direct - Jason Dean**

1      Mr. Spivak about Mr. Kane?

2      **A**      Mr. Kane is -- initially we laid him out there as one

3      of my financial partners that we did investments together.

4      Over time we disclosed to Mr. Spivak that he was a stock

5      promoter and investor relations specialist that could hype

6      his stock up quite a bit.

7      **Q**      Were there any other connections that you also

8      informed Mr. Spivak that you had?

9      **A**      Can you be more specific?  I'm --

10     **Q**      Yes.  Other individuals that you could connect

11     Mr. Spivak to.

12     **A**      Yes.  After the initial investment of 25,000, I waved

13     around my network of wealthy friends.  It was a fictitious

14     network that ultimately would consist of FBI agents, but at

15     their direction I inferred that there was much larger

16     investments that could come out of my group to see how

17     Mr. Spivak would react to that.

18     **Q**      Okay.

19            And is one of those individuals named Matt Bianchi?

20     **A**      Yes.

21     **Q**      And what was Mr. Bianchi's role to be?

22     **A**      The role I described Mr. Bianchi as is a very wealthy

23     investor from the Detroit area that managed family funds.  I

24     portrayed him as a guy that had well over a hundred million

25     in excess cash available, and he liked to do small-cap deals

Direct - Jason Dean

1      if he found them to be viable companies.

2      **Q**      And what was the significance of that $100 million

3      figure?

4      **A**      The significance of the hundred million dollar figure,

5      if you're running a family fund and you stay under a hundred

6      million dollars, you don't have to register with the SEC and

7      be transparent with all of your transactions, so I made it

8      pretty clear to Paul Spivak at the time that Matt

9      intentionally kept his funds -- his multiple funds under a

10     hundred million each to avoid reporting.

11     **Q**      In terms of other individuals that you offered to

12     connect Mr. Spivak to, was there also a Pete?

13     **A**      Yes.

14     **Q**      Who is Pete?

15     **A**      Pete was, as we laid it out to Mr. Spivak, Matt's

16     chief operating officer type of character, more of a

17     gatekeeper that did the diligence for him.  I portrayed Pete

18     as the guy that -- the tough guy that you had to get

19     through, the guy that would screen everything and really go

20     through the deal in detail to make -- make him believe first

21     before Matt would consider an investment.

22     **Q**      And then finally was there a John?

23     **A**      Yes.

24     **Q**      And who was John?

25     **A**      John was another FBI agent that we entered into the

**Direct - Jason Dean**

1    equation over time.  He was one of the employees at

2    Matt's -- at one of Matt's funds called Arrowwood

3    Securities.

4    **Q**    And did you have a series of calls or meetings with

5    Mr. Spivak to kind of introduce these folks?  Or tell us how

6    that worked.

7    **A**    Yes.

8         After describing the way the network worked and

9    dangling sizeable -- potential sizeable amount of money in

10   front of Mr. Spivak, I set up a meeting where initially I

11   brought Pete in to Mr. Spivak's office for this same tour,

12   kind of a dog and pony show that he gave me so that he could

13   re-pitch Pete, you know, and Pete could hit him with all the

14   hard questions and other questions that the government

15   wanted answers to but in the sense that Pete was screening

16   the investment for Matt to come in with a potential sizeable

17   investment.

18   **Q**    Did Mr. Spivak give you a sense of whether he was

19   interested in continuing to meet your connections and having

20   investment discussions with them?

21   **A**    Yeah.  He was absolutely excited about the prospect of

22   having these wealthy individuals come in and fund his

23   company.

24   **Q**    And were there times where Mr. Spivak kind of reached

25   out to you to prompt "Hey, when are you going to hook me up

**Direct - Jason Dean**

1    with this guy -- that guy?"  That type of thing?

2    **A**     Yeah, many times.  He was very aggressive and wanted

3    me to be the conduit to bring these group of people to him

4    and bring in sizeable investments.

5    **Q**    Now, turning your attention to middle of February, so

6    February 15th of 2021, did there come a time when you went

7    to Florida to meet with Mr. Spivak?

8    **A**     Yes.

9    **Q**    Tell us about that.

10   **A**     So in the -- the lure of Matt Bianchi that we created,

11   after Paul had met with his screener, his gatekeeper, Pete,

12   and we made Paul feel that he was pretty close to getting an

13   investment from Matt, we said that he needed now to come

14   down and meet with Matt, and Matt owned a boat in Florida,

15   and that we would do a meeting in south Florida on Matt's

16   boat, and he could discuss terms directly with Matt and get

17   to know him better with the potential investment.

18   **Q**    And how did it come about that Mr. Spivak was going to

19   be in Florida?

20   **A**     Mr. Spivak had told me in one of the many

21   conversations we had over those couple of months leading up

22   to February that he would be in February for a boat show --

23   he would be in Florida mid February for a boat show.

24   **Q**    Okay.  And did you in fact end up meeting Mr. Spivak

25   down in Florida?

**Direct - Jason Dean**

1    **A**    Yes.

2    **Q**    Where did you meet him?

3    **A**    Ft. Lauderdale area.

4    **Q**    And did you actually go out on this boat?

5    **A**    Yes.

6    **Q**    About how long did you spend on the boat?

7    **A**    It was about a three-hour boat ride in the

8    Intracoastal Waterway where we met and discussed business

9    terms and his company.

10   **Q**    Who all was on this boat?

11   **A**    On the boat was Pete, who was Matt's right-hand man,

12   gatekeeper; Pete's fiancée, a woman named Margaret; an FBI

13   agent named Wally, who was also posing as an investor; and

14   another investor named Mike, who was also an FBI undercover

15   agent posing as an investor.

16   **Q**    Any other folks other than Mr. Spivak?

17   **A**    Mr. Spivak; his wife, Olga; and they kind of surprised

18   us and brought their daughter on the boat last-second.

19   **Q**    What do you mean "surprised you"?

20   **A**    When they discussed the trip initially, Paul Spivak

21   had laid out a plan to drive his RV from Cleveland to

22   Florida.  His mother lives somewhere in the Gulf Coast, and

23   he was going to drop his daughter off over on the Gulf Coast

24   and rent a car over to Ft. Lauderdale and meet us there with

25   him -- just him and his wife.

**Direct - Jason Dean**

1    **Q**    So the daughter ending up on the boat was --

2    **A**    Something happened with his mother, and he brought the

3    daughter.

4    **Q**    Tell us about your conversations, generally speaking,

5    with Mr. Spivak on the boat.

6    **A**    On the boat, the conversations were Paul being very

7    aggressive about the business prospects of US Lighting

8    Group, about how much money we could all make together.  He

9    wanted to find a structure that would work for Matt Bianchi

10   to come in with a sizeable investment and potentially Matt's

11   other wealthy friends that were on the boat with us.

12   **Q**    Now, at this point, sir, are you talking about

13   investments in restricted stock, free-trading stock, some

14   combination?  What was the nature of the investment being

15   contemplated?

16   **A**    So initially, rewinding back to my initial

17   conversations with Paul, it was just about restricted stock.

18   Over time, at the FBI's direction, I asked him if there was

19   freely tradeable stock available, and told him that Matt

20   Bianchi would be much more interested in making an

21   investment if there was freely tradeable stock available in

22   the company.

23   **Q**    So, fair to say that boat ride is kind of on the

24   bridge between restricted and free-trading path?

25   **A**    Yes.  That's fair to say.

**Direct - Jason Dean**

1    **Q**     Okay.

2         Now, following the boat ride, did you have an occasion

3    to meet Mr. Spivak the following day?

4    **A**     Yes.  We met for a late breakfast the next morning

5    right in front of his hotel.

6    **Q**     And was that also a conversation that was audio

7    recorded?

8    **A**     Yes.

9    **Q**     And, to be fair, the conversations on the boat and so

10   on and so forth were also audio recorded?

11   **A**     Yes.  Every conversation with Mr. Spivak was

12   documented and recorded.

13   **Q**     Okay.

14   **A**     Fully.

15            MS. MILLER:  Can we please pull up

16   Government's Exhibit 427A.

17   BY MS. MILLER:

18   **Q**     And, sir, did you have an opportunity to listen to and

19   review that portion of your conversation with Mr. Spivak on

20   February 16th, 2021, the day following the boat ride?

21   **A**     Yes.  I recently listened to it.

22   **Q**     And was that recording a true and accurate reflection

23   of your conversation with Mr. Spivak on that date?

24   **A**     Yes.  It's the exact recording.

25            MS. MILLER:  May we publish Exhibit 427A,

**Direct - Jason Dean**

1    please?

2                      MR. DEVILLERS:  No objection.

3                      THE COURT:  You may.

4                      MS. MILLER:  If you could please play,

5    Ms. Wojtasik.  Thank you.

6                      (Audio played.)

7    BY MS. MILLER:

8    **Q**    We're going to skip over your recording the day after

9    the call.  And we will move to about ten days later, and

10   that would be about February 26, sir.

11           And on that day, do you recall a series of discussions

12   with Mr. Spivak where he's like "The stock went through the

13   roof?  Was that your activity?"  So on and so forth?

14   **A**    Yes.  I remember the conversation.

15   **Q**    Tell us about that conversation.

16   **A**    Initially in the conversation, Paul saw that there was

17   some -- a spike in volume and trading activity in USLG

18   stock.  He was asking me if it was me or my guys that were

19   starting to promote the stock at that point.

20   **Q**    And what did you mean by promoting the stock?

21   **A**    By promoting the stock, it happens often in penny

22   stocks where you'll have -- there's people out there that

23   specialize in putting out information on various social

24   media formats, on different news platforms, on Discord

25   channels, sometimes some real backdoor blog rooms and things

**Direct - Jason Dean**

1     like that to hype the stock and -- and basically get this

2     story out to unwitting investors that this stock is going to

3     go up significantly.

4     **Q**     And when you say "unwitting investors," what do you

5     mean?

6     **A**     Oftentimes somebody will be sitting at their desk and

7     they'll get an e-mail that will be exaggerating the future

8     prospects of a company, or if they'll be in some of these

9     disorder rooms, they'll be in these different blogs, they'll

10    be very hypish-type of projections of what's going to happen

11    with the stock going forward to induce them to buy shares on

12    the open market.

13    **Q**     And who was the individual that you were portraying,

14    from your associates, could hype the stock?

15    **A**     Bryan Kane.

16    **Q**     When you were portraying Mr. Kane, were you portraying

17    him as doing this in a legitimate fashion or an illegitimate

18    fashion?

19    **A**     I was portraying him to do it in an illegitimate

20    fashion just to drive the volume and the price up.

21    **Q**     All right.

22          And so was there then a subsequent conversation with

23    Mr. Spivak where he's questioning you about whether Mr. Kane

24    had taken some action in relation to the stock price?

25    **A**     Yes.  I believe that's the conversation you started to

**Direct - Jason Dean**

1    play just now.

2    **Q**    Yes.  And thank you for correcting me.

3         So, fair to say you've also listened to that portion

4    of the conversation with Mr. Spivak?

5    **A**    Yes.

6    **Q**    Is it also true and accurate to the best of your

7    knowledge?

8    **A**    Yes.

9              MS. MILLER:  May we play Government's 427A,

10   please?

11             THE COURT:  You may.

12             (Audio played.)

13   BY MS. MILLER:

14   **Q**    All right, sir.  Now, when Mr. Spivak is asking you

15   "We need to find out who our best friend is," what did you

16   understand him to mean?

17   **A**    Mr. Spivak -- my understanding was that he's very

18   excited about buy-in coming into the stock and the volume

19   increasing and the price increasing.

20   **Q**    And he was specifically asking you "Hey, is this

21   Bryan?"

22   **A**    Yeah.  He was asking if it was Bryan or one of my

23   guys.

24   **Q**    So when you responded "No, it's going to be a million

25   shares if it's Bryan," what were you relaying by that?

**Direct - Jason Dean**

1    **A**    What I was doing is kind of laying it out there that

2    Bryan's much bigger than this.  If he comes in and no, it

3    wasn't him coming in yet -- and I knew he -- Bryan Kane

4    hadn't done anything yet there specifically, so I laid it

5    out there is that when Bryan comes in, it's going to be much

6    larger than what he saw today.  You know, more to see how

7    Paul would react to it and, you know, what his actions would

8    be based upon the -- the possibility of a guy coming in that

9    could bring in millions of dollars of buy-in.

10    **Q**    And when Mr. Spivak said, "I want to figure out who

11    this person is so I can return the favor," what did you

12    understand by "returning the favor"?

13    **A**    My understanding is that if it was our group, he

14    wanted to compensate us or give us some stock or something

15    to that extent.  He wasn't specific obviously, but he wanted

16    to thank us in some form of compensation if it was us.

17    **Q**    And when you heard Mr. Spivak say, "Because I have

18    other people," what did you understand him to mean by "other

19    people"?

20    **A**    My understanding at the time was that he had other

21    people that might be pushing the stock or buying the stock

22    or inflating the price for him.

23    **Q**    So kind of competing for the business of doing it with

24    your folks?

25    **A**    Very possibly.

**Direct - Jason Dean**

1    **Q**    Now --

2                      MS. MILLER:  And you may take that down,

3    Ms. Wojtasik.  Thank you.

4    BY MS. MILLER:

5    **Q**    Following this phone call, did you have another

6    occasion on March 5th to meet with Mr. Spivak in person?

7    **A**    Yes.  I believe so.

8    **Q**    And where would that meeting have taken place?

9    **A**    Specifically I'd have to check the notes on all the

10   dates and everything.  We met many times.  I don't have all

11   the dates memorized, I apologize, of where each meeting was.

12   I know we have notes on that and we have records on that.

13   It would either most likely have been his office, or at some

14   point we had a meeting at Arrowwood as well.

15   **Q**    And what was Arrowwood again?

16   **A**    Arrowwood was one of Matt's family funds offices in

17   downtown Cleveland, Ohio -- Matt Bianchi's office, that he

18   sometimes worked out of and had employees working out of,

19   running a fake investment office essentially there.

20   **Q**    Okay.  But regardless of the specific location, you

21   believe you were present with Mr. Spivak in person?

22   **A**    Yes.

23   **Q**    Okay.

24            Now, was that in-person meeting also audio recorded?

25   **A**    Yes.  Every meeting was.

92

**Direct - Jason Dean**

1    **Q**    And have you had a chance to listen to Government's

2    Exhibit 429A in connection with that meeting on March 5th,

3    2021?

4    **A**    Yes.  I believe I heard it this week.

5    **Q**    And was it a true and accurate recording of your

6    interactions with Mr. Spivak?

7    **A**    Yes.

8                MS. MILLER:  Could we please pull up

9    Government's Exhibit 429A.

10           And may we publish?

11                MR. DEVILLERS:  No objection.

12                THE COURT:  You may.

13                (Audio played.)

14                MS. MILLER:  Stopping at about 40 seconds,

15    please.

16    BY MS. MILLER:

17    **Q**    Sir, you asked about freely tradeable shares.  What

18    specifically are you asking at this point of Mr. Spivak?

19    **A**    I was asking if he had any stock available that could

20    be deposited into a brokerage account right away without

21    restrictions.  Going back to the $0.15 share offering that I

22    participated with previously, when you buy stock directly

23    from the issuer, it normally has a restrictive period where

24    you can't put it in your brokerage account and resell it.

25    Depending on the status of the company and what their filing

1  status is with the SEC, it could be anywhere from the

2  six-month restriction to a 12-month restriction where you're

3  essentially locked out from trading it.  So I was asking

4  Mr. Spivak if there is any stock available that we could

5  purchase that was freely tradeable right then.

6  **Q**    And what did you understand Mr. Spivak's response to

7  mean when he said it depends on the price?

8  **A**    His response to me at that point, saying it depends on

9  the price, was setting the table for a negotiation on what

10  price we would actually pay for those shares.

11  **Q**    And specifically how many shares was he representing

12  these trusted individuals held?

13  **A**    He was representing that there were two individuals

14  that had approximately three million shares each.

15             MS. MILLER:  Could we continue playing,

16  please.

17             (Audio played.)

18             MS. MILLER:  So stopping there at about 1:35,

19  please.

20  BY MS. MILLER:

21  **Q**    What plan did you understand Mr. Spivak to be

22  describing to you?

23  **A**    In our meetings along the way, we had discussed that

24  he was going to release his -- his annual numbers, his 10K

25  around that timeframe, so the plan was for him to put out

**Direct - Jason Dean**

1    his numbers and have my group come in and promote the stock

2    and the stock go up much higher.

3    **Q**    When he -- when you're discussing with him the $0.15 a

4    share and they're not going to let you have it for that,

5    what's the context of that?  What did you understand that to

6    mean?

7    **A**    In context, given other conversations I had with Paul

8    along the way as well, the $0.15 a share was significant

9    because he said that his two shareholders would not be

10   interested in selling the shares to my group at $0.15 a

11   share because they had to give Paul $0.15 a share back of

12   the selling proceeds.  So there would be no profit in it for

13   these outside shareholders who held the shares, it would be

14   a net wash for them, they wouldn't make any money off of it.

15   **Q**    Did you perceive any benefit to Mr. Spivak to also

16   have you buy free-trading shares on the open market?

17   **A**    Yes.  If we came in and bought the shares in the open

18   market, it's a thinly traded stock, meaning it's low volume.

19   If our group came in and bought $20,000 or $40,000 or

20   $50,000, it would drive the price of the stock up pretty

21   considerably, pretty quickly, so he would have a benefit in

22   having a higher share price.

23              MS. MILLER:  Could we please keep playing,

24   Ms. Wojtasik.

25              (Audio played.)

**Direct - Jason Dean**

1          MS. MILLER:  Stop there at 2:38, please.

2     BY MS. MILLER:

3     **Q**     Now, what did you understand Mr. Spivak to mean when

4     he said it's technically company stock and if the company

5     owns it, it's no longer free trading?

6     **A**     My understanding from Mr. Spivak at that point was

7     that he fully controlled the stock and had the

8     decision-making authority over the stock and could call the

9     shots on whether they sold to us or not.

10    **Q**     You had then a response where you're saying "arm's

11    length," "tongue-in-cheek."  Tell us what you meant by those

12    things.

13    **A**     I was being sarcastic because if the company truly

14    controlled the stock, it would be back into treasury and it

15    would have to be treated the same as the initial purchase we

16    did.  So if I buy stock from the company, it's got the

17    automatic six-month or 12-month restriction on it where it

18    can't be resold on the market whereas if I bought the stock

19    with -- as a freely tradeable share, I could put it in the

20    market right away.

21         And my understanding was that Paul had placed this

22    stock with two friendly people.  And we were being sarcastic

23    saying arm's length because it wasn't really arm's length.

24    Paul controlled the shares, Paul got to call the shots on

25    those shares.

**Direct - Jason Dean**

1    **Q**    And Mr. Spivak also said they're holding for the plan

2    of when stock price goes up.  What plan and when?

3    **A**    Again, based upon this conversation and other

4    conversations I had with him, the plan was for him to get

5    current and file his 10K, his annual numbers, which were

6    going to be significantly better numbers from the year

7    before, and then immediately start promoting the stock and

8    have it go up to a higher price on that.

9    **Q**    And Mr. Spivak described the stock price going up as a

10   "when," not an "if"?

11   **A**    Yes.

12              MS. MILLER:  Can we please continue.

13              (Audio played.)

14   BY MS. MILLER:

15   **Q**    It's kind of faint, but where did Ms. Smirnova tell

16   you those two trusted guys were located?

17   **A**    She indicated that one investor was in Virginia and

18   one was in Alabama.

19   **Q**    During that same meeting, did you continue to discuss

20   the USLG stock with Mr. Spivak?

21   **A**    Yes.

22   **Q**    Have you also listened to recorded portions of that

23   conversation marked as Government's Exhibit 429B?

24   **A**    Yes.

25   **Q**    And, to your knowledge, are those true and accurate

**Direct - Jason Dean**

1    recordings that reflect your interactions with Mr. Spivak

2    that day?

3    **A**    Yes.

4              MS. MILLER:  Could we please go to

5    Government's Exhibit 429B and publish?

6              THE COURT:  You may.

7              (Audio played.)

8              MS. MILLER:  Stopping there for a moment at

9    ten seconds.

10   BY MS. MILLER:

11   **Q**    What was Mr. Spivak talking about when he's saying

12   there's very little stock in the float?

13   **A**    When -- in the stock market we discussed the float.

14   By definition, the float is the amount of stock that's

15   already deposited at brokerage firms that could be bought or

16   sold instantaneously or that's freely tradeable.  So a tight

17   float means there's very little stock out there that's

18   deposited.  Even though there might be a hundred million

19   shares of USLG stock out there, the float actually

20   represents what can be traded on the market at that current

21   moment that's already deposited at brokerage firms.

22   **Q**    What's the significance of discussing the float in

23   connection with Bryan?

24   **A**    In connection with Bryan in his ability to move a

25   stock up, it's a lot easier to manipulate the price upwardly

98

**Direct - Jason Dean**

1    or downwardly in a stock that has less shares than the

2    float.  It takes less buy-in to move 2 million shares than

3    to work through 50 million shares, so a company with a tight

4    float is much -- much easier to manipulate.

5                    MS. MILLER:  Please continue.

6                    (Audio played.)

7                    MS. MILLER:  Can we pause there for a moment

8    at about 1:38.

9    BY MS. MILLER:

10   **Q**    Now, you're talking about DTC, the NOBO list, CDNCO.

11   Fair to say those are all ways of identifying the actual

12   shareholders out there?

13   **A**    Yes.  It's a way of identifying how much stock is

14   actually on deposit with the company.

15        I could go in more detail if you'd like or --

16   **Q**    That's okay.  The jury has heard a lot about those

17   terms.

18        But in terms of your comment, "Doing this with 10

19   million, that won't take much stock to get real high," what

20   are you talking about doing there?

21   **A**    We're talking about promoting and pumping the stock to

22   the much higher price.

23   **Q**    What's the relationship between promoting it and that

24   10 million?

25   **A**    Since there's only 10 million shares available, they

**Direct - Jason Dean**

1    could possibly be sold into our marketing activity and our

2    pumping activity.  There's not going to be a lot of

3    resistance to manipulate the stock to a much higher price.

4                MS. MILLER:  Please continue, Ms. Wojtasik.

5                (Audio played.)

6                MS. MILLER:  Stopping at about 2:35.

7    BY MS. MILLER:

8    **Q**    What's this reference to toxic financing, as you

9    understand it?

10   **A**    Toxic financing in this scope that we're talking about

11   is generally meant by there's quite a few companies out

12   there that it's kind of your cash of last resort where

13   they'll loan a company, for a mathematical example, a

14   hundred thousand dollars, and the -- the loans, the notes

15   are structured in a manner that in six months they mature.

16        The six months is there for a reason, because that's

17   when the underlying stock that they could convert into --

18   because it works off of the -- the timing of when they

19   invest the money, when they loan you the money, that also

20   works with the six-month tacking period, the six-month

21   restriction period that we talked about.  So after six

22   months they either request that you pay them back their

23   capital plus 20 or 25 or 30 percent or some egregious number

24   that they'll make, and if you can't repay to that point,

25   then they can immediately start converting their note into

**Direct - Jason Dean**

1    shares of common stock that's immediately freely tradeable.

2         The problem with these financings is that most of

3    them -- the conversions -- there's a preset formula that

4    you'd get the stock at 40 or 50 percent below the market

5    price that day.  So these toxic financiers -- and there's a

6    lot of them out there in Connecticut, New York, south

7    Florida, San Diego -- they'll give you the money, and then

8    say your stock, for example, is at a dollar, they'll convert

9    $20,000 worth of this $100,000 note they set up six months

10   ago, they'll convert it, and their price will be 55 or $0.60

11   a share.  What they immediately do is they sell it as hard

12   as they can to recapture as much money as they can.  And

13   when they do that, especially with a tight float like this,

14   it could be manipulated up or down pretty easy, they'll be

15   pushing the price of the share down.

16        So mathematically this converter just took a stock

17   that was a dollar, and he drove it all the way to $0.60.  In

18   his average cost to sales, probably around $0.80 cents a

19   share.  He doesn't really care because he owns it at $0.55

20   with his first conversion.  So $0.25 -- $0.55 is a

21   50 percent return in six months, he's pretty happy with

22   that.

23        The next problem that comes in is that he's still got

24   $80,000 mathematically to convert.  So his next conversion

25   is $20,000, but it's no longer at $0.60 or $0.55, it's at a

**Direct - Jason Dean**

1    40 or 50 percent discount off of $0.60, so his next

2    conversion is at 32 or $0.34 or whatever the specific math

3    works out to be.  That guy is then doing the same exact

4    thing that week and he's driving that price down, dumping

5    the stock as quick as he can.  And sometimes in the market

6    there will be enough buyers for it and hold it up and he

7    just repeats it.  If not, he just drives the stock down, and

8    he does it in steps until your stock is either very cheap or

9    he's out of notes to convert.

10          And it's a mechanism where -- normally what I've seen

11   in my experience is that the guys force-feed and make their

12   50 or 60 percent in six months, and the company's left

13   trashed in the stock price where before they did this, it

14   might have been a dollar, they might wake up and be at $0.07

15   a share after five or six tranches of this in a thinly

16   traded stock.

17   **Q**    Sounds like there's a reason it's called toxic.

18   **A**    Yes.  It's very toxic.  It's very, very damaging to a

19   company.

20   **Q**    So in the context of what you guys are trying to talk

21   about, which is the importance of a small float and there

22   being only 10 million shares out there, why was it relevant

23   that there was no toxic financing?

24   **A**    It was relevant to us that we were playing a game with

25   supply and demand, and if there's a limited supply, only 10

**Direct - Jason Dean**

1     million shares out there at the time, we could create a

2     little demand through a pump, through a promotion, and move

3     the stock upwardly.

4         If all of a sudden one of these -- if there was a note

5     out there for a hundred or $200,000 that had this conversion

6     mechanism in there, all of a sudden there's a lot more

7     supply that we would have to work through because these

8     institutional guys are going to sell it, they're going to

9     sell it hard if they exist, based on my relationships and

10    what I've seen them do before.  So it would be much harder

11    to manipulate a stock higher with institutional investors

12    like that that are toxic converters than it would be without

13    them just on the sheer number of shares that would be now in

14    the market, the new shares that would be out there against

15    you.

16  **Q**     Got it.

17        So that's one roadblock that did not exist for your

18    manipulation of market?

19  **A**     Yes.  It makes it much easier.

20                MS. MILLER:  Can we please continue.

21                (Audio played.)

22                MS. MILLER:  Stopping there at about 3:28.

23    BY MS. MILLER:

24  **Q**     Why did you understand Mr. Spivak wanted to send out a

25    press release?

**Direct - Jason Dean**

1    **A**    He wanted to put a press release out that helped show

2    a positive picture of the company to help us promote the

3    stock and have the stock go up more quickly.

4    **Q**    And what was he asking you to do to facilitate issuing

5    that press release?

6    **A**    He was asking us to buy out the last convertible note

7    that was out there in the company so he could put out the

8    press release saying there were no convertible notes left in

9    the company.

10                   MS. MILLER:  Can we please continue.

11                   (Audio played.)

12   BY MS. MILLER:

13   **Q**    What was that reference to the 3 million dollar --

14   shares?

15   **A**    The -- yeah.  The reference was to the 3 million

16   shares that the investor in Virginia and the investor in

17   Alabama had that were freely tradeable that would be

18   available for us to purchase.

19   **Q**    Why were you asking whether they were deposited?

20   **A**    I was asking whether they were deposited because of

21   the timing of the process.  If the stock was already

22   deposited at, say, Charles Schwab, the investor would have

23   to put in a request to have the stock pulled out of Charles

24   Schwab, and that's a two- to four-week timeline normally

25   before the certificate comes back in to him in the mailbox

**Direct - Jason Dean**

1   to where he could do a transaction with us.  So I was trying

2   to find out what the timing in which we could acquire that

3   stock was for the purposes of the investment.

4   **Q**    Did you -- after this meeting with Mr. Spivak -- have

5   an opportunity to speak with him about five days later, on

6   March 10th, via phone call?

7   **A**    Yes.

8                   MS. MILLER:  Could we pull up Government's

9   Exhibit 430A, please.

10  BY MS. MILLER:

11  **Q**    And this phone call was similarly recorded?

12  **A**    Yes.

13  **Q**    You had an opportunity to listen to it prior to coming

14  to court today?

15  **A**    Yes.

16  **Q**    And is this Government's 430A -- true and accurate

17  recording of your interaction with Mr. Spivak?

18  **A**    Yes.

19                  MS. MILLER:  May we publish, please?

20                  THE COURT:  You may.

21      Before we get into this, would this be a good breaking

22  point?

23                  MS. MILLER:  Sure.

24                  THE COURT:  Take a short break, and get into

25  the substance of this afterwards.

**Direct - Jason Dean**

1          Ladies and gentlemen, we'll take a short break.  You

2     know my instructions to you at this point.  We'll stand in

3     recess for about 15 or 20 minutes, and then resume shortly.

4                    (Recess taken at 2:30 p.m.)

5                    (Court resumed at 2:59 p.m.)

6                    (The following proceedings were had in the

7                    presence of the jury.)

8               THE COURT:  I will remind the witness that you

9     are under oath.

10          Counsel, you may resume your examination when you are

11     ready.

12               MS. MILLER:  Thank you, Your Honor.

13     BY MS. MILLER:

14     **Q**     Mr. Kane, when we broke, we were just getting ready to

15     play Government's Exhibit 430A, which was your recorded

16     conversation with Mr. Spivak on March 10th, 2021.  Do you

17     recall that?

18     **A**     Yes.

19     **Q**     All right.

20          And that is what we have in front of us, Government's

21     Exhibit 430A?

22     **A**     Yes.

23               MS. MILLER:  May we publish, Your Honor?

24               THE COURT:  You may.

25               MS. MILLER:  And please play, Ms. Wojtasik.

**Direct - Jason Dean**

1           (Audio played.)

2           MS. MILLER:  Can we stop there, please, at

3      about 40 seconds.

4      BY MS. MILLER:

5      **Q**    Now, Mr.  Dean, you were talking about a $25,000

6      transaction as a test run?

7      **A**    Yes.

8      **Q**    Could you please explain what you were proposing.

9      **A**    The proposal was to start with the smaller transaction

10     to make sure that we could clear the certificates and

11     deposit them at our own brokerage firms properly.  That was

12     the proposal we made to the -- to Mr. Spivak.

13     **Q**    What was the process for the test run going to be?

14     **A**    The process would be that he would get in contact with

15     his guys, approve the transaction; we would then set up a

16     stock purchase agreement with his guys and wire his two guys

17     the money.

18     **Q**    Those two guys, who were you referencing?

19     **A**    Mr. Scott and Mr. Church.

20     **Q**    You also indicated you would start negotiating the

21     bigger piece, what was that a reference to?

22     **A**    That's in reference to the full 3 million share

23     blocks.

24     **Q**    Mr. Spivak responded to you that he has to call them

25     to let them know you're on the team.  Who's the "them" that

**Direct - Jason Dean**

1    he's referring to?

2    **A**    That would be the two shareholders, Mr. Scott and

3    Mr. Church.

4    **Q**    As you were proposing this, who would financially

5    stand to benefit from this situation?

6    **A**    Mr. Spivak or the company would get their $0.15 a

7    share is the understanding that -- that was created.  The

8    difference would go to the sellers of the stock, Mr. Scott

9    and Mr. Church, minus whatever taxes they had to pay on

10   their sale.

11   **Q**    When you say that $0.15, what do you mean by that?

12   **A**    We were talking about buying stock from them at either

13   25 or $0.30.  We gave a range initially.  It came out to be

14   $0.25 that we offered at some point.  So the $0.15 is what

15   Paul said was due back to him from the sale of the stock.

16   **Q**    The stock that you were purchasing, was that

17   free-trading or restricted stock?

18   **A**    This is free-trading stock.

19   **Q**    And you indicated what would happen from the proceeds

20   of the sale of that free-trading stock?

21   **A**    As it was discussed with Mr. Spivak, that the sellers,

22   Mr. Scott and Mr. Church, would immediately wire him $0.15 a

23   share, and then they could keep the rest and pay the taxes

24   on whatever was due.

25   **Q**    When you say wire them the $0.15 a share, what's that

1    a reference to?

2    **A**    That's -- could you be more clear?  Wire who?  If --

3    **Q**    Sure.

4    When you said that Mr. Scott and Mr. Church would then

5    wire USLG money, what was that money for?

6    **A**    That money was to purchase more shares.

7    **Q**    And what is the point of purchasing more shares?

8    **A**    Well, so in six months later, I would speculate that

9    they would want to do the whole thing again with his shares

10   once they've aged and come off restriction.

11   **Q**    You said speculate, but did you discuss with

12   Mr. Spivak the cyclical nature of this proposal?

13   **A**    Yes.  Multiple times.

14   **Q**    Explain that.

15   **A**    Mr. Spivak specifically said that's what was going to

16   happen, that -- even offered that to -- to my group over

17   time where he said, "If you guys buy restricted shares, in

18   six months you can come back and sell the shares and you can

19   ultimately then buy cheaper shares from us."  Essentially

20   split the money where we could buy shares for half the price

21   of the market, whatever it is at the time -- say it's $0.50,

22   we can buy it at $0.25 -- so that we could either constantly

23   have the same amount of shares and half the cash, or we

24   could double-up the amount of shares we had, say if --

25                    (Unclear speech; clarification requested by

**Direct - Jason Dean**

1      court reporter.)

2    **A**    To go back, if I sold shares six months later at $0.50

3    a share, Mr. Spivak made it very clear that I could go back

4    to him and give him the $0.50 -- the $50,000, for example,

5    and buy the shares back for half of whatever the price is.

6    He called it buying at wholesale and selling at retail, that

7    we could constantly perpetuate every six months a recycling

8    of the same transaction so that, mathematically speaking, if

9    I sold a hundred thousand shares today for X, I could buy

10   either 200,000 shares and have double the amount of shares

11   in six months, or I could buy half the amount of shares and

12   keep half the cash for myself so that Mr. Spivak's always

13   financially benefiting from it, and my share position either

14   goes up, or my cash position goes up, or both.

15   **Q**    When you said this "buying at wholesale and selling at

16   retail," is that the understanding of what Mr. Church and

17   Mr. Scott were going to be doing as well?

18   **A**    Yes.  That was my understanding.

19             MS. MILLER:  Could we please continue.

20             (Audio played.)

21   BY MS. MILLER:

22   **Q**    When you're talking about that "three, four, five

23   times your investment," was that a reference to the

24   recycling of this process you were just describing?

25   **A**    Yeah.  It's the anticipation of the share price going

**Direct - Jason Dean**

1   up and selling for a higher price and also compounded with

2   the ability to buy stock back cheaper and arbitrage it over

3   and over again.

4   **Q**   You also told Mr. Spivak Matt wasn't catching what you

5   were initially throwing down.  Breaking that up, was there

6   an original conversation with you, Matt, and Mr. Spivak?

7   **A**   Yes.  We met -- Paul described the recycling of the

8   cash and recycling of the shares, and Matt didn't seem to

9   bite into it very hard.  He seemed kind of indifferent to

10  what Paul was saying.  So I let Paul know that I had

11  explained to Matt exactly what he meant about just

12  reinvesting part of the money over and over again and

13  continually recycling the same money and increasing our

14  share position over time.

15  **Q**   When you say "reinvesting in the company," is that a

16  legitimate reinvestment?

17  **A**   No.

18  **Q**   Why not?

19  **A**   Because it's a predetermined -- it's a situation where

20  we -- us as the shareholders would always be further ahead

21  at the expense of other shareholders -- of the outside

22  shareholders, people who weren't on the team, so-to-speak.

23  **Q**   And who did you understand to be on the team?

24  **A**   At this point it was contemplated that the team would

25  be me and Matt Bianchi, Bryan Kane, Mr. Scott, Mr. Church,

1   and Paul Spivak.

2   **Q**     On this same date, March 10, 2021, did you continue to

3   discuss this plan with Mr. Spivak via phone call?

4   **A**     Yes.

5                  MS. MILLER:  Could we pull up Government's

6   Exhibit 430B.

7   BY MS. MILLER:

8   **Q**     Have you had an opportunity to listen to Government's

9   Exhibit 430B before testifying today?

10  **A**     Yes.

11  **Q**     And is it a true and accurate recording of your

12  interactions with Mr. Spivak on March 10th, 2021?

13  **A**     Yes.

14                 MS. MILLER:  May we publish, Your Honor?

15                 THE COURT:  You may.

16                 (Audio played.)

17  BY MS. MILLER:

18  **Q**     Why was Mr. Spivak providing you with the name of an

19  individual named Charlie?

20  **A**     I believe, in context, it was Mr. Scott's information,

21  so I could call him and arrange a transaction.

22  **Q**     And more specifically, who did you understand

23  Mr. Scott to be?

24  **A**     One of Paul's two trusted investors, particularly this

25  one from Virginia.

**Direct - Jason Dean**

1    **Q**    Continuing in your conversation this same day, were

2    you able to listen to another clip of that conversation as

3    Government's Exhibit 430C?

4    **A**    Yes.

5    **Q**    And did Government's Exhibit 430C portray an accurate

6    reflection of your recording with Mr. Spivak still on

7    March 10th, 2021?

8    **A**    Yes.

9               MS. MILLER:  May we publish, Your Honor?

10              THE COURT:  You may.

11              (Audio played.)

12   BY MS. MILLER:

13   **Q**    This entire portion that we just listened to, who are

14   you and Mr. Spivak discussing?

15   **A**    Charles Scott.

16   **Q**    When Mr. Spivak told you "I gave him the shell," what

17   did you understand that to be a reference to?

18   **A**    A shell is a publicly traded stock symbol that doesn't

19   have a business in it.  That's why we call it a shell

20   company.  There's a transaction -- there's a transaction

21   called a reverse merger, which is a mechanism for a private

22   company to come public without doing a full IPO and a full

23   registration.

24   **Q**    What did you understand Mr. Spivak's statement, that

25   he gave him the shell, to mean in relation to Mr. Scott's

**Direct - Jason Dean**

1    ticker, SOLI?

2    **A**    I understood that he gave him the public vehicle that

3    allowed Mr. Scott to bring his company public.

4    **Q**    And Mr. Spivak also indicated that the plan would be

5    for you to help Mr. Scott with SOLI after the USLG deal?

6    **A**    Yes.

7    **Q**    Now, Mr. Spivak --

8             MS. MILLER:  And you may take that down.

9         Thank you, Ms. Wojtasik.

10   BY MS. MILLER:

11   **Q**    Mr. Spivak had offered to connect the two of you,

12   Mr. Scott and yourself, is that right?

13   **A**    Yes.

14   **Q**    Did he in fact do that on March 10th, 2021?

15   **A**    Yes.

16            MS. MILLER:  Could we pull up Government's

17   Exhibit 1324, please.

18   BY MS. MILLER:

19   **Q**    Do you recognize this, sir?

20   **A**    Yes.

21   **Q**    What is this?

22   **A**    It's a group text between Jason Dean, Paul Spivak, and

23   Charlie Scott saying that we need to talk.

24            MS. MILLER:  May we publish, Your Honor?

25            MR. DEVILLERS:  No objection.

**Direct - Jason Dean**

1          THE COURT:  You may.

2     BY MS. MILLER:

3     **Q**     All right, sir.  For the jury's benefit, what are we

4     looking at?

5     **A**     It's a text to me and to Mr. Scott from Paul Spivak,

6     essentially us group texting to exchange contact

7     information.

8     **Q**     What does Mr. Spivak write to you and Mr. Scott?

9     **A**     "You guys need to talk."

10    **Q**     This is still that March 10th date we're discussing?

11    **A**     Yes.

12    **Q**     Did he also connect you to Mr. Church that day?

13    **A**     Yes.

14          MS. MILLER:  May we pull up Government's

15    Exhibit 1328, please.

16    BY MS. MILLER:

17    **Q**     Do you recognize this, sir?

18    **A**     Yes.

19    **Q**     What is this?

20    **A**     It's a very similar text where Mr. Spivak texts me and

21    Mr. Church together so we can have each other's contact

22    information.

23          MS. MILLER:  Permission to publish, Your

24    Honor?

25          MR. DEVILLERS:  No objection.

1        THE COURT:  You may.

2   BY MS. MILLER:

3   **Q**    And, sir, you indicated this is a group text with

4   Mr. Spivak, Mr. Church, and yourself?

5   **A**    Yes.

6   **Q**    What does Mr. Spivak write here?

7   **A**    "You two need to talk."

8   **Q**    And this is still that March 10th, 2021, date?

9   **A**    Yes.

10  **Q**    Sticking with that same date, did you ultimately speak

11  with Mr. Scott on March 10th, 2021?

12  **A**    Yes.

13  **Q**    Was that conversation also recorded?

14  **A**    Yes.

15  **Q**    Have you had an opportunity to review that recording

16  prior to testifying today?

17  **A**    Yes, I have.

18  **Q**    And is it a true and accurate recording depicting your

19  interactions with Mr. Scott?

20  **A**    Yes, it is.

21        MS. MILLER:  Could we please pull up

22  Government's Exhibit 430D.

23       And permission to publish?

24        THE COURT:  You may.

25        (Audio played.)

**Direct - Jason Dean**

1          MS. MILLER:  Stopping right there at ten

2     seconds, Ms. Wojtasik.

3     BY MS. MILLER:

4     **Q**     Whose voices do we hear, sir?

5     **A**     My voice and Charlie Scott's.

6          MS. MILLER:  Continue, please.

7          (Audio played.)

8          MS. MILLER:  Stopping there at about 1:03.

9     BY MS. MILLER:

10    **Q**     What are you explaining to Mr. Scott here?

11    **A**     That I received his number from Paul Spivak, and that

12    our intention was to buy a small block of stock -- by our

13    definition in that conversation and context was $25,000

14    worth -- to start the process of doing much bigger things

15    together.

16    **Q**     How does Mr. Scott respond when you lay out this plan?

17    **A**     He sounds all for it.

18          MS. MILLER:  Please continue.

19          (Audio played.)

20          MS. MILLER:  Can we stop there at about 2:25.

21    BY MS. MILLER:

22    **Q**     What's the additional discussion that you're having

23    about contracts, agreements at this point?

24    **A**     It would be stock purchase agreement to reflect the

25    transaction we're working on.

**Direct - Jason Dean**

1    **Q**    And Mr. Scott asks:  "However you want to do it, and

2    how much you -- you're going to pay for it."

3          Were those his two main concerns that he expressed to

4    you?

5    **A**    Yes.

6    **Q**    Did he otherwise seem like he was game?

7    **A**    Absolutely.

8    **Q**    And you also said that you could discuss with Paul and

9    make sure the whole team is taken care of?

10   **A**    Yes.

11   **Q**    Any confusion that Mr. Scott expressed to you about

12   who is the team?

13   **A**    No.

14              MS. MILLER:  Could we please continue.

15              (Audio played.)

16              MS. MILLER:  You can take that down,

17   Ms. Wojtasik.

18   BY MS. MILLER:

19   **Q**    Now, after your conversation with Mr. Scott, did you

20   follow up with Mr. Spivak to let him know how it went?

21   **A**    Yes.

22              MS. MILLER:  Could we pull up Government's

23   Exhibit 1322, please.  And if we could just scroll through

24   this exhibit quickly for the witness.

25   BY MS. MILLER:

**Direct - Jason Dean**

1    **Q**    You see, sir, this is 51 pages in this exhibit?

2    **A**    Yes.

3    **Q**    Do you recognize this collection of things in this

4    exhibit?

5    **A**    Yes.

6    **Q**    And what are they?

7    **A**    They're text message back and forth from the phone I

8    was using of the FBI's with Mr. Spivak.

9                 MS. MILLER:  Could we please go to page 10.

10         And publish?

11                 THE COURT:  You may.

12                 MS. MILLER:  Could we please zoom in on the

13    March 10th date.  Bottom half of the screen, please.

14    BY MS. MILLER:

15    **Q**    All right, sir.  And are you typing on the right or

16    left side here?

17         And we can zoom out -- sorry -- so you can

18    orient yourself.

19    **A**    Yeah.  That's my text to him saying:  "Spoke to

20    Charlie.  Went great.  He is on board to do 100,000 share

21    transaction to get this moving."

22    **Q**    You're on the right side here?

23    **A**    Yes.

24    **Q**    And Mr. Spivak on the left side?

25    **A**    Yes.

**Direct - Jason Dean**

1    **Q**    On that March 10th date, you just read this particular

2    text, is that correct?

3    **A**    Yes.

4    **Q**    And how did you tell Mr. Spivak that it went when you

5    spoke to Charlie?

6    **A**    I told him it went great.

7    **Q**    And what did you indicate he was on board to do?

8    **A**    A 100,000-share transaction to get this moving.

9            MS. MILLER:  Can we turn to page 11, and look

10   at Mr. Spivak's response to you -- top two texts, please.

11   BY MS. MILLER:

12   **Q**    How does Mr. Spivak respond to you?

13   **A**    He immediately says:  "I have a call in to Forrest,

14   the other friend."

15   **Q**    And then scrolling down to your response -- we're

16   still on March 10th, is that right?

17   **A**    Yes.

18   **Q**    And what do you indicate?

19   **A**    My text back to him was:  "Once you've prepped him,

20   let me know and shoot over his contact info, and I will

21   follow up as needed."

22           MS. MILLER:  You may take that down,

23   Ms. Wojtasik.

24   BY MS. MILLER:

25   **Q**    Then, sir, following your communication with

**Direct - Jason Dean**

1   Mr. Scott, did you also follow up with Mr. Scott via text

2   message?

3   **A**     Yes.

4                 MS. MILLER:  Can we please go to Government's

5   Exhibit 182.

6          And scrolling through those so the witness can see

7   them.

8   BY MS. MILLER:

9   **Q**     Do you recognize what's on Government's Exhibit 182,

10  sir?

11  **A**     Yes.

12  **Q**     And what is this a collection of here?

13  **A**     This is a collection of texts back and forth between

14  myself on the FBI phone and Charlie Scott.

15                MS. MILLER:  Can we please go to page 12.

16         And publish?

17                MR. DEVILLERS:  No objection.

18                THE COURT:  You may.

19                MS. MILLER:  If we can actually jump to

20  page 11 first.

21  BY MS. MILLER:

22  **Q**     And do you see here, sir, is that kind of a cutoff of

23  the larger text we are looking at on page 12?

24  **A**     Yes.

25  **Q**     What date are we focused on here?

**Direct - Jason Dean**

1    **A**    It's March 10th.

2    **Q**    And it looks like there's two texts that came through

3    with largely the same context, is that fair?

4    **A**    Yes.

5    **Q**    What does -- well, first, did you send that text, or

6    did Mr. Scott?

7    **A**    That came from Mr. Scott to me.

8    **Q**    And what did Mr. Scott say to you?

9    **A**    He said:  "Hi Jason.  Great meeting and chatting with

10   you today.  Per Paul -- per Paul's -- my e-mail address is

11   cosndc@gmail.com.  Thanks.  Charlie Scott."

12        And then there's a second copy that it came through

13   again.

14   **Q**    And in that second copy, sir, is there the addition of

15   one other word?

16   **A**    Yes.

17   **Q**    And could you read that for us, please.

18   **A**    "Hi Jason.  Great meeting and chatting with you today.

19   Per Paul's suggestion, my e-mail address is

20   cosndc@gmail.com.  Thanks.  Charlie Scott."

21   **Q**    Going back now to page 11 then.

22             MS. MILLER:  Could we please then zoom in on

23   your response, the top text.

24   BY MS. MILLER:

25   **Q**    And how do you respond to Mr. Scott here?

**Direct - Jason Dean**

1   **A**    I texted Mr. Scott, said:  "Charlie, great to meet

2   you, and look forward to working with you.  I will send over

3   an SPA" -- which is stock purchase agreement -- "for 100,000

4   shares tomorrow unless you have a SPA format that you would

5   prefer to use.  Let me know your preference.  Thanks.

6   Jason."

7   **Q**    And, sir, did you in fact send over a stock purchase

8   agreement to Mr. Scott then?

9   **A**    Yes.

10             MS. MILLER:  Could we go to Government's

11  Exhibit 181.  And scrolling through this exhibit.  Going

12  back to the first page.

13  BY MS. MILLER:

14  **Q**    Do you recognize this collection of exhibits, sir?

15  **A**    Yes.

16  **Q**    And what is this?

17  **A**    This is an e-mail from Jason Dean to Josh Flood and

18  Charles Scott.

19  **Q**    All right.

20       And fair to say that this Exhibit 181 contains a

21  collection of e-mails and attachments from you using the FBI

22  phone to Mr. Scott or Mr. Flood?

23  **A**    Yes.

24  **Q**    And so we're clear, who is Mr. Flood?

25  **A**    Mr. Flood is an employee of Mr. Scott's.

**Direct - Jason Dean**

1   **Q**     Did you interact with him and speak with him on

2   Mr. Scott's behalf at times?

3   **A**     Yes.

4                MS. MILLER:  Could we please go to page 7.

5          And publish?

6                THE COURT:  You may.

7                MS. MILLER:  Zooming in on the top half,

8   please, Ms. Wojtasik.

9   BY MS. MILLER:

10  **Q**     Okay, sir.  It appears that you're the sender of this

11  e-mail, is that correct?

12  **A**     Yes.

13  **Q**     Who are you sending it to?

14  **A**     To Mr. Scott at cosndc@gmail.com.

15  **Q**     Same e-mail he provided to you in his text?

16  **A**     Yes.

17  **Q**     What do you indicate in your e-mail to Mr. Scott?

18  **A**     My e-mail says:  "Charlie, Matt's office just sent

19  this over to me.  Please take a look and let me know what

20  you think.  Once again, great meeting you yesterday, and I

21  look forward to working with you.  Thanks.  Jason."

22  **Q**     So what is the date here then?

23  **A**     The date is March 11th, 2021.

24  **Q**     And that's the day after you just spoke to Mr. Scott?

25  **A**     Yes.

**Direct - Jason Dean**

1    **Q**    Do you see an attachment at the bottom, sir?

2    **A**    Yes.

3    **Q**    What is that?

4    **A**    It's titled "Arrowwood-Scott SPA 2021."

5              MS. MILLER:  Could we go to page 8, please.

6    BY MS. MILLER:

7    **Q**    What are we looking at here, sir?

8    **A**    That's the actual stock purchase agreement.

9              MS. MILLER:  Could we go to --

10   BY MS. MILLER:

11   **Q**    Well, first of all, who are the parties in this

12   preamble to this stock purchase agreement?

13   **A**    The parties are Charlie Scott, the seller, and

14   Arrowwood Securities, LLC, the purchaser.

15   BY MS. MILLER:

16   **Q**    And remind us who Arrowwood is again, sir.

17   **A**    Arrowwood is Matt Bianchi's fund based out of

18   Cleveland.

19   **Q**    In paragraph 1, "Purchase and Sale," what does it

20   indicate that -- well, how many shares are to be purchased

21   per that paragraph?

22   **A**    100,000 shares.

23   **Q**    In paragraph 2, what is the purchase price?

24   **A**    $0.25 a share or $25,000.

25              MS. MILLER:  Could we go to page 17 of this

1    exhibit, please.

2    BY MS. MILLER:

3    **Q**    And, sir, do you recognize that we're looking at that

4    same e-mail that you just sent to Mr. Scott but without the

5    attachment?

6    **A**    Yes.

7    **Q**    And do you see this as Mr. Scott's response?

8    **A**    Yes.

9    **Q**    How does Mr. Scott respond to you?

10   **A**    His response is: "Hi Jason.  Thanks.  Okay.  Thanks

11   for letting me know.  Charlie."

12   **Q**    On what date did he e-mail you?

13   **A**    That would be Friday, March 12, 2021.

14              MS. MILLER:  And you may take that down,

15   Ms. Wojtasik.

16   BY MS. MILLER:

17   **Q**    And, sir, was it part of your practice to keep

18   Mr. Spivak informed of developments with Mr. Scott and

19   Mr. Church?

20   **A**    Yes.

21   **Q**    And did you in fact follow up with Mr. Spivak via text

22   to keep him apprised?

23   **A**    Yes.

24              MS. MILLER:  Could we go to Exhibit 1322,

25   page 11, please.  Previously published to the jury.

**Direct - Jason Dean**

1          Could we zoom in on the bottom text, please,

2     Ms. Wojtasik.

3     BY MS. MILLER:

4     **Q**     And here, sir, what date are we looking at?

5     **A**     March 12th, 2021.

6     **Q**     What do you write to Mr. Spivak?

7     **A**     Just a brief text saying:  "I sent a SPA over to

8     Charlie yesterday for the first block.  Let me know when you

9     connect with Forrest."

10               MS. MILLER:  Can we scroll down to

11     Mr. Spivak's response, please, on the following page.

12     BY MS. MILLER:

13     **Q**     What date are we on here?  Still March 12, 2021?

14     **A**     Yes.

15     **Q**     How does Mr. Spivak respond?

16     **A**     He said:  "Forrest is waiting on your call."  And

17     included a kissy-face emoji.

18     **Q**     Did you ultimately then, following this text, have a

19     phone call with Mr. Spivak about sending the stock purchase

20     agreement over to Mr. Scott?

21     **A**     Yes.

22               MS. MILLER:  Could we please turn to

23     Government's Exhibit 431A.

24     BY MS. MILLER:

25     **Q**     And, again, sir, was this followup -- I'm sorry -- was

1    this followup call with Mr. Spivak recorded?

2    **A**    Yes.

3    **Q**    And have you had an opportunity to listen to a portion

4    of that as Government's Exhibit 431A?

5    **A**    Yes, I have.

6    **Q**    Is it a true and accurate recording of your

7    interactions with Mr. Spivak on that phone call on

8    March 15th, 2021?

9    **A**    Yes, it is.

10                  MS. MILLER:  May we please publish and play?

11                  MR. DEVILLERS:  No objection.

12                  THE COURT:  You may.

13                  (Audio played.)

14    BY MS. MILLER:

15    **Q**    All right, sir.  About how many days are we after you

16    sent the stock purchase agreement over to Mr. Scott?

17    **A**    It was several days, the following week.

18    **Q**    Okay.  So like we were -- this is the 15th, and we

19    were looking at your March 11th and 12th text?

20    **A**    Yes.

21    **Q**    So about three to four days, is that fair?

22    **A**    Yes.

23    **Q**    And Mr. Spivak responds with:  "He didn't send it

24    back, I'll kill him"?

25    **A**    Yes.

**Direct - Jason Dean**

1    **Q**     Did Mr. Spivak -- is it your understanding that

2    Mr. Spivak had a sense of urgency in your interactions with

3    him?

4    **A**     Yes.  He is very eager to proceed.

5    **Q**     And what did Mr. Spivak say that he would do once you

6    got off the phone with him?

7    **A**     He said that he would call and follow up immediately.

8    **Q**     With who?

9    **A**     With Mr. Scott.

10   **Q**     And you also indicated that you were going to reach

11   out to Mr. Church, is that correct?

12   **A**     Yes.

13              MS. MILLER:  May we take that down, please.

14         And go to Exhibit 431B.

15   BY MS. MILLER:

16   **Q**     Following your phone call with Mr. Spivak, did you in

17   fact speak with Mr. Church over the phone?

18   **A**     Yes.

19   **Q**     Was that phone call also recorded?

20   **A**     Yes.

21   **Q**     You had an opportunity to listen to it?

22   **A**     Yes.

23   **Q**     And it's true and accurate, to the best of your

24   recollection?

25   **A**     Yes, it is.

**Direct - Jason Dean**

1              MS. MILLER:  May we play and publish

2      Exhibit 431B?

3              MR. DEVILLERS:  Your Honor, I'm going to

4      object for the reasons I think we've stated on the record

5      just on a --

6              THE COURT:  Overruled.

7          You may.

8              (Audio played.)

9              MS. MILLER:  Stopping there at about 10

10     seconds.

11     BY MS. MILLER:

12     **Q**     Whose voices are we listening to now?

13     **A**     Forrest Joe Church.

14     **Q**     As well as yourself?

15     **A**     And my own, yes.

16             MS. MILLER:  Please continue.

17     BY MS. MILLER:

18     **Q**     Mr. Church's last comment that "It seems to have

19     worked out fairly well for Mr. Spivak and not totally sucked

20     for Mr. Church," what did you understand him to mean by

21     that?

22     **A**     My understanding from that is that Mr. Spivak always

23     made money on these transactions and sometimes Mr. Church

24     did pretty well, too.

25     **Q**     Following your phone call with Mr. Church, did you

**Direct - Jason Dean**

1    report back to Mr. Spivak about that discussion as well as

2    your discussion with Mr. Scott?

3    **A**    Yes.

4                MS. MILLER:  Could we please turn back to

5    Government's Exhibit 1322, page 12.

6         And zooming in in the middle portion, on March 15,

7    please, Ms. Wojtasik.

8    BY MS. MILLER:

9    **Q**    All right, sir.  Do you see your text here to

10   Mr. Spivak on March 15, 2021?

11   **A**    Yes.

12   **Q**    Same day we've been talking about?

13   **A**    Yes.

14   **Q**    And what do you indicate to Mr. Spivak?

15   **A**    I said to him I -- that "I connected with Forrest, I

16   will get him a SPA as well in a few minutes.  Let me know if

17   you are able to connect with Charlie.  Thanks."

18   **Q**    How does Mr. Spivak respond?

19   **A**    "I got VM," which is voicemail.

20   **Q**    In relation to what?

21   **A**    I understood that as his attempt to contact Mr. Scott.

22               MS. MILLER:  Can we please go to the next

23   page.

24        Zooming in on the entirety of that page, please,

25   Ms. Wojtasik.

1    BY MS. MILLER:

2    **Q**    All right.  And you ask for an update, and then

3    there's some phone tag it looks like, is that fair?

4    **A**    Yes.

5    **Q**    And then that first larger paragraph, what do you

6    indicate with respect to Mr. Scott?

7    **A**    I sent to Paul:  "Got your voicemail.  Tied up on

8    another conference call.  The price difference is on me.  I

9    spoke with Charlie and Matt separately.  I don't think a few

10   cents is going to be a big deal on these small test blocks,

11   but we will discuss when it comes to the larger blocks

12   later.  I will check with Matt's office and get back to

13   you."

14   **Q**    So what's going on here, sir?

15   **A**    When I initially spoke to Mr. Scott on the call you

16   heard a few minutes ago, I threw out the number of $0.30 a

17   share.  When we sent over the agreement, we had a price of

18   $0.25 a share on it.

19   **Q**    Was that an issue?

20   **A**    It appeared to be an issue with Mr. Scott.

21   **Q**    Now, did you continue then to speak with Mr. Spivak

22   and Mr. Scott in an effort to resolve this issue?

23   **A**    Yes.

24   **Q**    And, specifically, did you speak with Mr. Spivak on

25   the phone the following day about the arrangement with

1    Mr. Scott and Mr. Church?

2    **A**    Yes.

3                   MS. MILLER:  Can we pull up Government's

4    Exhibit 432A, please.

5    BY MS. MILLER:

6    **Q**    And you recognize this exhibit as a portion of your

7    conversation with Mr. Spivak on March 16th, 2021?

8    **A**    Yes.

9    **Q**    Have you had an opportunity to listen to it?

10   **A**    Yes, I have.

11   **Q**    And it's a fair and accurate depiction of that portion

12   of your conversation with Mr. Spivak?

13   **A**    Yes, it is.

14                  MS. MILLER:  Can we please publish and play?

15                  THE COURT:  You may.

16                  (Audio played.)

17                  MS. MILLER:  Can we stop there, please, at 55

18   seconds.

19   BY MS. MILLER:

20   **Q**    Now, sir, what's this in relation to?

21   **A**    This is in relationship to the discrepancy and price

22   from what I discussed with Mr. Scott on the phone in a

23   previously recorded call and the stock purchase agreement we

24   sent over.

25   **Q**    Did you have an understanding that Mr. Spivak had

**Direct - Jason Dean**

1  separately reached out and discussed this issue with

2  Mr. Scott?

3  **A**    Yes.

4  **Q**    And did Mr. Spivak tell you that on his phone call?

5  **A**    Yes.

6             MS. MILLER:  Please continue.

7             (Audio played.)

8             MS. MILLER:  Stopping there at about 1:44.

9  BY MS. MILLER:

10 **Q**    Now, Mr. Spivak said:  "The plan was until you guys

11 came along."

12      Who did you understand "you guys" to be?

13 **A**    My understanding was that was myself and Bryan Kane

14 and Matt Bianchi.

15 **Q**    And then he said:  "I had some other folks that were

16 going to do what you were going to do."  Is that right?

17 **A**    Yes.  He said that.

18 **Q**    And who did you understand those other folks to be?

19 **A**    I understood that to be Mr. Spivak in tandem with

20 Mr. Scott and Mr. Church.

21 **Q**    And what is it that you were going to do for

22 Mr. Spivak?

23 **A**    We were going to promote the stock and push it up to a

24 much higher price.

25 **Q**    When you say "promote the stock," by what method would

1    you be promoting the stock?

2    **A**    We would be hiring on Mr. Kane and his group and

3    pushing it out via social media, via Twitter, via Discord,

4    all the different channels, to try to hype the stock up.

5    **Q**    Those efforts, were they legitimate?  Illegitimate?

6    **A**    They were illegitimate.

7    **Q**    I'm sorry?

8    **A**    They were illegitimate.  Sorry.

9    **Q**    Are you familiar with the term "pump"?

10   **A**    Yes.

11   **Q**    Can you tell us what you understand that to mean?

12   **A**    My understanding of "pump" is when you flood the

13   market with positive or exaggerated information on a company

14   for the sole purpose of moving the stock price up so you

15   could sell it at a higher price later.

16   **Q**    And is that what you and your associates had

17   essentially agreed to do for Mr. Spivak and USLG?

18   **A**    Yes.  That's exactly what we agreed to do.

19   **Q**    And Mr. Spivak discussed a plan that existed before

20   you guys came along, is that fair?

21   **A**    Yes.

22   **Q**    Was that plan the same or different than the plan that

23   you had with Mr. Spivak?

24   **A**    As per Mr. Spivak's own words, they were going to do

25   exactly what we were going to do before we came along.

**Direct - Jason Dean**

1      MS. MILLER:  Can we please continue.

2           (Audio played.)

3      MS. MILLER:  Can we stop there at 2:10.

4  BY MS. MILLER:

5  **Q**    And so Mr. Spivak references $0.30 for one share plus

6  taxes.  What did you understand that to talk about?

7  **A**    I understand -- so that is that if they sold stock at

8  $0.30 a share, they would have to pay taxes on the entire

9  $0.30, so they would net a little bit under $0.30 a share.

10 **Q**    And when he indicated that "they would have to send me

11 $0.15 to replace it," what did you understand that to mean?

12 **A**    I understood that to mean that they would have to wire

13 the company or Paul directly, one of the two, the money

14 of -- on a $30,000 transaction, $15,000 -- for simple

15 math -- to get more stock issued in their name and get a

16 fresh hundred thousand shares.

17 **Q**    So how is Mr. Spivak prefacing the complaint or the

18 problem with that arrangement?

19 **A**    He's frustrated because at $0.25 a share minus maybe a

20 20 percent tax or whatever they have to pay, they net out a

21 number that's much less, and there's a much smaller spread

22 between Paul's $0.15 and whatever the net that -- that these

23 gentlemen would work out, and it made it less lucrative for

24 Mr. Scott and Mr. Church.

25          MS. MILLER:  Please continue.

**Direct - Jason Dean**

1              (Audio played.)

2              MS. MILLER:  Stopping there at 2:46.

3    BY MS. MILLER:

4    **Q**    Now, Mr. Spivak told you to get everybody on the same

5    page, is that right?

6    **A**    Yes.

7    **Q**    How were you supposed to accomplish that?

8    **A**    He wanted me -- well, my understanding is he wanted me

9    to make a phone call and explain the situation to Mr. Scott

10   and Mr. Church to make sure that everyone understands what's

11   happening.

12   **Q**    And then Mr. Spivak explained that that's why those

13   individuals are holding onto the corporate free-trading

14   stock, is that right?

15   **A**    Yes.

16   **Q**    Is there such a thing as corporate free-trading stock?

17   **A**    Absolutely not.

18   **Q**    Why not?

19   **A**    If it was corporate stock -- going back to our

20   discussion from earlier -- it would have to be restricted

21   for the six months, so you can't have both.

22              MS. MILLER:  Could we please continue.

23              (Audio played.)

24              MS. MILLER:  4:58.

25   BY MS. MILLER:

**Direct - Jason Dean**

1    **Q**    Now, Mr. Spivak is referencing -- well, is it fair to

2    say Mr. Spivak is referencing this $0.30 to $0.25 kind of

3    misunderstanding that you and Mr. Scott had at the outset?

4    **A**    Yes.

5    **Q**    And did you get an understanding from Mr. Spivak as to

6    whether Mr. Scott had spoken with Mr. Spivak about that?

7    **A**    Yes.  Very clearly.

8    **Q**    And how is that very clear to you?

9    **A**    He specifically said that Charlie told him that we

10   talked one price on the phone and the agreement came over at

11   another price, and he was very concerned and didn't candidly

12   trust us already.

13   **Q**    And did Mr. Spivak want you to continue to work with

14   Mr. Scott?

15   **A**    Yes.

16   **Q**    And how did he propose that you kind of rectify the

17   situation?

18   **A**    He gave me the option of calling Matt and working it

19   out at a higher price, or calling Charlie and working it out

20   at the lower price.

21   **Q**    And ultimately what did you end up doing?

22   **A**    Ultimately ended up calling Mr. Scott.

23              MS. MILLER:  Can we please continue.

24              (Audio played.)

25   BY MS. MILLER:

**Direct - Jason Dean**

1    **Q**    Following that conversation, sir, did you in fact call

2    Mr. Scott and tell him Mr. Spivak gave you hell?

3    **A**    Yes.

4    **Q**    Was that also a reported conversation with Mr. Scott?

5    **A**    Yes.

6                 MS. MILLER:  Can we pull up Government's

7    Exhibit 432B.

8    BY MS. MILLER:

9    **Q**    Was that this same March 16, 2021, date following your

10   conversation with Mr. Spivak?

11   **A**    Yes, it is.

12   **Q**    And you've had an opportunity to listen to this

13   recording?

14   **A**    Yes.

15   **Q**    It's a true and accurate reflection of your

16   conversation with Mr. Scott?

17   **A**    Yes.

18                 MS. MILLER:  May we publish and play, please?

19                 THE COURT:  You may.

20                 (Audio played.)

21                 MS. MILLER:  Stopping there, please, at 2:05.

22   BY MS. MILLER:

23   **Q**    Now, what did you explain to Mr. Scott here?

24   **A**    I explained to him why the price was changed to a

25   lower price.

**Direct - Jason Dean**

1    **Q**    And you indicated this is just a small piece of the

2    big picture?

3    **A**    Yes.

4    **Q**    What was that in reference to?

5    **A**    It was in reference to the fact that this is just a

6    hundred thousand shares, and we're prepping to buy 3 million

7    shares from him and from Mr. Church as well.

8    **Q**    How does Mr. Scott respond to you?

9    **A**    He says, "It makes perfect sense."

10   **Q**    Does he say he doesn't want to do business with you

11   anymore?

12   **A**    Not at all.

13   **Q**    Do you continue to speak with him?

14   **A**    Yes.

15   **Q**    And do you continue to plan to engage in business with

16   him?

17   **A**    Yes.

18              MS. MILLER:  Can we please continue.

19              (Audio played.)

20   BY MS. MILLER:

21   **Q**    Were you and Mr. Scott able to resolve any difference

22   over the price?

23   **A**    Yes.

24   **Q**    And how did Mr. Scott ultimately leave the

25   conversation?  What was he going to do after this?

**Direct - Jason Dean**

1    **A**    He was going to sign the purchase agreement and send

2    it back over to us.

3    **Q**    And he made no indication that he was backing out or

4    no longer willing to do this?

5    **A**    Exactly.  He was completely onboard.

6    **Q**    Now, on this same day did you then report back to

7    Mr. Spivak about how your conversation went with Mr. Scott?

8    **A**    Yes.

9              MS. MILLER:  Could we pull up Government's

10   Exhibit 1322, page 14.  And focusing in on your March 16th

11   text to Mr. Spivak.

12   BY MS. MILLER:

13   **Q**    What do you indicate here, sir?

14   **A**    I texted him and said:  "Spoke to Charlie.  All is

15   fine.  Good to go."

16             MS. MILLER:  May we publish?

17             THE COURT:  You may.

18   BY MS. MILLER:

19   **Q**    And for the jury's benefit, that's the text you just

20   read about Mr. Spivak -- or Mr. Scott in your conversation

21   with him?

22   **A**    Yes.

23   **Q**    And how did you characterize that to Mr. Spivak?

24   **A**    I said:  "Spoke to Charlie.  All is fine.  Good to

25   go."

**Direct - Jason Dean**

1    **Q**    What's good to go?

2    **A**    The stock purchase and transaction at the $0.25 per

3    share price that we sent over.

4    **Q**    And Mr. Spivak simply responds?

5    **A**    "Fantastic."

6    **Q**    So following this, did you later that day receive

7    Mr. Scott's signed purchase agreement?

8    **A**    Yes.

9              MS. MILLER:  Could we go to Government's

10   Exhibit 181, page 18.

11        And may we publish?

12             MR. DEVILLERS:  No objection.

13             THE COURT:  You may.

14   BY MS. MILLER:

15   **Q**    All right, Mr. Dean.  What do we have here?

16   **A**    It's an e-mail titled "USLG SPA-Charles Scott" from

17   Josh Flood, one of Mr. Scott's employees, to my Jason Dean

18   e-mail account with the FBI.

19   **Q**    On what date?

20   **A**    The date is Tuesday, March 16, 2021.

21   **Q**    And what does Mr. Flood indicate?

22   **A**    "Hi Matt.  Attached is the purchase agreement from

23   Mr. Scott.  Best, Josh Flood."

24             MS. MILLER:  Can we please go to page 19, the

25   next page.

**Direct - Jason Dean**

1   BY MS. MILLER:

2   **Q**    And, sir, what is this here?

3   **A**    It's the actual stock purchase agreement.

4   **Q**    And we see, sir, now the date is filled in, is that

5   correct?

6   **A**    Yes.

7   **Q**    And what date is that?

8   **A**    March 16th, 2021.

9   **Q**    And still between Mr. Scott and Arrowwood Securities?

10  **A**    Yes.  That's true.

11  **Q**    And then also this closing date is also filled in?

12  **A**    Yes.

13  **Q**    What's the closing date?

14  **A**    March 19th, 2021.

15          MS. MILLER:  And if we jump to page 21,

16  please.

17  BY MS. MILLER:

18  **Q**    Who is signed as "seller"?

19  **A**    Charles Scott.

20  **Q**    Did you also then send back a signed version on behalf

21  of the purchaser to Mr. Scott?

22  **A**    Yes.

23          MS. MILLER:  Can we go to page 1, please.

24          Focusing in on that top e-mail, please, Ms. Wojtasik.

25  BY MS. MILLER:

**Direct - Jason Dean**

1   **Q**    All right, sir.  And what date are we looking at here?

2   **A**    This is Wednesday, March 24, 2021.

3   **Q**    So about a week later?

4   **A**    Yes.

5   **Q**    And who is sending this e-mail, and to whom?

6   **A**    Me, Jason Dean, to Josh Flood and Charles Scott.

7   **Q**    What do you indicate?

8   **A**    "Hello.  Attached is the signed SPA as mentioned

9   earlier.  Please send the wire instructions at your earliest

10  convenience so Matt's office can initiate the wire to

11  Mr. Scott.  Thanks.  Jason."

12              MS. MILLER:  Page 2, please.

13  BY MS. MILLER:

14  **Q**    All right.  And this is the same purchase agreement

15  that we just looked at with the dates filled in, is that

16  fair?

17  **A**    Yes.

18              MS. MILLER:  And jumping to page 4, please.

19  BY MS. MILLER:

20  **Q**    Who has signed here now on behalf of the purchaser?

21  **A**    Matt Bianchi.

22  **Q**    And that's Arrowwood Securities, LLC?

23  **A**    Yes.

24              MS. MILLER:  And, finally, can we go to

25  page 15.

1    BY MS. MILLER:

2    **Q**    And you see, sir, here is the same e-mail that we just

3    talked about attaching the signed SPA?

4    **A**    Yes.

5          MS. MILLER:  Could you blow up the top portion

6    of this e-mail, Ms. Wojtasik?

7    BY MS. MILLER:

8    **Q**    This is still March 24th, 2021, is that right?

9    **A**    Yes.

10   **Q**    What is the response to your e-mail?

11   **A**    It's a response from Josh Flood to Jason Dean copying

12   Charles Scott.  He says:  "Hi Jason.  Here are the wire

13   instructions."  Includes wire instructions at Navy Federal

14   Credit Union.

15        And he wraps up beyond the wire instructions saying:

16   "Call us if you have any questions.  My cell is

17   202-246-2095.  Best, Josh."

18   **Q**    Now, on this same day, did you also speak with

19   Mr. Church about his stock purchase agreement?

20   **A**    Yes.

21          MS. MILLER:  Could we go to Government's

22   Exhibit 434A.

23   BY MS. MILLER:

24   **Q**    And, again, this was a recorded phone call?

25   **A**    Yes.

Direct - Jason Dean

1   **Q**    You've had an opportunity to listen to it?

2   **A**    Yes.

3   **Q**    And it's true and accurate, to the best of your

4   recollection?

5   **A**    Yes.

6                   MS. MILLER:  May we please publish and play?

7                   THE COURT:  You may.

8                   (Audio played.)

9   BY MS. MILLER:

10  **Q**    So Mr. Church says a lot of things about a lot of

11  people needing to send money.  Can you break that down for

12  us and tell us who's sending money?

13  **A**    Yes.  He's saying that Paul told him that he needs to

14  get back in touch with me so I could send Mr. Church money

15  and then Mr. Church could send Paul money.

16  **Q**    Money for what?

17  **A**    Each of their positions in the stock purchase

18  agreement.

19  **Q**    Again --

20  **A**    So it would be us buying shares from Mr. Church, and

21  Mr. Church paid Mr. Spivak his cut.

22  **Q**    And this is the same arrangement that you had with

23  Mr. Scott?

24  **A**    Yes.

25  **Q**    Continuing in that phone call, did you also listen to

**Direct - Jason Dean**

1    a clip at Government's Exhibit 434B?

2    **A**    Yes.

3    **Q**    True and accurate recording, to the best of your

4    knowledge, of that interaction with Mr. Church?

5    **A**    Yes.

6                    MS. MILLER:  And may we publish and play?

7                    THE COURT:  You may.

8                    (Audio played.)

9    BY MS. MILLER:

10   **Q**    Mr. Church says, "By the time he ships me 25."  Who's

11   that a reference to?

12   **A**    That's in reference to us sending him $25,000.

13   **Q**    And then he says he's supposed to ship somebody else

14   15 of that.  What's that a reference to?

15   **A**    Yes.  That's in reference to he has to send Paul --

16   Paul Spivak 15,000 of it.

17   **Q**    Okay.

18        And that's when Mr. Church is lamenting "is not overly

19   attractive" to him?

20   **A**    Yes.  That's correct.

21   **Q**    And did you get the sense that Mr. Church had

22   separately discussed this with Mr. Spivak?

23   **A**    Yes.

24   **Q**    And from your conversation with Mr. Church, did

25   Mr. Spivak assuage him that there were better things coming?

**Direct - Jason Dean**

1    **A**    Yes.

2    **Q**    When he in fact said, "It's going to get a lot

3    better," what did you understand that to be a reference to?

4    **A**    I understood it to be in reference to the share price

5    would be going up and that we would be taking down a much

6    bigger position from him to which he could make money.

7    **Q**    And in conjunction with that, you said, "We'll have

8    the promoters step up."  What did you mean by that?

9    **A**    I meant by that that as we get the transactions moving

10   forward, we would bring in the promoters to move the stock

11   price higher.

12   **Q**    Continuing on in that March 24th, 2021, phone call

13   with Mr. Church, did you also listen to the clip at

14   Government's Exhibit 434C?

15   **A**    Yes.

16   **Q**    And was that also a true and accurate recording of

17   your conversation with Mr. Church?

18   **A**    Yes.

19            MS. MILLER:  May we please publish and play?

20            THE COURT:  You may.

21            (Audio played.)

22   BY MS. MILLER:

23   **Q**    Mr. Church references an original deal, is that right?

24   **A**    Yes.

25   **Q**    And what did you understand him to be saying?

**Direct - Jason Dean**

1    **A**    My understanding is that they put -- he put $50,000 in

2    upfront on the deal, and he was supposed to get that money

3    back before any of this moved forward quite some time

4    before.

5    **Q**    And did he?

6    **A**    Apparently not.

7    **Q**    Who was also involved in the original deal?

8    **A**    Paul Spivak.

9    **Q**    And he also said, "The original deal included" -- "The

10   original deal was Charlie and I"?

11   **A**    Yes.

12   **Q**    And so you understood Mr. Scott to be involved in the

13   original deal as well?

14   **A**    Yes.

15   **Q**    And Mr. Church described that they didn't get their

16   investment back because Mr. Spivak wanted money?

17   **A**    Yes.

18              MS. MILLER:  Could we please continue.

19              (Audio played.)

20   BY MS. MILLER:

21   **Q**    And we're in March 24th, 2021, is that right?

22   **A**    Yes.

23   **Q**    And so when Mr. Church said that he and Charlie put up

24   50 grand about two-and-a-half years ago, what would that

25   timeframe have been?

**Direct - Jason Dean**

1    **A**    That would have been late -- well, two-and-a-half

2    years before 2021 would have been 2019, late 2018.

3    **Q**    Okay.

4         And he also told you that there was an additional

5    quarter million straight from his pocket?

6    **A**    Yes.

7    **Q**    What did you understand that to be a reference to?

8    **A**    I understood that as that Paul got him to invest a

9    quarter million dollars at that -- at sometime along the way

10   previously.

11   **Q**    And was this the first that you were learning of this

12   original deal with Mr. Church and Mr. Scott and Mr. Spivak

13   in late 2018, 2019?

14   **A**    Yes.

15   **Q**    Now, moving -- or keeping I guess with 2021 then and

16   the current deal, did Mr. Church send you a similar stock

17   purchase agreement?

18   **A**    Yes.

19   **Q**    Okay.

20        And obviously you sent a blank one, and then he filled

21   it out similar to your arrangement with Mr. Scott?

22   **A**    Yes.

23             MS. MILLER:  Can we pull up Government's

24   Exhibit 183, please.  And just scrolling through this

25   exhibit so the witness can see it.

**Direct - Jason Dean**

1    BY MS. MILLER:

2    **Q**    Do you recognize this compilation of documents here?

3    **A**    Yes.

4    **Q**    And what are they?

5    **A**    It's a stock purchase agreement between Forrest Joseph

6    Church and Kane Financial, LLC.

7    **Q**    And there's also e-mail attachments kind of sending

8    those to and from each other?

9    **A**    Yes.

10              MS. MILLER:  Can we please go back to page 8.

11        And publish?

12              THE COURT:  You may.

13              MS. MILLER:  Zooming in on that bottom

14    portion, please, Ms. Wojtasik.

15    BY MS. MILLER:

16    **Q**    Now, here it's March 16th, and you appear to be

17    sending an e-mail to who?

18    **A**    It's an e-mail from me to Forrest Joseph Church.

19    **Q**    Using what e-mail?

20    **A**    Joe@alanu.com.

21    **Q**    And what are you sending to him?

22    **A**    It's the stock purchase agreement with a short message

23    from myself.

24              MS. MILLER:  And going to the top of this

25    page, please.

**Direct - Jason Dean**

1    BY MS. MILLER:

2    **Q**    What's the date here?

3    **A**    Wednesday, March 24th, 2021.

4    **Q**    And is this a response to your e-mail?

5    **A**    Yes.

6    **Q**    And there's no text, correct?

7    **A**    There is no text.

8    **Q**    But there is an attachment?

9    **A**    Yes.

10              MS. MILLER:  And turning to page 9, please.

11   BY MS. MILLER:

12   **Q**    Is this the same form stock purchase agreement that

13   you sent to Mr. Scott?

14   **A**    Yes, it is.

15   **Q**    And so who are the parties to this stock purchase

16   agreement?

17   **A**    The seller is Forrest Joseph Church, and the purchaser

18   is Kane Financial, LLC.

19   **Q**    For the same hundred thousand shares of common stock?

20   **A**    Yes.

21   **Q**    At a purchase price of 25,000?

22   **A**    Yes.

23   **Q**    So the same terms as Mr. Scott's agreement?

24   **A**    Yes, they are.

25              MS. MILLER:  Could we go to page 11, please.

**Direct - Jason Dean**

1    BY MS. MILLER:

2    **Q**    And here it's in fact signed by the seller?

3    **A**    Yes.

4    **Q**    As Joseph Church?

5    **A**    Yes.

6              MS. MILLER:  Then going to page 2, please.

7    BY MS. MILLER:

8    **Q**    Couple of days later, on March 26 --

9              MS. MILLER:  May we blow that up, please.

10   BY MS. MILLER:

11   **Q**    -- you appear to send back your own signed version to

12   Mr. Church, is that right?

13   **A**    Yes.

14   **Q**    And, again, similar to Mr. Scott, you ask for

15   Mr. Church's wire instructions?

16   **A**    Yes.

17             MS. MILLER:  Going to page 3, please.

18   BY MS. MILLER:

19   **Q**    Same purchase agreement we just saw --

20   **A**    Yes.

21   **Q**    -- for Mr. Church?

22   **A**    Yes.  Same one.

23             MS. MILLER:  Going to page 5.

24   BY MS. MILLER:

25   **Q**    And here it's also signed by the purchaser, is that

**Direct - Jason Dean**

1    correct?

2    **A**    Yes.

3    **Q**    And who signed here?

4    **A**    Bryan Kane signed for Kane Financial, LLC.

5              MS. MILLER:  Page 6, please.

6    BY MS. MILLER:

7    **Q**    This bottom e-mail, same one we just looked at,

8    correct?

9    **A**    Yes.

10   **Q**    And in the top, we're still on March 26th, is that

11   fair?

12   **A**    Yes.

13   **Q**    How does Mr. Church respond you to?

14   **A**    He says:  "Attached are wire instructions.  Joe."

15             MS. MILLER:  Page 7.

16   BY MS. MILLER:

17   **Q**    Appears that you in fact received wire instructions

18   from Mr. Church?

19   **A**    Yes.

20             MS. MILLER:  And on page 8.

21        All right.  And we can take that down.

22   BY MS. MILLER:

23   **Q**    Now, sir, did you come to learn whether or not the

24   $25,000 was transferred to both Mr. Scott and Mr. Church?

25   **A**    Yes.  I was told it was wired.

**Direct - Jason Dean**

1    **Q**    Did you have any involvement in this process?

2    **A**    No.

3    **Q**    Who controlled those wires?

4    **A**    The FBI did.

5    **Q**    Now, following the transfer of that money, did you

6    have an opportunity to meet with Mr. Spivak in person again?

7    **A**    Yes.

8    **Q**    Would that have been on or about March 30th of 2021?

9    **A**    Yes.

10              MS. MILLER:  Could we go to Government's

11   Exhibit 435A, please.

12   BY MS. MILLER:

13   **Q**    And have you had an opportunity to listen to this

14   recording?

15   **A**    Yes.

16   **Q**    And is it true and accurate, to the best of your

17   knowledge?

18   **A**    Yes.

19              MS. MILLER:  May we publish and play?

20              THE COURT:  You may.

21              (Audio played.)

22              MS. MILLER:  Can we stop there at about 53...

23   BY MS. MILLER:

24   **Q**    Who's that other voice that we hear?

25   **A**    That's Bryan Kane.

**Direct - Jason Dean**

1    **Q**    And Mr. Kane is who?

2    **A**    He's my partner at Kane Financial, LLC --

3    **Q**    And specifically --

4    **A**    -- a stock promoter.  Yeah.

5    **Q**    Is he a real person?

6    **A**    No.  He's an FBI agent.

7    **Q**    And Mr. Spivak indicates:  "I can get you all the news

8    you want."

9         What are you talking about here in this conversation?

10   **A**    He's talking about a steady flow of news releases in

11   the context that the more news he puts out and coordinates

12   that with promotional efforts to pump the stock, it helps us

13   in what we contemplated to do.

14   **Q**    He also said he didn't want to "waste that on you

15   without you guys."  What do you mean by that --

16   **A**    He didn't want to put news releases out without having

17   the promotion ready to go.  You know, kind of like a tree

18   falling in the woods, does anyone actually hear it?  He

19   wanted to time it up so that we promoted the stock at the

20   same time that he was putting out press releases.

21   **Q**    And then it would be the pumping up that you were

22   touting Mr. Kane could do?

23                   MR. DEVILLERS:  Objection.  Leading.

24                   THE COURT:  Rephrase, please.

25                   MS. MILLER:  Sure.

1    BY MS. MILLER:

2    **Q**    Were you and Mr. Kane indicating that Mr. Kane could

3    have any role in this process?

4    **A**    Yes.  The role that Mr. Kane would have would be to

5    pump up the stock and to time it with the press releases

6    that Mr. Spivak was putting out.

7    **Q**    What was your understanding of the relationship in

8    that timing?

9    **A**    The importance of the timing is -- so that Mr. Kane

10   would know when the press releases are coming out is that he

11   would spend money and send a couple million e-mails out

12   touting the press release itself to make sure that while the

13   news is hot off the press, it hit the most eyes possible,

14   and then in turn made the stock go up as much as possible.

15   **Q**    There was also a discussion about whether the

16   outstanding float was friendly, what was that discussion

17   about?

18   **A**    You know, that's going back to the nature of the

19   shareholders in -- you know, in what we discussed with

20   Mr. Spivak previously, are there toxic note holders out

21   there?  Are there people who are going to dump right into

22   the news and right into the promotion and make it harder for

23   us to move the stock up?

24   **Q**    What was the significance, if any, to your plan of a

25   friendly float?

**Direct - Jason Dean**

1    **A**     A friendly float would hold onto the stock until it

2    got to much higher prices instead of selling right away into

3    the first jump up.

4    **Q**     And in turn, does that make your job easier or harder?

5    **A**     Makes it much easier.

6              MS. MILLER:  Could we please continue.

7              (Audio played.)

8    BY MS. MILLER:

9    **Q**     Mr. Spivak's reference to "4 or 5, 6 million, ready to

10   go," what did you understand that to mean?

11   **A**     Those would be the two blocks of stock that we were

12   negotiating to purchase from Mr. Scott and from Mr. Church.

13   **Q**     And how much did you understand that Mr. Church and

14   Mr. Scott each held?

15   **A**     Approximately 3 million shares each.

16   **Q**     When Mr. Spivak indicated that all of the shareholders

17   or most of the shareholders are customers, does that factor

18   into the ease of your ability to do your work?

19   **A**     Yes.  It would mean that they believe a little more in

20   the company, they're a little more familiar with the

21   company, and they're not looking at -- most likely it's just

22   a trade, they're looking at it as a long-term hold most

23   likely.

24   **Q**     Does that make it easier or harder for you to

25   manipulate the trade?

**Direct - Jason Dean**

1    **A**    It makes it much easier.  Again, the less sellers out

2    there on the street, the easier it is to move the stock

3    price up.

4    **Q**    Mr. Spivak also referenced needing a $4 share price.

5    Did you understand that there was any reason for that

6    particular metric?

7    **A**    Yes.  To be listed on a NASDAQ exchange, which is much

8    more prestigious and well thought -- the NASDAQ was much,

9    much more prestigious than the pink sheet exchange that the

10   stock was trading on at that time.  There's certain criteria

11   that have to be met in terms of minimal number of assets,

12   minimal share price, and then revenues.  And sometimes it's

13   a combination of the three that work out to get uplisted to

14   that better exchange.

15   **Q**    Was the $4 share price one of those?

16   **A**    Yes.

17   **Q**    Did you have an opportunity to listen to another clip

18   of this same March 30th, 2021, in-person meeting with

19   Mr. Spivak?

20   **A**    Yes.

21                MS. MILLER:  Could we pull up Government's

22   Exhibit 435B.

23   BY MS. MILLER:

24   **Q**    And was this clip also a true and accurate recording

25   of your interaction with Mr. Spivak that day?

**Direct - Jason Dean**

1    **A**    Yes.

2                    MS. MILLER:  May we publish and play?

3                    THE COURT:  You may.

4                    (Audio played.)

5                    MS. MILLER:  Can we stop there for a moment at

6    36 seconds.

7    BY MS. MILLER:

8    **Q**    Now, Mr. Spivak mentioned that Mr. Scott and

9    Mr. Church were going to run a stock promo.  Do you recall

10   that?

11   **A**    Yes.

12   **Q**    What did you understand Mr. Spivak to mean by that?

13   **A**    That they were going to do the exact same thing, or a

14   similar maneuver that we were talking about doing is -- is

15   once we got stock in place --

16                   MR. DEVILLERS:  Objection.  Speculation.

17       Could we approach, Your Honor?

18                   THE COURT:  Yes.

19                   (The following discussion was had between

20                   Court and counsel at sidebar.)

21                   MR. DEVILLERS:  This has been going on for

22   awhile.  There's this speculation that somehow my client was

23   involved in -- was planning some sort of stock manipulation.

24   I mean, we went through it in -- and what they were doing in

25   the first trial.  But where is he getting this information?

1    It's completely speculative.  There's no conversation with

2    Mr. Spivak about it.  There's no conversation with my client

3    about it.  There's no conversation with Church about it.  So

4    it's just out of thin air, and it's complete speculation.

5    And it's been going on.

6                    MS. MILLER:  I am asking the witness about his

7    conversations directly with Mr. Spivak with -- what -- his

8    understanding of that based on his conversations with him,

9    his text messages with him, his understanding of the plan,

10   his understanding what he was going to do.  And I believe

11   that one of the phrases was he was "going to do exactly what

12   you guys were going to do."  So if that was the witness's

13   understanding based on his communications with Mr. Spivak as

14   to what others were going to do in his stead, I think that's

15   appropriate.

16                    THE COURT:  Yeah.  I was looking back at the

17   foundation on it.  I think the foundation was there, so I'll

18   overrule the objection going forward.

19       Let me just -- while we're here, I assume he's --

20   you're not finishing up with him today, is that --

21                    MS. MILLER:  I will not.  That's correct.

22                    THE COURT:  Just roughly -- I mean, my -- in

23   terms of getting to a breaking point, I'm thinking like

24   5-ish, 5:10-ish, 5:15, something like that.  I suggest, you

25   know, if you get to a good breaking point in that

**Direct - Jason Dean**

1    timeframe --

2                    MS. MILLER:  Sure.

3                    THE COURT:  -- we might be over here before

4    then, but --

5                    MR. DEVILLERS:  We've been at a breaking point

6    for a couple weeks, Judge.

7                    THE COURT:  You don't have to tell me that.  I

8    mean, I think they would all stipulate.

9                    (Sidebar concluded.)

10                   THE COURT:  Overruled.

11        You may proceed, counsel.

12                   MS. MILLER:  Thank you.

13   BY MS. MILLER:

14   **Q**    And, sir, do you recall the question?  And --

15   **A**    Could you rephrase or repeat the question?

16   **Q**    Yes.

17        From your conversation with Mr. Spivak, what is it --

18   your understanding that Mr. Scott and Mr. Church were going

19   to do for him?

20   **A**    That they were going to run a stock promotion and

21   promote the stock.

22   **Q**    And is that similar to what you and Mr. Spivak

23   discussed you and your associates doing?

24   **A**    It was my understanding that it was the same thing.

25   **Q**    Now, Mr. Spivak also told you that "they're going to

### Direct - Jason Dean

1    do whatever I say," is that right?

2    **A**    Yes.

3    **Q**    And what was your understanding of that?

4    **A**    My understanding is that they were going to sell us

5    the blocks of stock as Mr. Spivak directed them to do on

6    this transaction and as well on the bigger transactions

7    later.

8    **Q**    From your conversations with Mr. Spivak, did you have

9    an understanding of who controlled that stock?

10   **A**    Yes.

11   **Q**    Who was that?

12   **A**    Ultimately Mr. Spivak.

13              MS. MILLER:  Could we please continue.

14              (Audio played.)

15   BY MS. MILLER:

16   **Q**    So this reference that the stock would have gone back

17   into treasury stock, what's treasury stock?

18   **A**    That's company stock, corporate stock.

19        And, again, it's -- per the discussions earlier, if it

20   goes back into company stock, it's automatically restricted.

21   **Q**    So is the corporation or its CEO able to hold

22   free-trading stock?

23   **A**    No.

24   **Q**    From your discussions with Mr. Spivak, what did you

25   understand -- I guess, did you discuss with Mr. Spivak how

**Direct - Jason Dean**

1    he would benefit from having free-trading stock in these

2    friendly hands?

3    **A**    Yes.  Mr. Spivak indicated that by nature of the

4    freely traded stock, when the stock was promoted or the

5    volume went up, the shareholders could sell the stock, and

6    then they would be reinvesting the money with him and

7    sending him his cut of the money.

8    **Q**    Would the company have to disclose those sales of

9    stock?

10   **A**    The company would not have to disclose sales of

11   third-party shareholders.

12   **Q**    But if the company sold its own, it would have to?

13   **A**    Yes.  It would have to do it on the next filing with

14   the SEC.

15   **Q**    Following this meeting, did you continue to discuss

16   via text message your deal with Mr. Spivak?

17   **A**    Yes.

18              MS. MILLER:  Could we go to Government's

19   Exhibit 1322, page 20.

20        Now can we focus in on April 8th, the top portion?

21        And may we publish this?

22              THE COURT:  You may.

23   BY MS. MILLER:

24   **Q**    What does Mr. Spivak write to you here on April 8th?

25   **A**    He writes:  "I have a press release is being backed

1    up.  Call me."

2    **Q**    What did you understand by "press release is being

3    backed up"?

4    **A**    Mr. Spivak wanted to start putting out press as soon

5    as possible and in turn moving the stock up, and that my

6    group was slowing him down because we weren't ready to move

7    forward yet.

8    **Q**    So, fair to say you tried to push him off a little

9    when you say, "Give me a couple"?

10   **A**    Yes.

11   **Q**    How does Mr. Spivak respond?

12   **A**    He gives me a thumb-up emoji.

13   **Q**    And then he indicates what -- if we could keep

14   scrolling down, please -- on the following day?

15   **A**    On the following day --

16   **Q**    On April 9th.

17   **A**    Oh.  On April 9th, he texted me and said:  "Jason,

18   you" --

19   **Q**    I'm sorry.  The one right above that.

20   **A**    Oh.  He asks -- this one says:  "What's the plan?"

21   **Q**    And did you respond to that at all?

22   **A**    No.

23   **Q**    So you're still trying to push him off for a bit?

24   **A**    Yes.

25   **Q**    So three days later, on April 12th, what does he write

**Direct - Jason Dean**

1    to you?

2    **A**    He said:  "Jason, USLG can no longer wait for you

3    guys.  Unfortunately I have to do this with another team."

4    **Q**    What did you understand him to mean by "I have to do

5    this"?

6    **A**    Start the promotion and essentially fire us.

7    **Q**    And "with another team," did you understand whether he

8    had other folks to jump in and help?

9    **A**    Seemingly so, yes.

10   **Q**    And he was at least threatening to replace you and

11   your team?

12   **A**    Yes.

13   **Q**    After you received this text, did you have an

14   opportunity to speak with Mr. Spivak about it?

15   **A**    Yes.

16   **Q**    And was that the following day, April 13th, 2021, at

17   Government's Exhibit 437A?

18   **A**    Yes.

19   **Q**    You also had an opportunity to review that recording?

20   **A**    Yes.

21   **Q**    And it's a true and accurate recording of your

22   interaction with Mr. Spivak that day?

23   **A**    Yes, it is.

24                    MS. MILLER:  Could we please publish and play?

25                    THE COURT:  You may.

**Direct - Jason Dean**

1                      (Audio played.)

2    BY MS. MILLER:

3    **Q**     Why was Mr. Spivak upset with you at the outset of

4    this call?

5    **A**     The outset of the call, he was upset because my group

6    wasn't moving along fast enough and getting ready to start

7    the promotion and do all the things he wanted us to do.

8    **Q**     Did you explain the situation to him?

9    **A**     Yes.

10   **Q**     And what was the situation?

11   **A**     The situation was despite the fact we paid for the

12   certificates, the sellers, Mr. Scott and Mr. Church, had not

13   sent the certificates yet, so that was log-jamming the

14   process because we still had to deposit the certificates and

15   get them cleared with the brokerage firm and go through

16   those steps prior to taking the next steps.

17   **Q**     Once Mr. Spivak realized the situation, what did he

18   say he would do?

19   **A**     He said he would call those guys and get on them

20   aggressively.

21   **Q**     Why was that important?

22   **A**     It was important because Paul was very eager to get

23   this process moving.

24   **Q**     And what was the goal of that process?

25   **A**     The goal of the process was to promote the stock and

**Direct - Jason Dean**

1     drive it higher and line Paul's pockets with money.

2     **Q**     Continuing on this same date, did you have an

3     opportunity to listen to Government's Exhibit 437B?

4     **A**     Yes.

5     **Q**     Is that also a true and accurate recording of your --

6     that portion of your phone call with Mr. Spivak?

7     **A**     Yes.

8             MS. MILLER:   May we please play and publish?

9             THE COURT:   You may.

10            (Audio played.)

11    BY MS. MILLER:

12    **Q**     Why were you and Mr. Spivak agreeing not to put

13    anything in writing?

14    **A**     Because the nature of the transaction was illegal.

15    **Q**     Mr. Spivak also references a log-jam of press

16    releases.   What's your understanding of why he was holding

17    onto those as opposed to just sending them out when they

18    became available?

19    **A**     He was holding press releases back so that we could

20    time it up with our e-mail campaigns and our blasts to the

21    market of the press releases so that we could get more

22    buyers into it.   If he put the press releases out without

23    our help, the audience that would read them would be much

24    smaller, and the results would be much less in terms of the

25    impact on the stock.

**Direct - Jason Dean**

1    **Q**    And so that was part of your agreement and your plan?

2    **A**    Yes.

3                MS. MILLER:  Government's Exhibit 437C,

4    continuing on this same date.

5    BY MS. MILLER:

6    **Q**    Did you also have an opportunity to review this clip?

7    **A**    Yes.

8    **Q**    And is it a true and accurate recording of this

9    portion of your conversation -- well, jumping actually --

10   we'll skip that.

11        Following Mr. Spivak, did you have an opportunity to

12   speak with Mr. Scott then?

13   **A**    Yes.

14   **Q**    And it was also on that same date?

15   **A**    Yes.

16   **Q**    And on that date, were you reaching out to Mr. Scott

17   as a result of your previous conversation with Mr. Spivak?

18   **A**    Yes.

19   **Q**    And specifically what portion?  Like why were you

20   reaching out to him?

21   **A**    To make sure we got the stock issued properly.

22   **Q**    Mr. Spivak was again in a sense of urgency about the

23   situation?

24   **A**    Yes.  Extreme urgency.

25   **Q**    And did you also record your interaction with

**Direct - Jason Dean**

1    Mr. Scott on this phone call?

2    **A**    Yes.

3    **Q**    And so now pulling up Government's Exhibit 437C, did

4    you review that for its truth and accuracy in terms of your

5    interaction with Mr. Scott?

6    **A**    Yes.

7    **Q**    And is it truthful and accurate, to the best of your

8    knowledge?

9    **A**    Yes, it is.

10                   MS. MILLER:  May we publish and play?

11                   MR. DEVILLERS:  No objection.

12                   THE COURT:  You may.

13                   (Audio played.)

14                   MS. MILLER:  And stopping at 19 seconds again.

15    BY MS. MILLER:

16    **Q**    So you're talking about speeding up the whole process.

17    What's the process you're referencing?

18    **A**    We're referencing the process of purchasing the stock,

19    clearing the stock, and starting the promotion.

20                   MS. MILLER:  Please continue.

21                   (Audio played.)

22                   MS. MILLER:  Let's stop there at 1:05, please.

23    BY MS. MILLER:

24    **Q**    Now, Mr. Scott referenced some confusion.  What did

25    you understand him to be confused about?

**Direct - Jason Dean**

1    **A**    He was confused about the actual delivery of the

2    shares.  What he was asking me for in this conversation was

3    our brokerage accounts, DWAC information.  DWAC is like a

4    money wire, except it's with stock where they electronically

5    transfer it from the transfer agent into the actual

6    brokerage account, which would be Kane Financial or

7    Arrowwood Securities.

8    **Q**    Other than the methodology, did Mr. Scott express

9    confusion over why you were calling or what you were asking

10   about?

11   **A**    No.  Just the delivery.

12                    MS. MILLER:  Please continue.

13                    (Audio played.)

14   BY MS. MILLER:

15   **Q**    Mr. Scott told you that Mr. Spivak told him that you

16   were thinking about taking it all out?

17   **A**    Yes.

18   **Q**    What did you understand "taking it all out" to refer

19   to?

20   **A**    That's referring back to the 3 million shares he held

21   of buying the whole lump of them.

22   **Q**    And were you on that call with Mr. Scott and

23   Mr. Spivak?

24   **A**    No.

25   **Q**    So you understand that Mr. Scott and Mr. Spivak spoke

**Direct - Jason Dean**

1    separately again?

2    **A**    Yes.

3    **Q**    Continuing in your conversation with Mr. Scott, did

4    you have an opportunity to review Government's Exhibit 437D,

5    also on April 13th, 2021?

6    **A**    Yes.

7    **Q**    And is that a true and accurate recording of your --

8    portion of your conversation with Mr. Scott?

9    **A**    Yes.

10                    MS. MILLER:  May we publish and play, please?

11                    MR. DEVILLERS:  No objection.

12                    THE COURT:  You may.

13                    (Audio played.)

14                    MS. MILLER:  And stopping there at 12 seconds.

15    BY MS. MILLER:

16    **Q**    In the last call, did you get disconnected from

17    Mr. Scott?

18    **A**    Yes.  I believe so.

19    **Q**    Okay.

20            And so did you -- one or the other of you call each

21    other back?

22    **A**    It appeared he called me back, yes.

23    **Q**    Okay.

24            And what does Mr. Scott indicate was the reason that

25    you were disconnected in your previous call?

**Direct - Jason Dean**

1    **A**     He took a call from Paul Spivak.

2             MS. MILLER:  Please continue.

3             (Audio played.)

4    BY MS. MILLER:

5    **Q**     Mr. Dean, when you offered Mr. Scott a similar type of

6    transaction, what type of transaction were you offering?

7    **A**     We were offering to invest a large amount of money in

8    his company and promote his stock.

9    **Q**     In a legitimate or illegitimate way?

10   **A**     In an illegitimate way.

11            MR. DEVILLERS:  Objection, Your Honor.

12            THE COURT:  Overruled.

13   BY MS. MILLER:

14   **Q**     Couple of days later, on April 16th, did you follow up

15   with Mr. Spivak about how things were going with Mr. Church

16   and Mr. Scott?

17   **A**     Yes.

18            MS. MILLER:  May we turn to Government's

19   Exhibit 439B, please.

20   BY MS. MILLER:

21   **Q**     And did you also have an opportunity to review the

22   recorded portion of this phone call?

23   **A**     Yes.

24   **Q**     And is it a true and accurate recording of your

25   interaction with Mr. Spivak?

**Direct - Jason Dean**

1   **A**     Yes.

2                    MS. MILLER:  May we please publish and play?

3                    THE COURT:  You may.

4                    (Audio played.)

5   BY MS. MILLER:

6   **Q**     What's the whole thing going on here with this Max

7   person?

8   **A**     That's referring back to the note holder -- the one

9   remaining note holder that had a convertible note named Max

10  Hoerr.

11  **Q**     What did Mr. Spivak want you to do in connection with

12  Mr. Hoerr?

13  **A**     He still wanted us to buy out his note, which I

14  believe was $50,000.

15  **Q**     And Mr. Spivak indicates he's still holding onto his

16  press releases until his partners are on the same page?

17  **A**     Yes.

18  **Q**     Continuing in this April 16th, 2021, phone call, did

19  you have an opportunity to listen to Government's

20  Exhibit 439C?

21  **A**     Yes.

22  **Q**     And that's also a true and accurate clip of your

23  recorded interaction with Mr. Spivak?

24  **A**     Yes.

25                   MS. MILLER:  Could we please publish and play?

**Direct - Jason Dean**

1            THE COURT:  You may.

2            (Audio played.)

3    BY MS. MILLER:

4    **Q**    Now, when Mr. Spivak is discussing that he cannot be a

5    part of the free-trading stock, what did you understand that

6    discussion to be about?

7    **A**    I understood it specifically to be that he can't have

8    the appearance that he's involved in it, that he -- he can't

9    be involved in the actual documentation of it, that he has

10   to kind of hide what he's doing in this transaction.

11   **Q**    And that was something that you had also discussed

12   with him, not putting parts of this deal in writing,

13   correct?

14   **A**    Yes.  Previously, yes.

15   **Q**    Now, Mr. Spivak indicated that the stock would lose

16   all of its value if it was restricted?

17   **A**    Yes.

18   **Q**    Does restricted stock have some value?

19   **A**    It does.

20   **Q**    Would it have any value to you in the sense of what

21   you were trying to accomplish with your colleagues?

22   **A**    Not in this sense because we were trying to deposit

23   the stock and promote it, which -- the discussion with Paul,

24   and if we bought stock that was restricted for six months,

25   it would have nothing to do with what we're doing in this --

1    in the immediate term.

2    **Q**    And so your focus was on the free-trading stock and

3    being able to market the free-trading stock?

4    **A**    Yes.

5    **Q**    On this same day, did you have an opportunity to speak

6    with Mr. Scott as well?

7    **A**    Yes.

8    **Q**    Was that also a recorded conversation?

9    **A**    Yes, it was.

10   **Q**    And you heard a portion of that at Government's

11   Exhibit 439D, that you've had an opportunity to review?

12   **A**    Yes.

13   **Q**    And it's also true and accurate, to the best of your

14   knowledge?

15   **A**    Yes, it is.

16                    MS. MILLER:  May we publish and play, please?

17                    THE COURT:  You may.

18                    (Audio played.)

19   BY MS. MILLER:

20   **Q**    Now, what is this conversation in reference to with

21   Mr. Scott?

22   **A**    At this point the discussion with Mr. Scott shifted

23   from USLG stock into Paul Spivak transactions with the big 3

24   million share blocks, and it shifted to bringing us in and

25   getting involved in his publicly traded company, which is a

**Direct - Jason Dean**

1   different symbol, SOLI.

2   **Q**   When you're talking about Ks and Qs, what are those

3   references to?

4   **A**   The 10K is the annual financial numbers that are filed

5   with the SEC, and the 10Qs are the quarterly.  So each

6   quarter -- the three quarters a year you have to file the

7   10Q, and then at the end of your fiscal year you have to

8   file a 10K, which is the annual numbers, with the SEC.

9   **Q**   And Mr. Scott told you that "you guys might want to

10  get in before the herd."  What specifically was that a

11  reference to, as you understood it?

12  **A**   It's a reference that he -- that we might want to get

13  in first before everybody else and get a better price.

14  **Q**   Now, turning your attention to about a week later, did

15  you have any --

16          MR. DEVILLERS:  Objection, Your Honor.

17      May we approach?

18              (The following discussion was had between

19              Court and counsel at sidebar.)

20          MR. DEVILLERS:  439 is about a half-hour

21  conversation regarding CareClix and -- everything about it,

22  and this is -- this is completely misleading.  If you were

23  to look at and play the rest of those tape, before and

24  after, you would see that it has nothing to do with any sort

25  of fraud, it has nothing to do with any sort of marketing

1    inflation, it has nothing to do with any sort of marketing.

2    It's trying to get him to buy into this stock.  There's

3    other people on this conversation, and they're -- in the

4    rule of completeness, this is completely misleading.

5              MS. MILLER:  We don't disagree that this is

6    about CareClix or SOLI as the witness knows it.  He talked

7    about that the conversation has turned toward that.  He's

8    also going to talk about what those conversations were.

9    It's not a Rule 106 completeness for him to be able to sit

10   in here and talk about, oh, how great his company is.  None

11   of that is relevant.  They don't have a hearsay exception to

12   get that in.  It's not...

13        And moreover, and more importantly, there's been

14   nothing misleading about what he's testifying to.  He's

15   simply talking about how he's going to use -- in this -- I

16   mean, I literally asked him, "What's this conversation in

17   reference to?"

18        He said, "It's about another stock ticker."

19        I said, "What's Ks and Qs?"

20        He said, "Those are SEC filings."  I don't think

21   there's any dispute about that.  And he talks about getting

22   in before the herd.

23        And I said, "What did you understand that to mean?"

24        He said, "Your guys would want to get involved in this

25   company and make money beforehand."

1          I think from Mr. DeVillers' opening statement, there's

2     no dispute that they were going to work together, it's just

3     a matter of what they were going to do when they worked

4     together.  So I don't think this has opened the door to any

5     type of rule of completeness argument.

6                    MR. DEVILLERS:  Your Honor, just "getting in

7     before the herd" is a pump and dump, that's what they want

8     them to believe, and this is clearly not that.

9                    THE COURT:  Bear with me one second.  Excuse

10    me.

11                    (Pause in proceedings.)

12                    THE COURT:  Sorry.  I just needed to confirm

13    one thing.

14         I think you're free to go into it.  I do think under

15    the rule of completeness, which was fairly recently amended,

16    Mr. DeVillers is entitled to put all of this in over a

17    hearsay objection.  So that's my ruling.

18                    MR. DEVILLERS:  Your Honor, I know there's two

19    ways to do it.  I could do it on cross, or we can insist

20    that she does it.  And I don't care which, but --

21                    THE COURT:  I don't much care which either.  I

22    think -- I mean, pick your poison.  I mean -- pick your

23    poison.

24                    MS. MILLER:  I guess I'm just -- I'm confused

25    on the ruling just in that -- this is part and parcel of

1    what was charged in the indictment, they're his --

2              THE COURT:  Yeah.  106 says:  "If a party

3    introduces all or part of a statement, an adverse party may

4    require the introduction, at that time, of any other part --

5    or any other statement -- that in fairness ought to be

6    considered at the same time.  The adverse party may do so

7    over a hearsay objection."

8              MS. MILLER:  And I believe --

9              THE COURT:  So I don't think the hearsay

10   argument you're making has any merit under Rule 106.

11             MS. MILLER:  I certainly understand.  But,

12   Your Honor, I don't think they've made a showing that the

13   entirety of the recording would satisfy the rule of

14   completeness.  If they want to identify --

15             THE COURT:  I'm not sure if -- so I would say

16   two things.  One, I don't know that Mr. DeVillers is asking

17   for the entirety of any 49-minute recording.  Maybe you are,

18   but I'm not there yet, but -- I mean, I think certainly some

19   portions -- it sounds like beyond what you're prepared to go

20   into certainly come in.

21        Now, I think a formal application of Rule 106 would

22   say it should all come in now.  As a matter of advocacy, if

23   I were in your shoes, I'd probably put them in all now so

24   that you don't set him up in cross.  But if it's easier for

25   you to have Mr. DeVillers do it on cross, then so be it.

1           MR. MORRISON:  Because it's 4:54 and --

2           MS. MILLER:  We don't actually have them teed

3    up.  We can --

4           THE COURT:  Okay.  So what I'm going to do --

5    so this is probably the place to break --

6           MS. MILLER:  Yeah.

7           THE COURT:  -- to deal with --

8           MS. MILLER:  Yeah.

9           THE COURT:  That is a fair point.  So why

10   don't we deal with that, and I'll send them home and we'll

11   pick up here in the morning and figure out tonight what to

12   do.

13          MS. MILLER:  Okay.

14          THE COURT:  All right.  Thank you.

15          (Sidebar concluded.)

16          THE COURT:  Ladies and gentlemen, we have one

17   technological issue we need to deal with.  We're not going

18   to do that in the next few minutes.  And in light of the

19   fact that it's now five minutes of 5, we will stand in

20   recess tonight and resume tomorrow morning.  Usual time,

21   usual instructions.  Please arrive by 8:15 tomorrow morning

22   here on the 16th floor.  As soon as you are all assembled,

23   we will begin the proceedings promptly.

24       Again, tonight, do not discuss the case with anyone

25   including with one another; do not allow anyone to discuss

1    it with you; do not do any outside research.

2         And we will stand in recess until tomorrow morning.

3    Thank you very much.

4                   (The following proceedings were had out of the

5                   presence of the jury.)

6              THE COURT:  You may step down.

7         So in terms of planning ahead for tomorrow, I'll be an

8    optimist and assume we're getting Mr. Dean off the stand.

9              MS. MILLER:  Oh.  Yes.

10             THE COURT:  I think that's probably as much on

11   Mr. DeVillers as you; I'm not putting all the weight on this

12   side of the courtroom.

13        After that, in terms of my preparation and the like,

14   who are our next witnesses?

15             MR. MORRISON:  There is a chance that we would

16   call Mr. Bianchi, but I think it's unlikely.  So I think

17   it's very likely that we would first call Mr. Church and

18   then Special Agent Fry.  And then it's very possible that

19   will be it.

20             THE COURT:  Okay.

21        That probably takes us through the end of tomorrow, I

22   would imagine.

23             MR. MORRISON:  Yes, I think definitely.

24             MR. DEVILLERS:  We have a witness flying in

25   tomorrow and will be ready to go early -- first thing Friday

1    morning.

2              THE COURT:  And, again, just so we're clear

3    and it wasn't lost, we are prepared to have a normal day on

4    Friday with our jury, so I think we're moving along at a

5    good clip.

6         Any other matters we should discuss before we stand in

7    recess for the evening?

8              MR. MORRISON:  No.  I think we'll try and work

9    this out.  I just normally -- if we can hash it out in

10   advance, that's better for the reasons you discussed among

11   others, and we'll turn to that right now.

12        One thing I wanted to put on the Court's radar that we

13   noticed in the jury instructions as we were kind of

14   pondering notes and verdicts was that the -- we changed the

15   elements of wire fraud to remove the reference to "in

16   connection with this purchase and sale of securities," but

17   then I think the verdict forms -- again, our fault, our

18   proposed forms -- still had that language.

19        So I just wanted to preview for the Court that we'll

20   be asking for that to be changed in these verdict forms.

21             THE COURT:  In terms of -- let me ask maybe a

22   best-case scenario and a worst-case scenario.  I have

23   assumed until this very moment that I have the weekend with

24   the instructions, but you can tell me that we might be

25   charging the jury on Friday night.  My guess is that's

183

1    optimistic, but you all tell me.  You know better.

2                MR. MORRISON:  That sounds optimistic to me.

3        Mr. DeVillers said they have a witness.  I had

4    understood they had a few witnesses potentially to include

5    the defendant himself, and so I guess it depends on numbers

6    potentially.

7                MR. DEVILLERS:  Yeah.  It would be two, Your

8    Honor, including Mr. Scott, if that's what we intend to do.

9                THE COURT:  Okay.

10       So in a scenario where it's one -- again, I'm trying

11   to plan both eventualities -- it sounds like the worst-case

12   scenario is we send the jury home early on a Friday, I get

13   my weekend to work, which, you know, I --

14               MR. MORRISON:  Been coveting, it seems.

15               THE COURT:  Exactly.  And I don't know

16   anything else, so that will be good.

17               MR. DEVILLERS:  I'm guessing the jury

18   instructions won't be too controversial based on the last

19   trial, so I know it will be different, but...

20               THE COURT:  I think a little bit different.  I

21   mean, I can -- you referenced one issue.  There's the

22   instruction about the audio recordings; the audio is what

23   controls, not the accompanying text.  I think other than

24   that, it's probably going to be fairly straightforward, but

25   it will still take a little time just to make sure we get it

1      all right.

2                    MR. MORRISON:  Agreed.

3                    MR. DEVILLERS:  Agreed.

4                    THE COURT:  Well, thanks, everyone.  I'll see

5      you in the morning.

6                      (Court adjourned at 5:00 p.m.)

7

8                    **C E R T I F I C A T E**

9          I certify that the foregoing is a correct transcript

10     of the record of proceedings in the above-entitled matter

11     prepared from my stenotype notes.

12                    */s/ Gregory S. Mizanin          April 10, 2025*
                     GREGORY S. MIZANIN, RDR, CRR              DATE
13

14

15

16

17

18

19

20

21

22

23

24

25